Jon M. Sands
Federal Public Defender
Therese Michelle Day (Georgia Bar No. 213810)
David Christensen (Utah Bar No. 13506)
Assistant Federal Public Defenders
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
(602) 382-2816(voice)
(602) 889-3960(facsimile)
therese_day@fd.org
david_christensen@fd.org

*Attorneys for Petitioner Taberon Honie*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| TABERON DAVE HONIE,<br><br>Petitioner,<br><br>v.<br><br>SCOTT CROWTHER, Warden of the Utah State Prison,<br><br>Respondent. | Case No. 2:07-MC-628 CW-PMW<br><br>**Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254**<br><br>**Death Penalty Case** |

**Petition for Writ of Habeas Corpus**
**Pursuant to 28 U.S.C. § 2254**

# Table of Contents

I.     Introduction ................................................................................ 1

    A.  The AEDPA Suspends the Writ of Habeas Corpus ........................ 10

    B.  The AEDPA Violates the Separation of Powers Doctrine................ 11

    C.  Conclusion ..................................................................................... 12

II.    Procedural History ....................................................................... 13

    A.  Overview of the Case ..................................................................... 13

    B.  Summary of the Evidence Presented in State Court ...................... 15

        1.  Trial Evidence at the Merits Phase ...................................... 16

        2.  Mr. Honie Waived a Jury at the Penalty Phase...................... 31

        3.  Trial Evidence at the Penalty Phase ..................................... 32

            a.  The State's Case at the Penalty Phase ....................... 32

            b.  The Defense's Case at the Penalty Phase ................... 33

            c.  The State's Rebuttal at the Penalty Phase................... 47

            d.  The Court's Order and Findings .................................. 48

    C.  Direct Appeal Proceedings............................................................ 48

    D.  Post-Conviction Proceedings ........................................................ 51

III.    Introduction to Taberon Honie's Background ................................ 65

IV.    Claims for Relief ......................................................................... 71

Claim One ............................................................................................ 71

    I.   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CONDUCT A REASONABLE INVESTIGATION INTO A VIABLE TRIAL DEFENSE OF VOLUNTARY INTOXICATION PRIOR TO CONCEDING MR. HONIE'S GUILT TO AGGRAVATED MURDER .......... 71

    A.  Exhaustion .................................................................................... 72

    B.  There was significant evidence that Mr. Honie was extremely intoxicated at the time of the crime..................................................................... 72

    C.  Trial counsel was ineffective for failing to investigate a viable trial defense of voluntary intoxication prior to deciding to concede Mr. Honie's guilt to aggravated murder................................................. 79

Claim Two ......................................................................................................... 92

I.  TRIAL COUNSEL WAS INEFFECTIVE FOR INTRODUCING MR. HONIE'S INCULPATORY STATEMENTS AT TRIAL DESPITE ACKNOWLEDGING THEY WERE INVOLUNTARILY GIVEN, AND DESPITE THE STATE'S WILLINGNESS TO STIPULATE TO THEIR INADMISSIBILITY ........................................................................... 92

A.  Exhaustion ........................................................................................ 93

B.  Trial counsel failed to challenge the introduction of Mr. Honie's custodial statements despite recognizing that they were involuntarily given. ................................................................................................. 94

C.  Trial counsel failed to investigate the facts and circumstances of the crime and Mr. Honie's arrest prior to deciding to introduce his inculpatory statements at trial. ........................................................... 97

D.  Trial counsel was ineffective for failing investigate the facts and circumstances of the crime prior to deciding to introduce Mr. Honie's version of the events at trial, and for introducing Mr. Honie's inculpatory statements when he recognized they were involuntarily made. ....................... 100

Claim Three ...................................................................................................... 110

I.  TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PROPERLY ADVISE MR. HONIE OF HIS RIGHT TO HAVE A JURY DETERMINE HIS PENALTY, RESULTING IN A JURY WAIVER THAT WAS NOT KNOWINGLY AND VOLUNTARILY GIVEN ............ 110

A.  Exhaustion ...................................................................................... 112

B.  Trial counsel encouraged Mr. Honie to waive a jury at sentencing so that the trial would go more quickly. .................................................... 112

C.  Trial counsel failed to adequately advise Mr. Honie of his right to jury determination of his sentence. ......................................................... 117

D.  Trial counsel's reasons for recommending Mr. Honie to waive a jury and proceed to sentencing with the judge were objectively unreasonable. ........... 121

E.  Mr. Honie was prejudiced by trial counsel's deficient performance .............. 123

Claim Four ....................................................................................................... 125

I.  TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE EVIDENCE OF AGGRAVATED SEXUAL ABUSE OF A CHILD, WHICH THE STATE INTENDED TO INTRODUCE AS AN AGGRAVATING CIRCUMSTANCE IN SUPPORT OF THE DEATH PENALTY, AND FOR INTRODUCING THIS EVIDENCE DURING

THE PENALTY PHASE DESPITE THE FACT THAT THE JURY DID NOT FIND IT AS AN AGGRAVATING CIRCUMSTANCE DURING THE MERITS PHASE ..................................................................... 125

A.  Exhaustion ....................................................................................... 126

B.  Trial counsel failed to investigate potentially exculpatory evidence that implicated someone else in the sexual molestation of D.R. .............................. 126

C.  Trial counsel was responsible for the introduction of evidence of aggravated sexual abuse of a child during the penalty phase, despite the existence of evidence that someone else was responsible for molesting D.R. ...................................................................................................... 127

D.  Trial counsel was ineffective for failing to investigate D.R.'s statement that her father, and not Mr. Honie, was responsible for molesting her ............ 130

E.  Trial counsel was ineffective for failing to consult with Mr. Honie about this allegation before admitting his alleged statement during the penalty phase. .......................................................................................................... 132

F.  Trial counsel's deficient performance prejudiced Mr. Honie because the trial court relied on the evidence of aggravated sexual molestation of a child in its calculus to impose the death penalty. ............................................. 135

G.  The state court's decision was an unreasonable application of clearly established federal law. ........................................................................... 136

Claim Five .................................................................................................. 138

I.  TRIAL COUNSEL FAILED TO CONDUCT A REASONABLE MITIGATION INVESTIGATION .................................................... 138

A.  Exhaustion ....................................................................................... 139

B.  Mr. Honie raised a colorable claim of ineffective assistance of counsel for failing to conduct an adequate mitigation investigation during his post-conviction proceedings. ................................................................. 139

C.  The state district court refused to provide Mr. Honie with funding to develop his mitigation claims despite finding that Mr. Honie had raised a genuine issue of material fact with regard to "whether trial counsel's less-than-complete investigation was reasonable and, therefore, whether he failed to comply with prevailing norms of professional practice in conducting his mitigation workup." (PCR ROA 1037-1038) ........................ 145

D.  Mr. McCaughey's performance fell below reasonable professional norms. .................................................................................................... 150

iv

E.   Mr. McCaughey unreasonably relinquished his duty to investigate mitigation to people who were not qualified to perform a thorough mitigation investigation and who did not understand their role as being responsible for the mitigation investigation. .................................................... 155

F.   The mitigation investigation that was performed in Mr. Honie's case was unreasonably limited and prejudiced Mr. Honie. .............................................. 159

G.   Mr. Honie was prejudiced by Mr. McCaughey's deficient mitigation investigation, which failed to uncover substantial evidence of the facts and circumstances of Mr. Honie's background and his mental issues, including frontal lobe brain damage................................................................ 168

Claim Six ........................................................................................................................ 201

I.   THE TRIAL COURT'S FINDINGS OF FACT AND DETERMINATIONS OF LAW REGARDING THE AGGRAVATING AND MITIGATING CIRCUMSTANCES DID NOT COMPLY WITH DUE PROCESS OR THE NEED FOR AN INDIVIDUALIZED SENTENCING PROCEDURE WHICH GIVES FULL EFFECT TO ALL OF THE EVIDENCE PRESENTED AT TRIAL ............................................... 201

A.   Non-statutory aggravating factors ................................................................. 205

B.   Mitigating factors ........................................................................................... 209

C.   Conclusion ...................................................................................................... 212

Claim Seven .................................................................................................................... 213

I.   MR. HONIE'S DEATH SENTENCE WAS THE PRODUCT OF PROSECUTORIAL RACIAL DISCRIMINATION .......................................... 213

Claim Eight ..................................................................................................................... 216

I.   TRIAL COUNSEL DID NOT OBJECT TO THE ADMISSION OF HIGHLY PREJUDICIAL PHOTOGRAPHS HAVING LITTLE OR NO PROBATIVE VALUE. ..................................................................................... 216

A.   Repeated use of several photographs of the deceased victim was redundant of the testimony of the medical examiner and law enforcement officers at the scene. ......................................................................................... 218

B.   The photographs of Mr. Honie had no evidentiary value at all. ..................... 220

C.   Photographs of children at the scene were excessively cumulative and prejudicial. ....................................................................................................... 221

D.   Conclusion ...................................................................................................... 222

Claim Nine..................................................................................................224

    I.   TRIAL COUNSEL FAILED TO OBJECT TO THE STATE'S USE OF PREJUDICIAL VICTIM IMPACT EVIDENCE WHICH WAS INCORPORATED INTO THE FINDINGS OF FACT SUPPORTING MR. HONIE'S DEATH SENTENCE ...............................................224

Claim Ten ...................................................................................................231

    I.   MR. HONIE'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO STIPULATE TO THE ADMISSION OF MR. HONIE'S CRIMINAL HISTORY OR TO OBJECT TO THE PREJUDICAL AND CUMULATIVE EVDIENCE OF THAT HISTORY .........................................231

Claim Eleven ..............................................................................................234

    I.   THE INEFFECTIVE ASSISTANCE OF MR. HONIE'S APPELLATE COUNSEL ..........................................................................................234

        A.   The ineffective assistance of trial and appellate counsel resulted in the state court applying the lowest standard of review to Mr. Honie's direct appeal issues. ..............................................................236

        B.   Improper briefing by appellate counsel resulted in issues not being determined on appeal at all. ...................................................238

Claim Twelve ..............................................................................................242

    I.   THE UTAH AGGRAVATED MURDER STATUTE FAILS TO NARROW THE CLASS OF ELIGIBILITY FOR THE DEATH PENALTY, RESULTING IN SENTENCES THAT ARE ARBITRARY AND ARE IN VIOLATION OF DUE PROCESS AND EQUAL PROTECTION ....................................................................................242

Claim Thirteen............................................................................................250

    I.   MR. HONIE'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN HIS CASE. ..............................................................250

Claim Fourteen ...........................................................................................252

    I.   THE DEATH PENALTY IS UNCONSTITUTIONAL BECAUSE IT IS CRUEL AND UNSUAL PUNISHMENT ....................................252

V.    PRAYER FOR RELIEF....................................................................254

VI.   VERIFICATION OF PETITION.........................................................256

VII.  CERTIFICATE OF ELECTRONIC FILING AND SERVICE .........................257

## I.       INTRODUCTION

Petitioner Taberon Dave Honie, through counsel, hereby brings this Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, and the Local Rules for the United States District Court for the District of Utah, challenging his conviction and death sentence, as being in violation of his rights under the United States Constitution.  Mr. Honie submits that the State of Utah has violated and arbitrarily refused to correct violations of his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, thereby resulting in his unconstitutional conviction and sentence of death.

Mr. Honie is in the custody of the Utah Department of Corrections ("UDOC"), pursuant to a sentence of death for his 1999 conviction for the aggravated murder of Claudia Benn.  Mr. Honie presents the following claims concerning the unconstitutionality of his conviction and sentence and asks that this Court afford him all the protections guaranteed by the United States Constitution, the federal habeas corpus statutes, the Rules Governing Section 2254 Cases in the United States District Courts, and all other pertinent statutes, court rules, and legal precedent.  Mr. Honie also seeks an Order from this Court granting his petition for federal habeas corpus relief.

As set forth in this Petition, the adjudications of Mr. Honie's federal claims in the state courts resulted in decisions that were contrary to, and involved unreasonable applications of, clearly-established federal laws as determined by the Supreme Court of the United States, and/or resulted in decisions that were based on an unreasonable

1

application of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Each claim presented herein incorporates all of the factual allegations and background facts set forth in this Petition.  All of the claims for relief and references to federal constitutional violations are expressly intended to, and by this reference do, allege violations of Mr. Honie's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and their individual clauses and sections.

The United States Constitution enshrines the privilege, through the writ of habeas corpus, to seek the aid of the federal courts whenever a person is held in jail or prison in violation of the Constitution.  U.S. Const. art. I, § 9.  Congress expressly provides that those wrongly held in state custody may resort to the writ of habeas corpus to secure their release.  28 U.S.C. § 2254.

The Fifth Amendment, in pertinent part, provides that, "No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Similarly, the Fourteenth Amendment provides, in pertinent part, that, "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1.  Together, these amendments guarantee every defendant due process as the government seeks to convict and sentence him and to restrain his liberty.

The Sixth Amendment, in pertinent part, provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ,

and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Inherent in this amendment is the guarantee of effective representation as the government seeks to convict and sentence the accused and uphold the conviction and sentence on appellate and post-conviction review. The Eighth Amendment, in pertinent part, provides that every citizen shall enjoy protection from having "cruel and unusual punishments inflicted." U.S. Const. amend. VIII. Inherent in this amendment is the right to a reliable, individualized sentencing.

These constitutional amendments cumulatively provide that every individual has the right to be free from restraint of liberty unless the government seeks to take away that individual's liberty through procedures that are fair, that provide effective representation, and that do not result in unreliable and arbitrary sentencing decisions. Where, as in Mr. Honie's case, the procedures used to convict and sentence were unfair, when unconstitutionally prejudicial evidence was admitted, where counsel provided constitutionally deficient representation, and where the ultimate sentence handed down was neither individualized nor reliable, the results can only be deemed a miscarriage of justice. At its core, the writ of habeas corpus is the primary, and in many cases the only, recourse to redress such miscarriages of justice.

## Incorporation and Judicial Notice

Mr. Honie incorporates by reference all briefs, petitions, informal responses and replies, exhibits and all other pertinent matter from his prior proceedings: *State of Utah v. Taberon Dave Honie*, Fifth Judicial District Court, Criminal Case No. 981500662; *State of Utah v. Taberone* [sic] *Dave Honie*, Utah Supreme Court, Case No. 990497; *Taberone* [sic] *Dave Honie v. State of Utah*, Fifth Judicial District Court, Case No. 030500157; *Taberone* [sic] *Dave Honie v. State of Utah*, Utah Supreme Court, Case No. 20100363; *Taberone* [sic] *Dave Honie v. State of Utah*, Utah Supreme Court, Case No. 20120220 (later incorporated with Case No. 20110620); *Taberone* [sic] *Dave Honie v. State of Utah*, Utah Supreme Court, Case No. 20110620; as well as the following opinions: *State v. Honie*, 57 P.3d 977 (Utah 2002); *Honie v. State*, 342 P.3d 182 (Utah 2014); and *Honie v. State*, 2014 Utah Lexis 233 (unpublished) (rehearing denied without opinion).

Mr. Honie requests that this Court take judicial notice of the certified record in each of the cases cited above.

Mr. Honie incorporates the factual allegations contained within an individual claim into each and every other claim in this Petition.

## State Court Presumption of Correctness

Mr. Honie hereby provides notice of his intention to challenge the presumption of correctness of certain findings of fact made by the state courts in his case.  Certain findings of fact by the state court in Mr. Honie's case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1).  These include,

but are not limited to, factual findings made by the trial court and state post-conviction court, and the opinions of the Utah Supreme Court on direct appeal, and on appeal from the grant of summary judgment and the denial of Rule 60(b) relief.  Pursuant to 28 U.S.C. § 2254(e)(1), Mr. Honie intends to assert that certain findings of fact by the state court at trial or on direct appeal, if any are found to exist, are not fairly supported by the record. Mr. Honie also intends to assert other exceptions to the presumption of correctness, including, but not limited to: that the procedures employed by the state courts in making findings of facts were not adequate to afford him full and fair hearings; that material facts were not adequately developed at the state court hearings; that Mr. Honie did not receive full, fair and adequate hearings in state court; and that Mr. Honie was otherwise denied due process of law in the state court proceedings.

## Exhaustion

Mr. Honie has raised allegations of constitutional violations in his state court pleadings and briefs and associated filings, hearings and/or arguments.  The burden is on Respondent to demonstrate that Mr. Honie has failed to exhaust particular claims.  *See Brown v. Maass*, 11 F.3d 914 (9th Cir. 1993); *see also Hooks v. Ward*, 184 F.3d 1206, 1216-17 (10th Cir. 1999).  To the extent that any of his claims are deemed to be unexhausted, untimely, or procedurally or otherwise barred, Mr. Honie submits that it is as a result of: (1) ineffective assistance of state trial, appellate, and/or post-conviction counsel; (2) inadequate state court funding for state proceedings; (3) the state court's refusal to grant adequate time and/or funds and/or procedures for Mr. Honie to plead and

develop his claims; and/or (4) the State's actions, inactions, failures to disclose, active concealment of evidence and/or actual or threatened interference in Mr. Honie's case or the case of any other capital defendant.  Mr. Honie submits that any of these reasons excuse any non-exhaustion under 28 U.S.C. § 2254(b)(1)(B)(i) and/or (ii).

In death penalty cases, the Utah Supreme Court has recognized that it possesses "the prerogative to correct *sua sponte* manifest and prejudicial errors not objected to at trial or assigned on appeal."  *State v. Lafferty*, 20 P.3d 342, 370 (Utah 2001) (citing *State v. Tillman*, 750 P.2d 546, 552 (Utah 1987)).  The Utah Supreme Court has bypassed or excused, and continues to bypass or excuse, on a case-by-case basis, state rules regarding default and/or waiver to address errors presented in capital cases in the interest of justice.  *See Gardner v. Galetka*, 151 P.3d 968, 972-73 (Utah 2007) (holding that a post-conviction claim can be procedurally barred yet receive substantive review under independent "good cause" common law exceptions); *see also Tillman v. State*, 128 P.3d 1123, 1130  (Utah 2005) ("[T]he law should not be so blind and unreasoning that where an injustice has resulted the [defendant] should be without remedy" (quoting *Martinez v. Smith*, 602 P.2d 700, 702 (Utah 1979))).  Accordingly, in addressing the manifest and prejudicial errors Mr. Honie sets forth in this Petition, this Court should find all constitutional claims impliedly exhausted and address the claim on the merits.

In the event this Court determines that any of Mr. Honie's claims have not been adequately exhausted in state court, Mr. Honie requests that these proceedings be stayed pending exhaustion, and that his counsel be directed to return to state court to fully

exhaust the unexhausted claim(s).  *Rhines v. Weber*, 544 U.S. 269 (2005); *see also*

*Anderson v. Sirmons*, 476 F.3d 1131, 1138-39 (10th Cir. 2007); *Olvera v. Giurbino*, 371

F.3d 569, 573-74 (9th Cir. 2004) (finding an abuse of discretion when the district court

refused to allow petitioner to withdraw unexhausted claims and hold proceedings in

abeyance pending their exhaustion because this procedure cures the statute of limitation

problem, and "advances the court's interest in deciding cases on the merits rather than

technicalities.")  *Id.* at 573.  This stay-and-abeyance procedure would "enable all

constitutional claims to be settled in one federal habeas proceeding," thereby promoting

judicial economy, reducing piecemeal litigation, and facilitating Mr. Honie's ability to

have a federal court consider the merits of his constitutional claims.  *Thompson v.*

*Wainwright*, 714 F.2d 1495, 1499-1500 (11th Cir. 1983) (internal citation omitted).

Because the requirement of total exhaustion stems from principles of federal-state

comity, habeas courts must dismiss so-called "mixed" petitions so that habeas petitioners

may return to state court to exhaust the unexhausted claims.  *Rose v. Lundy*, 455 U.S.

509, 522 (1982).  However, "[w]hen we decided *Lundy*, there was no statute of

limitations on the filing of federal habeas petitions.  As a result, petitioners who returned

to state court to exhaust their previously unexhausted claims could come back to federal

court to present their perfected petitions with relative ease."  *Rhines*, 544 U.S. at 274

(citing *Slack v. McDaniel*, 529 U.S. 473, 486 (2000)).  With the enactment of the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and its statute of

limitations, habeas "petitioners who come to federal court with 'mixed' petitions run the

7

risk of forever losing their opportunity for any federal review of their unexhausted claims." *Id*. at 275. The solution to this dilemma is the stay-and-abeyance procedure approved by *Rhines*. *See id.* at 277-78 (citing *Zarvela v. Artuz*, 254 F.3d 374, 381 (2d Cir. 2001)).

District courts must employ the stay-and-abeyance procedure because of the AEDPA's statute of limitations. "Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Id*. at 277. In order to promote finality in litigation, "district courts should place reasonable time limits on a petitioner's trip to state court and back." *Id*. at 278. Where the petitioner "has good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory tactics," the district court abuses its discretion when it does *not* grant a stay. *Id*.

Should this Court find any of his claims unexhausted, Mr. Honie asks this Court to allow him the opportunity to demonstrate cause, at a hearing if necessary, for failing to exhaust those claims before it exercises its discretion to deny him a stay. *See Rhines*, 544 U.S. at 277. Because Mr. Honie is asking this Court to grant a stay in his initial Petition, concerns that he is using the stay-and-abeyance procedure for purposes of delay do not exist.

**Reservation of Rights**

Mr. Honie does not waive any applicable rights or privileges by the filing of this Petition and, in particular, does not waive either the attorney-client privilege or the work-product privilege.  Mr. Honie hereby requests that any waiver of privilege occur only after a hearing, with sufficient notice and the right to be heard, on whether a waiver has occurred and the scope of any waiver.

Mr. Honie expressly reserves his right to amend this Petition.  In *McCleskey v. Zant*, the Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition."  499 U.S. 467, 498 (1991).  Referring to Rule 6 (discovery), Rule 7 (expansion of the record) and Rule 8 (evidentiary hearing), of the Rules Governing Section 2254 Cases in the United States District Courts, the Supreme Court held that a habeas petitioner must have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first petition.  *See id.*  Mr. Honie believes additional claims may be identified through a thorough review of the record, through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held.  At the appropriate time during these proceedings, Mr. Honie will present any additional claims through amendments or supplements to the Petition.

## The AEDPA[1] is Unconstitutional

Because this Petition is filed after April 24, 1996, Mr. Honie's case is governed by the AEDPA, an unconstitutional statute.  28 U.S.C. § 2254; *see also Lindh v. Murphy*, 521 U.S. 320, 336 (1997).

Central to fundamental fairness and the integrity of the United States' justice system is that every prisoner must have all of his constitutional claims heard by a court. *See Bounds v. Smith*, 430 U.S. 817, 822-23 (1977).  One method of ensuring that a prisoner's constitutional claims are heard is through the writ of habeas corpus.  However, the passage of the AEDPA substantially changed the law that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651, 654 (1996).  The AEDPA's restrictions suspend the writ of habeas corpus and violate the separation of powers, which results in prisoners remaining in prison without review of alleged constitutional defects of their convictions and sentences.

### A.      The AEDPA Suspends the Writ of Habeas Corpus

Congress cannot define prisoners' habeas rights so narrowly that Congress, in effect, suspends the writ.  The writ of habeas corpus is guaranteed by the United States Constitution, which provides, "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art. I, § 9, cl. 2.  The Suspension Clause is a structural limitation on the power of Congress.  Like bills of attainder and *ex post facto* laws, which are also

---

[1] Antiterrorism and Effective Death Penalty Act of 1996.

prohibited in Article I, section 9, the suspension of habeas corpus (except in cases of rebellion or invasion) belongs to a "category of congressional actions which the Constitution barred." *United States v. Lovett*, 328 U.S. 303, 315 (1946). The writ "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void." *Id.* at 314 (quoting The Federalist Paper No. 78 (Alexander Hamilton)). Because the AEDPA prevents federal courts in certain circumstances from granting relief when it is undisputed that the conviction or sentence was unconstitutional, it suspends the writ of habeas corpus. *See* 28 U.S.C. § 2254.

### B.       The AEDPA Violates the Separation of Powers Doctrine

Congress cannot impinge on the courts' duty to say what the law is, but Congress does so when it requires Article III courts to ignore any part of the Constitution and to instead give effect to a contrary law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). Congress has the power to define the jurisdiction of the lower federal courts. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993). "The judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. However, Congress must not manipulate the "test for determining the scope of [habeas corpus]" because the writ "is designed to restrain" Congress, and because the writ is "an indispensable mechanism for monitoring the separation of powers." *Boumediene v. Bush*, 128 S.Ct. 2229, 2259 (2008).

11

The separation of powers doctrine "serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government . . . and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (internal citations and quotation marks omitted). When it was confronted with an unconstitutional provision, the Supreme Court in *Marbury* asked whether courts are bound by "an act of the legislature" that is "repugnant to the constitution;" the Court answered that "[i]t is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. at 177.

"[I]f Congress does provide for habeas in the federal courts, Congress cannot . . . instruct the federal courts, whether acting in a federal or in a state case, how to think, how to ascertain law, how to judge." *Irons v. Carey*, 505 F.3d 846, 855 (9th Cir. 2007) (Noonan, J., concurring). Because the AEDPA requires courts to ignore unlawful detentions if the prisoner does not meet certain provisions, it unconstitutionally suspends the writ of habeas corpus.

### C.     Conclusion

The AEDPA suspends the writ of habeas corpus and violates the separation of powers doctrine because it dictates that courts must not "grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859 (Reinhardt, J., concurring). Also,

12

the AEDPA does not allow an appellate judge to correct an unlawful detention if a lower court's "error is understandable," which is inconsistent with a judge's duty "to enforce the laws and protect the rights of our citizens against arbitrary state action." *Id.* Therefore, the AEDPA is unconstitutional.

## Jurisdictional Statement

This Court has jurisdiction over this Petition pursuant to 28 U.S.C. § 2254.  Venue is proper in the District of Utah because Petitioner was convicted in Iron County, Utah, which is located within this district.  28 U.S.C. § 2241.  Mr. Honie is a prisoner of the State of Utah.  He is illegally and unconstitutionally confined by the Warden of the Utah State Prison in Draper, Utah, and the Executive Director of the Utah Department of Corrections, pursuant to a judgment of death imposed upon him by the Fifth Judicial District Court on May 24, 1999.  *State of Utah v. Taberone* [sic] *Dave Honie*, Criminal Case No. 981500662.  (TR ROA at 552, 555, 557)

## II.    PROCEDURAL HISTORY

### A.    Overview of the Case

Mr. Honie was convicted of aggravated murder by a jury for the death of Claudia Benn, and was sentenced to death by a judge in the Fifth Judicial District Court in Iron County, Utah.  (TR ROA[2] 608 at 495; TR ROA 606 at 86)  The Utah Supreme Court affirmed his conviction and sentence on January 11, 2002.  *See State v. Honie*, 57 P.3d

---

[2] TR ROA indicates the trial court record on appeal.  PCR ROA indicates the post-conviction record on appeal.

977 (Utah 2002).  Mr. Honie, thereafter, sought state post-conviction relief from his judgment and sentence, filing his Amended Petition for Post-Conviction Relief in the Fifth Judicial District Court on December 1, 2003.  (PCR ROA 19-71)  The State moved for summary judgment which was granted in part and denied in part.  (PCR ROA 212-217; 965-1058)  The district court found that Mr. Honie had presented a genuine issue of material fact as to certain claims involving the ineffective assistance of trial counsel; however, due to the statutory funding limits imposed by the Post-Conviction Remedies Act ("PCRA") in effect at that time, the court was unable to provide funding in excess of the statutory maximums for Mr. Honie to develop these claims for relief.  (PCR ROA 1246)

The State later filed a second motion for summary judgment and the parties litigated the issue of whether the 2008 Amendments to the PCRA were applicable to Mr. Honie's case.  (PCR ROA 1266-1269)  The district court found that the 2008 Amendments were applicable to Mr. Honie's case and that Mr. Honie was, therefore, entitled to request funds in excess of the statutory maximums for attorney fees and expert and investigative expenses.  (PCR ROA 2564-2577)  Despite this, the court refused to approve additional funds for Mr. Honie to develop his claims of ineffective assistance of counsel for failing to perform a reasonable mitigation investigation, which had survived the State's first motion for summary judgment.  (PCR ROA 2825-2839)  The district court thereafter granted the State's second motion for summary judgment on Mr. Honie's remaining claims.  (PCR ROA 3315-3348)

14

Mr. Honie filed a Motion for Relief From and To Set Aside Judgment on September 20, 2011, which was denied on February 9, 2012.  (PCR ROA 3356-3357)  He then filed a consolidated appeal challenging the state post-conviction court's grant of summary judgment and denial of Rule 60(b) relief on October 1, 2012.  On May 30, 2014, the Utah Supreme Court affirmed the post-conviction court's summary judgment as to all claims.  *Honie v. State*, 342 P.3d 182 (Utah 2014).  The Utah Supreme Court then denied Mr. Honie's Petition for Rehearing without remark on October 24, 2014.  *Honie v. State*, 2014 Utah LEXIS 233 (unpublished).

### B.   Summary of the Evidence Presented in State Court

Mr. Honie's case is, in great part, about the failure of his trial counsel to subject the prosecution's case against him to the meaningful adversarial testing required by our criminal justice system.  Trial counsel failed to conduct a reasonable investigation as to possible trial defenses and potentially exculpatory evidence related to one of the most egregious charges against Mr. Honie.  Trial counsel not only refused the State's offer to stipulate to the inadmissibility of Mr. Honie's custodial statements, which included highly damaging and prejudicial facts, but was, in fact, responsible for their admission at trial.  Trial counsel also performed unreasonably during the penalty phase by performing a cursory mitigation investigation that failed to unearth compelling mitigation that could have resulted in a sentence other than the death penalty.  Trial counsel was responsible for introducing, at the penalty phase, highly inflammatory aggravating evidence that the jury failed to find beyond a reasonable doubt during the merits phase of the trial.  This

evidence served as one basis for the trial court to impose the death penalty.  Rather than acting as an advocate, trial counsel unreasonably conceded Mr. Honie's guilt to aggravated murder and was responsible for introducing some of the most damaging evidence against Mr. Honie at trial.

### 1.      Trial Evidence at the Merits Phase

On July 9, 1998, Carol Pikyavit, the daughter of the victim, Claudia Benn, called Mr. Honie around 7:30 p.m.  (TR ROA 607 at 240)  Ms. Pikyavit and Mr. Honie had an intermittent relationship (TR ROA 607 at 239), and had a child together.  *Id*. at 238. They usually checked in on one another every day to talk.  *Id*. at 240.  Ms. Pikyavet called Mr. Honie that evening because she had not heard from him that day and wanted to make sure he was okay.  *Id*. at 241.  During this time, Ms. Pikyavet was living with her mother, Ms. Benn, her sister, Benita Rogers, and her sister's two children, as well as her own daughter with Mr. Honie.  *Id*. at 237.  Mr. Honie was living with the woman he was seeing at the time, Shiloh John.  *Id*. at 238.  Ms. Pikyavet called Mr. Honie at Ms. John's home.  *Id*. at 241.

A little later that evening, between 8:00 and 8:30 p.m., Mr. Honie called Ms. Pikyavet back and asked her to come see him.  *Id*. at 239, 241.  Ms. Pikyavet told Mr. Honie she could not come see him because she was working that evening.  *Id*. at 242. Ms. Pikyavet testified that Mr. Honie was intoxicated when he called.  *Id*. at 250.  She had been around Mr. Honie when he was intoxicated before and could tell that "he was to

the point where he was real buzzed[,]" and getting to the point where he would be very drunk.  *Id*. at 250.

Ms. Pikyavet also testified that during this call, Mr. Honie told her he wanted her to come over and be with him, and that if she did not he would go to her mom's house and kill her mom and her sister's kids and take his daughter with him.  *Id*. at 242.  Ms. Pikyavet stated that she did not believe Mr. Honie's threat because he had made similar threats to her before when he was drinking and never acted on them.  *Id*. at 250-251.  Ms. Pikyavet did not call the police after Mr. Honie made this threat, nor was she alarmed by it because she did not believe he would act on it.  *Id*. at 243.  Mr. Honie called Ms. Pikyavet twice more that evening, telling her she should come see him.  *Id*. at 243.  Ms. Pikyavet then left for work with her sister at 10:30 p.m.  *Id*. at 241-242.

Ms. Pikyavet's sister, Ms. Rogers, testified that both she and her mother, Ms. Benn, knew Mr. Honie had called her sister that night but that Ms. Pikyavet had not said anything to them about the content of the calls.  *Id*. at 258-269.  Ms. Rogers also testified that Ms. Pikyavet and Mr. Honie still saw each other and that Mr. Honie would occasionally stay overnight with Ms. Pikyavet at their mother's home.  *Id*. at 261-262.

Rick Sweeney was a taxi driver in Cedar City.  *Id*. at 263-264.  Mr. Sweeney testified that he knew Mr. Honie a little because Mr. Honie had visited friends who lived across from Mr. Sweeney's home in a trailer park in Cedar City.  *Id*. at 264-265.  Mr. Honie had also used Mr. Sweeney's taxi services before.  *Id*. at 265.  On July 9, 1998, at approximately 11:20 or 11:30 p.m., Mr. Sweeney was dispatched to the corner of 300

West and 600 South to pick up a man. *Id*. at 265-266. When Mr. Sweeney arrived at the corner, he recognized Mr. Honie, who was leaning against a stop sign. *Id*. at 267, 272. Mr. Honie got into the taxi and sat in the front seat and asked to be taken to Fiddler's Canyon. *Id*. at 267. Mr. Honie did not give Mr. Sweeney a specific address, but said he was going to visit a friend. *Id*. at 267, 269. Mr. Sweeney testified that Mr. Honie was intoxicated and that he could smell alcohol on him, but that he could talk "pretty good." *Id*. at 269-270, 275. Mr. Sweeney also testified that Mr. Honie did not appear to be angry, or frightened, or irritated, but rather, was calm and "pretty laid back." *Id*. at 275. When asked by defense counsel whether he recalled testifying at the preliminary hearing and giving a statement to the police that he thought Mr. Honie had had too much to drink and was really drunk, Mr. Sweeney stated that he did not remember that. *Id*. at 274.

Officers were called to the scene of 2077 Dana Drive, Ms. Benn's home, at 12:12 a.m. on July 10, 1998. *Id*. at 283-284. Officer J.R. Robinson arrived at the scene within a few minutes, along with other officers. *Id*. at 288. Another officer, Officer Griffiths, noticed that the sliding glass door was broken and the officers drew their weapons. *Id*. at 290. Officer Robinson was discussing how to approach the home with Sergeant Petersen when they noticed a large subject walk past the sliding glass door. *Id*. at 291. The police then engaged their P.A. system asking the occupants to "come out with your hands up." *Id*. at 292. At the same time, Sergeant Petersen told Officer Robinson that he could hear Officer Griffiths "ordering someone to get their hands up and get on the ground." *Id*. at

292.  Officer Robinson heard someone say, "I killed her.  I stabbed her with a knife."  *Id*.

at 293.  He then entered the home to see if someone was hurt.  *Id*. at 293.

Officer Robinson entered the home and found Ms. Benn lying face down in the

living room with a large amount of blood around her.  *Id*. at 294.  He then noticed two

small children come from the back of the house.  *Id*. at 294.  Officer Robinson grabbed

the children and took them to his police car.  *Id*. at 294.  After placing the two children in

his police car, he faced the home again and saw a third smaller child in the doorway.  *Id*.

at 296.  Officer Robinson retrieved this child as well.  *Id*. at 297.

Officer Robinson testified that he saw Mr. Honie at the scene.  *Id*. at 304.  Mr.

Honie did not have a shirt on and appeared to have blood on him.  *Id*. at 304.  Mr. Honie

was compliant with the police.  *Id*. at 305.  Officer Robinson testified that Mr. Honie was

fairly calm and that he could smell alcohol on Mr. Honie from two feet away.  *Id*. at 305-

306.  Officer Robinson also testified that he heard Mr. Honie making bizarre statements.

*Id*. at 306.  Mr. Honie stated, "She's dead.  If he ever comes back, I'll kill him."  *Id*. at

306.  Mr. Honie also stated, "With the next full moon we will all be gone.  If I find you,

I'll shoot you myself."  *Id*. at 306-307.  Officer Robinson also testified that at one point

he was alone with Mr. Honie and Mr. Honie asked him to do him a favor.  *Id*. at 307.

Officer Robinson asked him what the favor was and Mr. Honie said, "Just shoot me."  *Id*.

at 307-308.  Officer Robinson told him he could not do that.  *Id*. at 308.

Sergeant Terry Petersen arrived at the scene around midnight.  *Id*. at 310.

Sergeant Petersen was in charge and gave instructions to the other officers who were

19

already at the scene.  *Id*. at 311.  Sergeant Petersen observed Officer Griffiths with a man on the ground at gun point.  *Id*. at 312.  Sergeant Petersen handcuffed the man and left him with Officer Griffiths.  Sergeant Petersen then went inside the home and found Ms. Benn on the floor and checked her for signs of life, but she was deceased.  *Id*. at 313-314. Sergeant Petersen also noticed a large kitchen knife lying next to her head.  *Id*. at 314.

Officer Destry Griffiths was also at the scene.  *Id*. at 319.  Officer Griffiths was at the north side of the house when Mr. Honie exited the house.  *Id*. at 320-321.  Officer Griffiths told Mr. Honie to "[p]ut your hands up[,] . . . get down on the ground[,]" and Mr. Honie complied.  *Id*. at 321.  Officer Griffiths noticed blood on Mr. Honie and asked him, "Where did you get the blood?"  Mr. Honie responded, "I stabbed her.  I killed her with a knife."  *Id*. at 321.  Mr. Honie was then arrested and Officer Griffiths transported him to the jail.  *Id*. at 322.  Even though Officer Griffiths was the one who transported Mr. Honie, he testified that he did not recall Mr. Honie having a deep cut to his hand.  *Id*. at 325.  Officer Griffiths also smelled alcohol on Mr. Honie's breath.  *Id*. at 325-326.

Detective Lynn Davis was the interrogating officer in Mr. Honie's case.  *Id*. at 342.  Detective Davis testified that during his interrogation of Mr. Honie, he took photographs of Mr. Honie in the nude, including his genitalia.  *Id*. at 343-344. Photographs of Mr. Honie's naked body were introduced to the jury at trial, including photos of his penis and scrotum.  *Id*. at 343-345, State's Exhibits 22, 23, 24.  No one from the defense team objected to the admission of the photos or their publication to the jurors. The State did not ask Detective Davis any questions about his interrogation of Mr. Honie.

20

Prior to trial, the State offered to stipulate to the inadmissibility of Mr. Honie's custodial statements during trial.  (TR ROA 598 at 7)  While trial counsel filed a motion to suppress Mr. Honie's statements, at the hearing on the motion to suppress, Mr. Honie's lead defense counsel, Stephen McCaughey, informed the court that he wanted to introduce two of the three statements Mr. Honie made to the police, but filed a motion to suppress to protect himself against a future claim of ineffective assistance of counsel.  *Id.* at 6.  Mr. McCaughey informed the court, "So I am sort of doing this for the record, so the record's clear that we are aware, that is, there may be some *Miranda*[3] violations in this case.  And I want the record to reflect that we are pointing those out."  *Id.* (alteration added).  Mr. McCaughey stated that he thought that the latter two statements of Mr. Honie were reflective of what actually happened during the crimes so he wanted them to be introduced into evidence.  *Id.*  He then added, "So it is a motion to suppress[,] [b]ut it's done primarily for an appeals court or another lawyer to look at later on."  *Id.*

In response to trial counsel's position, the state prosecutor stated:

> This is a capital case . . . . [and] the state will concede if counsel feels that in the best interest of his client, the accused, that these are statements that should be suppressed[,] [t]he state does not want to overreach or push or anything that may be on the edge of denying the defendant his fair day in court or violating his constitutional rights.  So I will concede to strike, omit, not use and not refer to the three statements of Officer Davis in any of the proceedings if that's the request of the defendant.

*Id.* at 7.  Trial counsel refused the prosecutor's offer to stipulate to the inadmissibility of the statements, and reiterated that the only reason he was challenging the use of the

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

21

statements at trial was because "I don't want two years down the road somebody coming back saying, hey, you should have moved to suppress those statements, because there was no *Miranda* given." *Id.* at 11 (alteration added).  Perplexed by trial counsel's position, the court found that since the motion was filed, a hearing should be held. *Id.* at 12.

Unsurprisingly, Mr. McCaughey did little to challenge the admissibility of the statements at the hearing.  While there was testimony from several witnesses at the preliminary hearing indicating that Mr. Honie was extremely intoxicated during the time leading up to the crime, Mr. McCaughey failed to call any of these witnesses to testify at the suppression hearing.  (TR ROA 597 at 21, 29, 35, 62)  While the transcripts of Mr. Honie's statements[4] also indicated he was not clearly coherent during the interrogations, Mr. McCaughey failed to ask Detective Davis at the suppression hearing about Mr. Honie's level of intoxication during questioning.  Mr. McCaughey also failed to ask Detective Davis if Mr. Honie was given pain medication when he was taken to the hospital following the first interrogation to receive treatment for the gash on his hand. (TR ROA 598 at 37-38)

In fact, it was the trial court that raised the issue of intoxication with Detective Davis at the suppression hearing.  *Id*. at 48.  Detective Davis stated that Mr. Honie smelled of alcohol when he first interviewed him but he "did not feel that he was

---

[4] Mr. Honie is filing a Motion to Expand the Record, pursuant to Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts, simultaneously with this habeas Petition to include the transcripts of Mr. Honie's custodial interrogation which occurred on July 10, 1998.

22

intoxicated to the point that he didn't understand what I was saying or what I was doing, what was going on.  I mean, *he was intoxicated*, yes, but not—he was not inebriated.  I mean he knew what was going on."  *Id.* at 49 (emphasis added).  Even though Detective Davis admitted that Mr. Honie was intoxicated during the first interview, the only interview for which he was offered *Miranda* warnings, *id.* at 35-36, Mr. McCaughey failed to follow up on this line of questioning which went directly to Mr. Honie's voluntariness.

As promised, trial counsel did, in fact, introduce Mr. Honie's custodial statements during trial.  Following the direct examination of Detective Davis, co-counsel, Susanne Gustin-Furgis performed the cross-examination of him.  (TR ROA 607 at 345)  Ms. Gustin-Furgis elicited details of the interrogation through Detective Davis.  According to Detective Davis, Mr. Honie was still having sexual relations with Ms. Pikyavet and, in fact, had sex with Ms. Pikyavet the day before the crime.  *Id.* at 347.  Mr. Honie told Detective Davis that Ms. Benn did not like him so he had to sneak into the house to see Ms. Pikyavet.  *Id.*  Mr. Honie then spontaneously told Detective Davis, "Claudia wasn't supposed to die."  *Id.*  Mr. Honie said that he just wanted to scare her because he was upset that Ms. Benn was interfering with his relationship with Ms. Pikyavet.  *Id.* at 348.

Detective Davis testified that Mr. Honie initially told him that he went to Ms. Benn's home to sleep under the porch, but that he felt Mr. Honie had lied about a lot of things during the interrogation.  *Id.* at 352.  Detective Davis also testified that Mr. Honie

had told him initially he had been drinking and had blacked out and could not remember what had happened.  *Id.* at 350.

Several hours into the interrogation, Mr. Honie told Detective Davis that he had been fighting with Ms. Benn through the sliding glass door and that Mr. Honie became upset because Ms. Benn was verbally cutting him down.  *Id*. at 348.  Ms. Benn said that he was worthless and a "no good s.o.b." and that she did not think her daughter should go out with him because she was too good for him.  *Id*. at 348-349.  Ms. Benn called Mr. Honie "a black bastard . . . [who] ain't worth shit[.]"  *Id*. at 354.  Ms. Benn's words upset Mr. Honie to the point that he broke the sliding glass door and went into the house.  *Id*. at 349, 354.  Mr. Honie told Detective Davis that he entered the house only to scare Ms. Benn.  *Id*. at 355.  Once Mr. Honie entered the house, Ms. Benn had a knife in her hand and pulled it on Mr. Honie.  *Id*. at 351.  Mr. Honie then grabbed the knife, came behind her and put the knife to Ms. Benn's throat.  *Id*. at 351.  Mr. Honie then stated that he and Ms. Benn tripped and fell to the floor.  *Id*. at 352.  Mr. Honie stated that when they fell to the floor, Ms. Benn fell on the knife.  *Id*. at 355.  Mr. Honie stated that she was not meant to die.  *Id*. at 355.

Detective Davis testified that as the interrogation progressed, he "planted" the idea in Mr. Honie that the reason he broke the glass door was because of the things Ms. Benn was saying to him.  *Id*. at 353.  Detective Davis said he did this to get Mr. Honie to talk about the murder.  *Id*. at 353.

Detective Davis questioned Mr. Honie about whether he sexually abused D.R. [5]

that night; and Mr. Honie told Detective Davis that he had not sexually abused any of the

three children who were in the home that night. *Id*. at 356. Mr. Honie stated that the

three children "were the gems of my eyes." *Id*. at 359. Mr. Honie explained that the

children probably had a lot of blood on them because he had a severe cut on his hand that

was bleeding. *Id*. at 357. At one point, Mr. Honie was trying to hide from the police by

going into a closet. *Id*. at 357. The little girls followed him into the closet and he pushed

them out of the closet, which likely left blood on them. *Id*. at 357.

Mr. Honie told Detective Davis that he was sorry for what happened and "should

die for what he d[id] wrong." *Id*. at 357. Mr. Honie told Detective Davis, "I don't know

what the hell I did[;] I could have killed her myself, I don't know[.]" *Id*. at 358. Mr.

Honie then said, "If I did, I am very, very sorry[.]" *Id*. at 358. Mr. Honie also said,

"Dee[6], please forgive me." *Id*. at 359.

Mr. Honie also told Detective Davis that when he and Ms. Pikyavet lived in Salt

Lake City, he and Ms. Benn would have sex together while Ms. Pikyavet was at work.

*Id*. at 360. Detective Davis assumed this was the reason Ms. Benn was upset with Mr.

Honie. *Id*. at 360. While Mr. Honie and Ms. Benn were in the midst of their sexual

relationship, Ms. Pikyavet became pregnant with Mr. Honie's child. *Id*. at 360-361.

---

[5] The initials of minor children will be used to protect their privacy.
[6] "Dee" is a nickname for the victim, Claudia Benn.

Detective Davis assumed this was a turning point in the relationship between Mr. Honie and Ms. Benn.  *Id*. at 361.

Having opened the door to the introduction of Mr. Honie's statements, the State elicited further details about the interrogation through Detective Davis on redirect examination.  *Id*. at 362.  Detective Davis testified that there were three interviews with Mr. Honie, and that he apprized Mr. Honie of his *Miranda* rights only prior to the first interview.  *Id*. at 362.  As soon as the State started asking Detective Davis about the substance of Mr. Honie's statements, Ms. Gustin-Furgis immediately objected and requested a side bar with the court.  *Id*. at 363.  Ms. Gustin-Furgis then objected to the State making any reference to some of the bizarre statements Mr. Honie made during his interrogation about Satan and cults saying they were "highly prejudicial" and "inflammatory."  *Id*. at 363-364.

The State responded:

> [I]n an overabundance of caution, the state did not go into any of the three interviews.  The defendant clearly opened the door.  And  I think for counsel to spend a preparation time for this trial gleaning the two or three or four exculpatory or sympathetic or helpful quotes that the defendant may have had from each of the three interviews and then say, but, you know, let's don't get into anything else he said in the three interviews, is ludicrous.  The door is swung wide open. . . . [I]t is unfair to the state that they can open the door, then slam it in our face as we are attempting to go into the interviews that, frankly, we weren't going to get into it at all until the defendant chose to go there.

*Id*. at 364-365.  In response, Ms. Gustin-Furgis acknowledged opening the door to the interviews and stated her objection was only to any reference to the occult.  *Id*. at 366.

26

The State replied that evidence of Satan and cults already came in and no one objected. *Id.* at 367.  The State also noted, "And, frankly, maybe I am missing something but, to me, in the light of the facts of this case, I don't know how anything can be more aggravating, misleading, or inflaming than . . . 'I put my hands inside her, or I have tried to put my penis inside it.'"  *Id.* at 367.

The court acknowledged, "I agree this is unusually graphic and grotesque.  He's through cross-examination, is into his interview, which he wants, has come in.  The door is open, and I am going to allow the state to pursue the balance of the interview."  *Id.* at 367.  Whereupon, the State introduced testimony from Detective Davis about Mr. Honie's bizarre statements during the interrogation.  *Id.* at 368-369.  The State also elicited extremely prejudicial and inflammatory details about the crime that, otherwise, never would have come into the record.  *Id.* at 370.  Detective Davis testified that Mr. Honie told him that he thought about having anal intercourse with Ms. Benn, but changed his mind when he realized she was dead.  *Id.* at 370.  Mr. Honie told Detective Davis that he had pulled his pants down and was "getting ready to stick it in her."  *Id.* at 370. Detective Davis asked Mr. Honie, "So you put your fingers inside of her anal, but you never did put your . . . dick inside of her?"  *Id.* at 371.  Mr. Honie answered, "Uh-uh[.]"  *Id.* at 371.  Mr. Honie then told Detective Davis that the reason there was blood on the back side of Ms. Benn was because he was holding his penis with his injured hand that was bleeding while he was "trying to stick it in."  *Id.* at 372.

27

The State also introduced testimony from child welfare witnesses about the potential sexual abuse of D.R., one of the children of Benita Rogers, who was at the scene at the time of the crime. *Id*. at 373-389. Testimony was also presented from Dr. Bruce Herman, a physician at Primary Children's Hospital, who examined D.R. *Id*. at 389-401. Dr. Herman found two lesions inside D.R.'s mouth that were superficial and "nonspecific in nature." *Id*. at 392. He also found superficial abrasions in the area around D.R.'s hymen and the posterior fourchette, which indicated "some minor trauma." *Id*. at 393. Dr. Herman stated that these abrasions were "consistent with rubbing[,]" which could be from a finger or penis or other object. *Id*. at 394.

On cross-examination, Dr. Herman acknowledged that D.R. could have caused these abrasions herself, but noted that "[g]enerally, in children, without symptoms of itching or burning or discharge suggestive of an infection, children do not touch themselves hard enough to cause these kinds of abrasions." *Id*. at 397-398. At the time of his examination of D.R., Dr. Herman asked her if anyone had ever touched her "to make her feel badly[,]" and D.R. responded no. *Id*. at 398. Dr. Herman also testified that this type of injury heals quickly, usually within seventy-two hours. *Id*. at 398-399. However, in D.R.'s case, the injuries were consistent with being newer than that. *Id*. at 399.

Detective Ray Houchen was the lead investigator in the case who took photographs of the scene. *Id*. at 402-403. He also had the knife that was found at the scene tested for fingerprints. *Id*. at 405-406. While a couple of smudged prints were

28

found, they could not be identified or linked to anyone.  *Id.* at 406.  Detective Houchen

also retrieved a pair of underwear belonging to D.R. that had blood on them.  *Id.* at 407.

Detective Houchen had the blood tested, which matched D.R.  *Id.* at 407.  No one else's

blood was found on D.R.'s underwear.  *Id.* at 407

 Dr. Kelly Faddis, a dentist, was asked to determine if Mr. Honie's teeth could be

matched to a bite mark found on the body of Ms. Benn.  (TR ROA 608 at 430-431)  Dr.

Faddis took dental impressions from Mr. Honie and produced a positive model from

them.  *Id.* at 431.  He then compared the model to photographs of Ms. Benn he received

from the medical examiner.  *Id.* at 431; State's Exhibits 34 and 35.  Dr. Faddis

acknowledged that what he was doing was not "an exact science."  *Id.* at 432.  However,

he nonetheless testified that he could not exclude the impressions from Mr. Honie as

being a match to the mark in the photographs of Ms. Benn.  *Id.* at 433.  No one from the

defense team cross-examined Dr. Faddis.  The defense also did not produce its own

expert to refute either the testimony or the reliability of the technique employed by Dr.

Faddis.

 The medical examiner, Dr. Maureen Frikke, was the final witness presented during

the merits phase of the trial.  *Id.* at 434.  Both the State and the defense elicited testimony

from her on direct examination.  On the State's direct examination, she testified that Ms.

Benn's neck "had been cut from ear to ear[,] [with] [c]ut marks start[ing] out underneath

the ears and go[ing] all the way across from one ear to the other.  The depth go[ing] all

the way back to the backbone in the back of the neck."  *Id.* at 440.  She further stated that

29

"you can see individual start marks . . . . [that] all come together into this big, huge, deep cut.  And on the left side of the neck there are at least four start marks or individual cuts that then run together into this deep cut into her neck."  *Id*. at 441.

Dr. Frikke also testified that the injuries could have been caused by the knife found at the scene.  *Id*. at 443.  She stated that Ms. Benn's injuries could not have resulted from a fall, and that a single fall especially would not account for the multiple cuts to Ms. Benn's neck.  *Id*. at 444.  Dr. Frikke then offered her own theory, without objection from the defense, stating that the injuries were consistent with someone standing behind the victim and reaching around and cutting the neck.  *Id*. at 444.  Dr. Frikke went on to describe Ms. Benn's other injuries.  *Id*. at 445-447.  At one point, the State introduced an extremely inflammatory autopsy photo of Ms. Benn's reflected scalp that Dr. Frikke used to describe bruises.  *Id*. at 447; State's Exhibit 39.  There was no objection from the defense, despite the highly grotesque nature of the photo.

The State went into great detail about injuries inflicted to Ms. Benn's genitalia using a schematic diagram of the female anatomy.  *Id*. at 449-450; State's Exhibit 46.  Despite this, the State also unnecessarily introduced another highly prejudicial photograph of Ms. Benn, taken at the scene, of her backside.  *Id*. at 451; State's Exhibit 27.  Again, there was no objection from the defense.  Dr. Frikke also opined, without objection, that it was possible Ms. Benn was still alive at the time she sustained the injuries to her genitalia.  *Id*. at 452.  Dr. Frikke concluded that the cause of death was from exsanguination from "sharp force injuries to her neck."  *Id*. at 452-453.

30

On cross-examination, Dr. Frikke explained that it was possible for a body to still have enough blood in certain areas to bleed even after death. *Id*. at 455. However, on redirect examination, she stated that Ms. Benn did have blood pressure at the time she sustained these injuries. *Id*. at 458.

After the State rested, Mr. McCaughey engaged Dr. Frikke in direct examination about the timing of the injuries to Ms. Benn's genitalia. *Id*. at 459. Dr. Frikke explained that it was possible for someone to be brain-dead and still have blood pressure. *Id*. at 460. On cross-examination by the State, Dr. Frikke concluded that Ms. Benn had "some blood pressure" given the amount of blood, but could not say "where that happened during the sequence of her dying exactly[.]" *Id*. at 460-461. The defense then rested. *Id*. at 462.

On the same day, the jurors found Mr. Honie guilty of aggravated murder with the following circumstances: "[t]he homicide was committed while the actor was engaged in the commission of or an attempt to commit object rape . . . . forcible sodomy . . . . aggravated sexual assault . . . . burglary . . . . and aggravated burglary." *Id*. at 495-496. The jurors did not find that Mr. Honie had committed aggravated sexual abuse of a child. *Id*. at 496.

### 2.    Mr. Honie Waived a Jury at the Penalty Phase

At a pre-trial scheduling conference held approximately two weeks before trial, Mr. McCaughey informed the trial court that he anticipated waiving the jury in the penalty phase in order to "eliminate the need to death qualify this jury" and so the

evidence would only have to be put on once, simplifying the process.  (TR ROA 602 at 3-4)  Mr. McCaughey described it as "short circuit[ing] things quite a bit, especially the death qualification of the jury."  *Id*. at 4.  Mr. McCaughey informed the court that he had discussed the waiver with Mr. Honie who agreed to it and that the State had provided the necessary statutory consent.  *Id*. at 4-5.  The State asked the court for assurances that the court would consider imposing the death penalty and the court stated that it would impose the death penalty if it felt it was appropriate and the facts and circumstances of the case warranted it.  *Id*. at 7-8.

Because Mr. Honie was not present when the jury waiver was discussed, the court and parties reconvened after a short break to go over the waiver.  *Id*. at 8.  Mr. McCaughey again expressed his interest in streamlining the trial and noted that the parties would have to call fewer witnesses during the penalty phase if the judge, rather than the jurors, were to consider sentencing.  *Id*. at 9.  The trial court agreed to allow Mr. Honie to waive jury sentencing.  *Id*. at 10.

### 3.     Trial Evidence at the Penalty Phase

#### a.     The State's Case at the Penalty Phase

The penalty phase of the trial began the day after the jury returned its verdict.  (TR ROA 605 at 6)  The State first introduced Mr. Honie's prior criminal record from the Hopi Tribal Court, which the court noted appeared to be all misdemeanors.  *Id*. at 8-11. The State then presented evidence of a 1995 domestic incident between Mr. Honie and Ms. Pikyavet that had been prosecuted in tribal court, and to which Mr. Honie had

32

pleaded guilty.  *Id*. at 12-16.  The tribal law enforcement officer who responded to the scene of the 1995 incident explained that all cases prosecuted in tribal court are misdemeanors.  *Id*. at 38.  He testified that more serious cases were referred to and prosecuted by the U.S. Attorney.  *Id*. at 38.  He also testified that the 1995 incident was submitted to the U.S. Attorney, but was declined and returned to the tribal court to be prosecuted as a misdemeanor.  *Id*. at 38.  Ms. Pikyavet provided a detailed account of the 1995 incident.  *Id*. at 20-31.  Ms. Pikyavet also testified that Mr. Honie had been drinking heavily throughout the day leading up to the incident in 1995 and had passed out at one point.  *Id*. at 31-34.

The State then presented victim impact evidence through several witnesses who had known Ms. Benn at different times in her life: Lorraine Benn, Mitzi Meyers, Kathryn Brooks, and Geneal Anderson.  *Id*. at 41-62, 70-73.  Karen Mayo, Benita Rogers's mother-in-law, who was the grandmother of D.R. and her sister T.R., both of whom were at the scene on the night of the crime, also testified about the impact the crime had on the children.  *Id*. at 62-68.  The State then rested.  *Id*. at 73.

### b.    The Defense's Case at the Penalty Phase

The defense's mitigation case was comprised of the testimony of five family members, one of whom asked to speak on the day of the trial and had never met with a member of the defense team prior to this time; the testimony of the defense psychologist, a school counselor, and Ms. Pikyavet; and Mr. Honie's statement.

33

### Wilfred ("Si") Honie

Si Honie is the oldest brother of Mr. Honie.  (TR ROA 605 at 74)  Si testified that

as a child Mr. Honie liked animals and that "[y]ou could always find him rollin' around

with dogs and cats, laughin' away outside."  *Id*. at 75.  Mr. Honie "used to help the old

people a lot when he was growing up and haul wood, coal, haul water, chop it for 'em, go

down to a store, get 'em groceries and stuff."  *Id*. at 75.  Mr. Honie was "a likeable

kid[,]" who "[e]verybody got along with[.]"  *Id*. at 75.  Mr. Honie was affectionate with

these elderly people and was hit hard when one of them died.  *Id*. at 76.

Si testified that his family had taken the incident involving Ms. Benn very hard

and spent a lot of time crying about it.  *Id*. at 76.  Si stated that he missed his brother.  *Id*.

at 77.  Si then asked the court to give his brother another chance.  *Id*. at 77.  Si explained:

> [H]e's been saying now he wants to go back to school and finish school and
> get a better job so he can get out of the Rez.  There's nothing here on the
> Rez.  No jobs, nothing.  But yeah, I mean I can do with him being in there
> for a while now, life, something like that, instead of seeing him die.  It
> would be better for all of us.

*Id*. at 77.  When asked if he wanted to say anything to his brother, Si stated, "I hope you

learned from what you did.  I hope you think about it.  I guess I didn't tell him much

about getting shit face [sic] and stuff—oops, excuse me—in bars.  Didn't do nothing for

us.  Just killed us off.  I hope you learn.  I'll see you again."  *Id*. at 78.

### Franklin Honie, Sr.

Franklin is Mr. Honie's father.  *Id*. at 78.  Franklin testified that Mr. Honie's

daughter, T.H., had spent a lot of time with him and the family since the incident.  *Id*. at

34

80.  He stated that the family got along well with T.H.'s mom, Ms. Pikyavet, which made

spending time with T.H. easier.  *Id*. at 81.

Franklin then spoke a little about Mr. Honie as a child.   Mr. Honie's Indian name

was Tangyoehnau, which meant "blue spruce boy."  *Id*. at 81-82.  Mr. Honie used to help

the elderly in their community by hauling water and coal, chopping wood, getting

groceries, and cleaning their houses.  *Id*. at 90.  Mr. Honie used to go around with dogs

and cats and bring them home when they were injured to nurture them back to health.  *Id*.

at 91.

Franklin testified that when Mr. Honie was in the sixth grade a dump truck ran

into the vehicle he and his wife were in, injuring him and preventing him from working.

*Id*. at 82.  Franklin stayed home with the children after this and his wife worked to

support the family.  *Id*. at 82.  Franklin stated that every morning he would wake up the

children and take them outside to pray to the sun.  *Id*. at 83.  He explained that by doing

that, they prayed for everybody, not just themselves but the whole world, "so that people

grow strong and nobody will be sick."  *Id*. at 83.

Franklin testified that Mr. Honie became very involved with the spiritual and

religious teachings of the Hopi-Tewa and participated in the ceremonies, including

Kachina dances.  *Id*. at 83.  He never had trouble with Mr. Honie when he was a child,

and noted that Mr. Honie played football in junior high school.  *Id*. at 84-85.  It was not

until Mr. Honie was fifteen years of age that his parents started to have trouble with him.

*Id*. at 86.  Franklin described it as "[j]ust the way the younger generation is doing now,

35

how they're getting in trouble, staying out and all that kind." *Id*. at 86.  Franklin stated

that Mr. Honie was suspended from school for smoking marijuana and that they arranged

for Mr. Honie to get counseling.  *Id*. at 87.  Mr. Honie later got into trouble again and

they put him into rehabilitation programs on two occasions.  *Id*. at 87-88.

Franklin stated that he loved his son and did not want him to die.  *Id*. at 92.  He

then stated, "See, right now you people won't believe it, but he's praying for everybody,

that they'll go through their lives in good health and they won't bump into obstacles.

That's what we do.  That's what he does every night and mornings [sic]."  *Id*. at 92.

Franklin said that if his son was put into prison, he could help the illiterate read.  *Id*. at

93.  He also said that if Mr. Honie is allowed to live, then he can complete the final

ceremony of his spiritual training, but that he could not do it if he was in prison.  *Id*. at

93-94.  Franklin then told the court that his son should be spared so that he can show

everybody that he has changed.  *Id*. at 94.  Franklin closed by telling his son, "Tate, hang

in there."  *Id*. at 94.

On cross-examination, Franklin testified that he raised Mr. Honie in the Hopi

culture and tradition and he was a good father who raised Mr. Honie to be a good son.  *Id*.

at 95.  Franklin stated that Mr. Honie was raised in a good home, in a good environment.

*Id*. at 95.  When Mr. Honie was fourteen years of age they moved from their home on the

mesa to a H.U.D. home below the mesa.  *Id*. at 96, 103.  The home on the mesa did not

have running water or toilets.  *Id*. at 98, 101.  The mesa home was partitioned off into two

rooms, a bedroom and the front room.  *Id*. at 101.  The family all slept together in the

36

bedroom in bunk beds.  *Id*. at 101.  The new home had four bedrooms, running water, a

bathroom and a furnace.  *Id*. at 102.

### Dellarita Leslie

Ms. Leslie was Mr. Honie's aunt.  (TR ROA 605 at 104)  Mr. Honie always called

her "Rita Momma."  *Id*. at 105.  She and Mr. Honie were very close.  *Id*. at 105.  As a

child, Mr. Honie was very loving, very caring, and very affectionate.  *Id*. at 105.  He got

along with other kids and was very caring for adults, especially the elderly.  *Id*. at 105-

106.  He always had a helping hand for the elderly, whatever they needed.  *Id*. at 106.

Mr. Honie loved animals and never let an injured animal go by without helping it.  *Id*. at

106.  Ms. Leslie thought of Mr. Honie as a "model child."  *Id*. at 106.  She learned that he

later had some problems, but she never witnessed them herself.  *Id*. at 106.  Mr. Honie's

mom, Teresita, would tell Ms. Leslie, who was her sister, "Your boy got into this . . . or

got into trouble."  *Id*. at 107.  Mr. Honie's mother told Ms. Leslie that Mr. Honie was

drinking but Ms. Leslie never saw him drinking.  *Id*. at 107.

When Mr. Honie was seventeen or eighteen, the Hopi Tribal Court, at Mr. Honie's

request, ordered him to live with Ms. Leslie and her family in Tuba City.  *Id*. at 107-108.

Ms. Leslie had four children with whom Mr. Honie got along.  *Id*. at 108.  Ms. Leslie

stated that Mr. Honie did really well in school, getting As and Bs, and very rarely, a C.

*Id*. at 108.  Mr. Honie was a happy outgoing child when he lived with her, which was for

about one and one-half to two years.  *Id*. at 108-109.  Mr. Honie always participated in

family activities and never skipped school when he lived with her.  *Id*. at 109.  After

school, he would play football during the season; and when there was no football, he

came straight home to do homework.  *Id*. at 109-110.  Mr. Honie never stayed out at

night and never drank alcohol when he lived with Ms. Leslie.  *Id*. at 110.  While they

looked forward to his graduation, about six months before he was to finish high school,

the family went to Polacca for a weekend, and Mr. Honie met up with some old friends

and never returned to Tuba City.  *Id*. at 111.

      Ms. Leslie testified that Mr. Honie did not think that his parents cared for him.  *Id*.

at 113.  Mr. Honie thought his father did not like him.  *Id*. at 113.  Ms. Leslie said there

was a family history of depression and that she herself had depression.  *Id*. at 113.  Ms.

Leslie testified that Mr. Honie's sister, Francine, had depression and had attempted

suicide.  *Id*. at 114.  Ms. Leslie did not know that Mr. Honie had depression.  *Id*. at 115.

Ms. Leslie stated that she has a brother who is an alcoholic.  *Id*.  Ms. Leslie was not

aware that Franklin had a drinking problem.  *Id*. at 116.

      Ms. Leslie testified that Mr. Honie's daughter, T.H., calls her "Ice Cream

Grandma."  *Id*. at 117.  Ms. Leslie stated that the day before her testimony, she had a

conversation with Ms. Pikyavet who said she still wanted Mr. Honie around so T.H.

would have a father in her life.  *Id*.  Ms. Leslie stated that she met with Mr. Honie for the

first time in a long time and that he was still the same affectionate person, and was sorry

for what he has done.  *Id*. at 118.  She also testified that since Mr. Honie has been in

custody, he has written to his cousins telling them that drugs and alcohol are bad.  *Id*. at

119.  Ms. Leslie then addressed the court, "I think, Your Honor, I would really like to see

my son stay around so that he can show other—other people that drugs and alcohol can do a lot of damage to a person; and I definitely don't want him to die." *Id*. at 120. She then asked permission to "hug my son for the last time[,]" which the court allowed. *Id*.

### Maudine James

Ms. James is Mr. Honie's aunt. (TR ROA 605 at 123) Ms. James described Mr. Honie as a "real happy child." *Id*. at 125. Her husband always took him fishing. *Id*. Ms. James noted that she had just approached Mr. McCaughey that day in court and asked if she could get on the stand and apologize to the Paiute community. *Id*. at 125-126. Ms. James then offered her apology but also at one point questioned her nephew's guilt:

> I know she was—she meant a lot to you people. She was one of you. But I also sincerely believe that we're here today to determine my nephew's destination and I want to beg you people[ ], if there is anything here that I have said today that made any sense, my son . . . has done, *if he has done it*, a great wrong, and nothing we say or do is going to undo that.

*Id*. at 126-127 (emphasis added). On cross-examination, she described Mr. Honie's childhood home as "a happy place." *Id*. at 129. When asked to explain her earlier remark, "if he has done it[,]" she responded, "I really don't think that he's capable of it . . . . ." *Id*. at 130.

### Teresita Honie

Teresita is Mr. Honie's mother. (TR ROA 605 at 131) Teresita described her son as a "happy, outgoing, loveable, pretty quiet[]" child. *Id*. at 131. She testified that he began drinking and staying out at night when he was around fourteen years old. *Id*. at 132. She attributed his behavior to the friends with whom he was spending time. *Id*.

39

Teresita testified that she first became aware of his drinking when he was in junior high, and that by that time he was already an alcoholic. *Id*. at 133. She acknowledged that her husband and son, Si, also had drinking problems. *Id*. She stated that she was into alcohol from the time Mr. Honie was in third or fourth grade through his junior high school years, and drank heavily. *Id*. at 133-134. Teresita testified that her husband only drank once in a while, but would drink until he passed out; whereas, she would drink every day. *Id*. at 134.

Teresita testified that her son had told her he did not feel loved by her and his father and that they preferred their other children over him. *Id*. She also stated that she and her husband had marital problems when Mr. Honie was a child and that they did not get along well during that time. *Id*. at 135. She stated that they fought verbally and physically and that Mr. Honie witnessed this. *Id*. at 135-136. Teresita also testified that both she and her daughter, Francine, suffer from depression and had attempted suicide on separate occasions. *Id*. at 137-138. Mr. Honie was about eight years old when she attempted to take her life. *Id*. at 138. Mr. Honie was home at the time and saw her go into the bedroom where she attempted to shoot herself. *Id*. at 139. Teresita noticed that her son became withdrawn as he got older and they tried to get counseling for him. *Id*. at 139-140.

Teresita described a vehicle accident in which both she and her husband were involved. *Id*. at 143. It occurred on the night of Mr. Honie's sixth grade graduation, and the vehicle she and her husband were driving was struck by a dump truck. *Id*. at 143.

40

She said that her son witnessed the accident from the top of the mesa and ran down to where they were.  *Id*. at 144.  Teresita said her son was very upset when he saw his father covered in blood.  *Id*.  Her son became more withdrawn and depressed after this.  *Id*. at 145.

Teresita described her son as a good father to his daughter, T.H.  *Id*.  Teresita also felt that her son had changed since he had been in custody: he seemed more grown up and less selfish.  *Id*. at 146.  Her son also expressed concern for Ms. Benn's family and had been praying a lot as a white man does.  *Id*.

Teresita asked the court to let her son live because she loves him.  *Id*. at 148.  She then said, "I didn't raise a horrible monster that everybody seems to think he is.  He's human.  I'm human.  We make mistakes.  He made a horrible mistake, *if he did.  But I can tell you I never never will believe that he did what some of the things that were said he did.  Id*. at 148-149 (emphasis added).  Teresita then added, *"[N]obody will ever convince me that my son would do something as horrible as the things that were said.*  If his hands did do what they said he did, I know his mind was not Tate's mind.  I know my son.  I raised him to know right from wrong."  *Id*. at 149 (emphasis added).  She then asked the judge to spare her son.  *Id*. at 150.

### Nancy Cohn, Ph.D.

The defense retained Nancy Cohn, Ph.D., to perform a psychological evaluation to determine whether there was a basis for raising a mental state defense during the merits phase of the trial, or whether there was mental health evidence that could serve as

41

mitigation during the penalty phase of the trial.  (TR ROA 605 at 163)  Dr. Cohn testified

she had worked for both the prosecution and the defense on a limited number of capital

cases and that the majority of her practice entailed doing court-appointed competency

evaluations.  *Id*. at 160.  When asked what she believed her role was in Mr. Honie's case,

she stated, "I view myself as though I were a court-appointed expert in all cases, which

means that I have a neutral opinion when I go in and that whatever my opinion is, the

person who retains me has to stand by that."  *Id*.

Dr. Cohn performed psychological testing on Mr. Honie over the course of two

days and met with him several months later to discuss some of the background

information she had found.  *Id*. at 164-165.  Dr. Cohn also traveled to Polacca, Arizona

and Tuba City, Arizona with Stephen McCaughey and the trial investigator, to meet with

and interview Mr. Honie's family.  *Id*. at 166.  She met the family as a whole, and

interviewed Mr. Honie's parents and his brother Si, then drove to Tuba City to interview

his aunt Dellarita Leslie.  *Id*. at 165-167.

Dr. Cohn testified that Mr. Honie grew up in poverty and did not feel loved by his

family.  *Id*. at 170-171.  Dr. Cohn testified that Mr. Honie felt disconnected from his

family, and had an anxious attachment, rather than a firm bond, with his parents and

family.  *Id*. at 171-172.  Dr. Cohn noted that Mr. Honie started getting into trouble and

using drugs when he was eleven or twelve years of age.  *Id*. at 172-173.  She noted that

because he did not feel connected to his family, he bonded with elderly women in the

community, all of whom subsequently died, which was very traumatic for him.  *Id*. at

42

173.  This was followed by an incident involving attempted sexual molestation by a man named John Boone when he was eleven or twelve.  *Id*. at 174.  Both of the incidents occurred prior to the change in Mr. Honie, and she believed that both events triggered defiant and oppositional behavior in Mr. Honie at this time.  *Id*. at 176.

Dr. Cohn briefly addressed the fact that both of Mr. Honie's parents drank when he was young and were not home a lot, leaving the older siblings to take care of the younger siblings.  *Id*. at 178.  She also addressed Mr. Honie's drug and alcohol abuse and attempts at recovery through counseling with Mr. Hoosava and treatment in rehabilitation programs.  *Id*. at 180-186.  Dr. Cohn noted that during one of his stays in rehab at the Indian Alcohol Recovery Center, Mr. Honie was prescribed antidepressants; however, he stopped taking them when he left rehab because he could not afford the prescription.  *Id*. at 184.  Dr. Cohn noted that it was difficult for Mr. Honie to maintain his sobriety outside of rehab because he returned home to his family who were using.  *Id*. at 186.

Dr. Cohn performed some cursory testing of Mr. Honie, including intellectual screening and neuropsychological screening, rather than full testing in these areas.  *Id*. at 188-189.  She also performed some personality testing on Mr. Honie.  *Id*. at 189.  Dr. Cohn's testing revealed that Mr. Honie was a "troubled young man who has struggled with both anxiety and depression."  *Id*. at 190.  She noted that Mr. Honie's depression was not "the kind of depression that you take a pill for and get better."  *Id*. at 190.  She stated that Mr. Honie's depression stemmed from "being raised in an unattached family in an insecure environment in a place that isn't safe and predictable . . . ."  *Id*.at 190.  She

43

also then acknowledged that there were "some strong suggestions in the record that he actually gets depressed and can benefit from medication." *Id*. at 190.

Dr. Cohn testified that Mr. Honie felt remorse and shame for his actions. *Id*. at 190-191. Dr. Cohn believed that Mr. Honie was both consciously remorseful and unconsciously remorseful given the dreams he was experiencing. *Id*. at 191.

Despite the fact that the jurors did not find him guilty of aggravated sexual abuse of a child during the merits phase of the trial, Mr. McCaughey then elicited testimony from Dr. Cohn that Mr. Honie had told her he molested D.R. in an apparent effort to demonstrate Mr. Honie's remorse about the crime. *Id*. at 192. While Dr. Cohn characterized Mr. Honie's statements with regard to D.R. as an admission of guilt, she stated he told her that he had pushed D.R. away from him when he realized the police were at the house, but could not explain why he would have put his finger inside of her. *Id*. Dr. Cohn testified that Mr. Honie told her, "That happened to me and I can't believe I did that. I don't know why I did that. I can't believe I did that." *Id*.

Dr. Cohn went on to testify that Mr. Honie had a pattern of having relationships with older women and had a sexual relationship with Ms. Benn when he and Carol lived with her in Salt Lake City. *Id*. at 193. Dr. Cohn believed that this was a source of conflict between Ms. Benn and Mr. Honie. *Id*. at 195. Dr. Cohn stated that she believed that Ms. Benn was unhappy about Mr. Honie's relationship with her daughter after they had had sexual relations and began saying demeaning things about Mr. Honie to her daughter. *Id*. at 195.

44

Dr. Cohn then gave her account of what she believed happened at the house.  *Id.* at 199-200.  While the defense did not present any theory of the crime during the merits phase of the trial, to refute the State's theory, Dr. Cohn then described the crime as a heated domestic incident that stemmed from provocation by the victim, Ms. Benn.  *Id.* at 199-200.  Dr. Cohn noted that Mr. Honie had been drinking and smoking marijuana throughout the day of the crime.  *Id.* at 199.  Dr. Cohn testified that she believed Mr. Honie went to Ms. Benn's home to sleep under the porch and wait for Ms. Pikyavet to get home.  *Id.* at 200.  When Ms. Benn heard Mr. Honie under the porch, she began yelling at him and demeaning him which served as a provocation to Mr. Honie.  *Id.*  Because Ms. Benn would not relent in her insults, Mr. Honie broke the glass to get into the house.  *Id.*

Dr. Cohn then testified that she did not believe that there was a risk that Mr. Honie would be violent while in prison, especially because he would not have access to drugs or alcohol.  *Id.* at 201.

On cross-examination, Dr. Cohn clarified that she believed the crime resulted from "extreme emotional arousal" in an "intense domestic dispute."  *Id.* at 206.  She believed it was "intense affective violence."  *Id.* at 206-207.  She also admitted on cross-examination that she did not know the difference between the Hopi and Tewa Tribes, nor did she know what Mr. Honie's clan was.  *Id.* at 208.

### Farrell Hoosava

Farrell Hoosava was a mental health counselor for the Hopi Tribe who treated Mr. Honie for several years for alcohol and drug abuse.  (TR ROA 606 at 8)  Mr. Hoosava

noted that there was no family support for Mr. Honie's therapy and that Mr. Honie was really on his own.  *Id*. at 11.  Mr. Hoosava described the Hopi Reservation as being impoverished.  *Id*. at 12.  He also noted that while Hopi High School looked nice from the outside, the teachers and staff did not want to deal with any problems and would suspend students for any kind of offense rather than trying to get to the source of problems.  *Id*. at 13-14.

### Carol Pikyavet

Ms. Pikyavet testified for the third time at trial during Mr. Honie's penalty phase.  *Id*. at 21.  Ms. Pikyavet testified that three to six months into her relationship with Mr. Honie, he confided in her that he had been molested when he was young.  *Id*. at 22.  She could not remember the details of what Mr. Honie told her.  *Id*. at 22-23.  Ms. Pikyavet also testified that she would be satisfied if Mr. Honie received a life without parole sentence for the death of her mother.  *Id*. at 23.

### Taberon Honie

Mr. Honie exercised his right to allocution at the penalty phase.  *Id*. at 25.  He had been preparing the statement for ten months.  *Id*. at 26.  In his allocution, he apologized and begged for forgiveness from the victims.  *Id*. at 26-28.  He also apologized to his parents and his aunt, Dellarita, as well as to the State of Utah, Iron County, and the Paiute Tribe.  *Id*. at 28.  This concluded the defense's penalty phase presentation.

46

### c.      The State's Rebuttal at the Penalty Phase

### Roger Dokken

On rebuttal, the State presented the testimony of Roger Dokken, the Assistant United States Attorney in Phoenix, who prosecuted John Boone for child molestation on the Hopi Indian Reservation.  *Id*. at 30.  Mr. Dokken testified that Mr. Boone kept a chart of his victims, who numbered 142.  *Id*. at 32.  Of the total victims, he stated 94 were molested and the remainder were victims of voyeurism.  *Id*. at 32.  Mr. Dokken testified that Mr. Boone was well-respected by the community and had obtained the trust of the parents and children.  *Id*. at 32-33.  There were not a lot of recreational activities for children on the reservation and Mr. Boone invited children over to his home to watch videos.  *Id*. at 33.  Many children lived on the mesa without any water and Mr. Boone invited them to shower at his home.  *Id*. at 33.  Mr. Boone developed relationships with the children over time, leading up to the act of anal intercourse.  *Id*. at 33.  Mr. Dokken testified that Mr. Boone's chart was detailed with nine categories of actions leading up to anal intercourse.  *Id*. at 33-34.

Mr. Boone, a Caucasian, was employed by the Bureau of Indian Affairs and all of the victims were Native American children.  *Id*. at 35.  The federal government conducted an investigation, looking for victims and offering counseling to those who admitted to being victimized.  *Id*. at 36.  A number of civil lawsuits were filed and consolidated, resulting in a $13 million settlement.  *Id*.  Mr. Honie was not part of any of the lawsuits and did not appear on Mr. Boone's chart.  *Id*. at 38-39.  Mr. Dokken testified

that it was possible Mr. Honie had been a victim of Mr. Boone but that he "would be surprised." *Id*. at 39.

On cross-examination, Mr. Dokken testified that only 58 victims filed civil suits, 90 victims did not. *Id*. at 40-41. Mr. Dokken also admitted on cross-examination that there was not a category on his chart for attempted anal intercourse, or any anal intercourse at all, even though some children were victims of anal intercourse. *Id*. at 43-44. The children who were identified as victims of anal intercourse were the ones who appeared on the chart and had all of the categories on the chart checked off. *Id*. at 44. There was not a column or category for anal intercourse. *Id*.

### d.      The Court's Order and Findings

The court found that the totality of the aggravating circumstances outweighed the totality of the mitigating circumstances beyond a reasonable doubt, and sentenced Mr. Honie to death. *Id*. at 86.

### C.      Direct Appeal Proceedings

Mr. Honie was represented by Mr. McCaughey during his direct appeal. On appeal, Mr. McCaughey challenged the constitutionality of Utah's aggravated murder statute, the sufficiency of the evidence introduced at trial, the court's weighing of aggravating and mitigating facts in his determination that Mr. Honie should be sentenced to death, and the disproportionality of a death sentence in Mr. Honie's case. (Opening Brief of Appellant, 04/11/00)

In a supplement to the Opening Brief, Mr. McCaughey argued that a portion of the prosecutor's closing argument constituted error.  Mr. McCaughey noted that the prosecutor argued:

> [Mr. Honie] did not murder a drunken Indian in the park in Cedar City.  He did not murder a woman who, ah, had spent her life drinking alcohol and puking and walking the streets and shoplifting at Wall-Mart [sic].  He murdered someone that these people look up to.  He murdered a superstar in the P[a]iute community and much like Mr. Hoosava that worked hard to get his bachelor's degree and two-year substance degree and return to the people, she returned to her people.

(Supplement to Opening Brief, 08/15/00, at 2)  Mr. McCaughey argued this was structural error requiring reversal.  (Supplement to Opening Brief, 08/15/00, at 7-12)  Mr. McCaughey also argued the Utah Supreme Court should exercise its supervisory powers to correct a fundamental unfairness in Mr. Honie's proceedings.  (Supplement to Opening Brief, 08/15/00, at 13)

In an additional supplement to the Opening Brief, Mr. McCaughey raised further arguments challenging the felony murder statute as well as the application of harmless error review to capital sentencing proceedings.  (Supplement to Opening Brief, 10/23/00)

On review, the Utah Supreme Court found that "[o]nly one of the issues raised on appeal was properly presented to the trial court and thereby preserved for appeal[,]" and held that, consequently, the claims on appeal would be reviewed only for "manifest and prejudicial error."  *Honie*, 57 P.3d at 983.  The court noted, "[e]xcept for his argument that Utah's statutory scheme unconstitutionally fails to channel sentencing discretion by failing to narrow the class of person who are eligible for the death penalty, defendant did

not raise before the trial court and properly preserve the constitutional and other issues he raises now on appeal." *Id.* at 983 n.2.

With regard to Mr. McCaughey's argument that the trial court erred in considering the aggravating factor of aggravated sexual abuse of a child where the jury did not find this aggravating factor beyond a reasonable doubt at the merits phase, the court noted that it was, in fact, the defense who presented this information at sentencing through the testimony of its own expert, Dr. Cohn. *Id.* at 993.

The court was also critical of the manner in which Mr. McCaughey raised his claims in the brief. In addressing his argument that victim impact evidence should not be considered at sentencing as a matter of constitutional law, the court noted that it "decline[d] the invitation to address the issue [ ]" because:

> [Mr. McCaughey did nothing] more than offer that the footnoted constitutional provisions could be used by this court to support an exclusion of victim impact evidence. He did not, in any meaningful fashion, discuss how any of these constitutional provisions should be interpreted to exclude victim impact evidence. As we have repeatedly reminded, this court is simply not a depository in which the appealing party may dump the burden of argument and research.

*Id.* at 994 n.7. The court also refused to consider Mr. McCaughey's argument that the prosecutor's ethnic statement during closing argument constituted reversible error because he merely provided a string cite of case law in a footnote without providing any analysis. *Id.* at 995.

The court concluded that it "decline[d] to assume the role of advocate" and that given the facts and argument before it, did not find that the case contained any

50

manifest or prejudicial error.  *Id.*  The court affirmed Mr. Honie's conviction and sentence.  *Id.* at 996.

### D.    Post-Conviction Proceedings

Represented by Michael Esplin in his post-conviction proceedings, Mr. Honie filed his Preliminary Petition for Post-Conviction Relief on February 26, 2003, (PCR ROA 1-6) and, thereafter, filed his Amended Petition for Post-Conviction Relief on December 1, 2003.  (PCR ROA 19-71)  In response, the State moved for sanctions pursuant to Rule 11 on April 30, 2004, claiming inadequate briefing, which was denied by the district court on August 30, 2004.  (PCR ROA 103-106; 204-208)  The State then filed a Motion to Dismiss Amended Petition and for Partial Summary Judgment on October 26, 2004.  (PCR ROA 212-217)

The district court denied the State's first motion for summary judgment, in part, finding that several of Mr. Honie's claims of ineffective assistance of trial counsel for failing to adequately investigate and present mitigating evidence "raise[d] a genuine issue with respect to whether trial counsel's less-than-complete investigation was reasonable and, therefore, whether he failed to comply with prevailing norms of professional practice in conducting his mitigation workup."  (PCR ROA 1037-1038)

Following the district court's ruling, the State moved for discovery (PCR ROA 1096-1098), which was granted.  (PCR ROA 1133-1134)  In response, post-conviction ("PCR") counsel filed a motion and memorandum in support requesting additional funds to complete discovery and to stay the response to the State's discovery motion.  (PCR

ROA 1139-1154)  In this motion, PCR counsel informed the district court that investigative "expenses submitted for payment have exceeded the amount allowed by the regulations of the Division of Finance[,]" and that additional funds were needed for "costs associated with the completion of the investigation including expert fees for consultation and related services."  (PCR ROA 1143)

In support of his motion, PCR counsel submitted an additional declaration from Bruce Whitman, the PCR mitigation investigator, who outlined specific areas of mitigation that warranted further investigation based on his preliminary review of Mr. Honie's background, including: Mr. Honie's family history of serious mental illness and seizure disorders which could have effected Mr. Honie's brain function and behavior; Mr. Honie's history of multiple serious head injuries which could have affected his cognitive functioning; Mr. Honie's family history of severe alcoholism as well as Mr. Honie's own long-standing addiction to alcohol and drugs which began early in his life, including marijuana, inhalants, and heroin; the likelihood that Mr. Honie suffers from brain damage; the likelihood that Mr. Honie suffers from neurological impairments caused by Fetal Alcohol Syndrome (FAS) or Fetal Alcohol Effects (FAE) due to prenatal exposure to alcohol in his mother's blood stream; and psychological trauma caused by witnessing violence in the home and being sexually molested by a man in the community.  (PCR ROA 1147-1151)  Mr. Whitman explained that further investigation was necessary to develop this mitigating evidence, including further interviews with witnesses and further record collection, which then could be provided to counsel and experts who would be

hired to determine Mr. Honie's cognitive functioning and mental health state.  (PCR ROA 1151-1154)

Upon the request for additional funds, the Utah State Division of Finance moved to intervene pursuant to R25-14-1 through 6 of the Utah Administrative Code.  (PCR ROA 1157-1159)  The Division of Finance also filed a response to Mr. Honie's request for additional funds, arguing that Mr. Honie did not comply with the Division's rules because he failed to estimate the cost of the work to be performed by Mr. Whitman and other experts, and failed to demonstrate that "this work is reasonable and necessary to the presentation of his claims."  (PCR ROA 1160-1166)  The Division of Finance further argued that the work to be performed may be duplicative of work already before the court.  (PCR ROA 1160-1166)  The State also opposed Mr. Honie's request for additional funds, stating that "[t]hrough a combination of statute and administrative rule, the State of Utah provided Mr. Honie with a maximum of $20,000 to cover the costs of investigators, expert witnesses, and consultants."  (PCR ROA 1170)

On November 20, 2006, the district court denied Mr. Honie's funding request stating he had already received the maximum amount of funding for investigation under Rule R25-14-5.  (PCR ROA 1243-1248)  Thereafter, on November 24, 2006, the district court denied Mr. Honie's motion to stay his response to the State's requests for

discovery,[7] rejecting Mr. Honie's argument that he could not respond to the State's discovery requests without first obtaining additional funding.  The district court allowed Mr. Honie thirty days to comply or be subject to sanctions pursuant to Rule 37.  (PCR ROA 1249-1255)

On December 22, 2006, Mr. Honie submitted his Answers to Interrogatories and Response to Request for Production of Documents in response to the State's discovery requests.[8]  (PCR ROA 1338-1358)  In response to the State's request for the identities of experts Mr. Honie intended to call, Mr. Honie stated that while he had identified several potential experts he was not able to retain them at this time because he did not have any funding to do so, but "in the event . . . [he] is able to obtain additional funding either from the State of Utah, or through another source to enable him to retain those experts, [he] will supplement his answers to interrogatories and provide the requested information."  (PCR ROA 1339-1340)  In response to the State's request for the identities and anticipated testimony of the lay witnesses Mr. Honie intended to call, Mr. Honie stated that he was providing as much information as possible given the limited funding that had been available for investigation.  (PCR ROA 1341)  Mr. Honie noted that additional investigation was warranted based on what counsel had learned up to this point, and if

---

[7] In the interest of presenting this issue in a concise manner, the State's Motion to Compel Discovery and the subsequent pleadings and Order related to this motion, have been omitted.

[8] The Utah Supreme Court does not have a copy of the original of this document in its file.  The only copy of this document in the state court record is a copy that is attached to the State's Second Motion for Summary Judgment filed on June 22, 2007, as "Exhibit B."  It is this exhibit that the court references with PCR ROA numbers 1338-1358.

additional funding became available, Mr. Honie would complete his investigation and supplement his answers to the interrogatories.  (PCR ROA 1341)

Mr. Honie stated that he intended to introduce the testimony of his father, Franklin Honie Sr., who was expected to offer testimony about Mr. Honie's childhood and the circumstances of his life as a child and young man.  (PCR ROA 1343)  Mr. Honie also intended to introduce the testimony of his mother, Teresita Honie, who would testify about the family history of depression, the events in Mr. Honie's life that contributed to his drug and alcohol abuse, the nature of the family makeup and family dynamics, the cultural and religious practices in which Mr. Honie was raised, and the family's disciplinary practices.  Teresita would also testify that she had a very difficult birth with Mr. Honie which required an episiotomy to facilitate his parturition (PCR ROA 1344); that Mr. Honie did not cry for three to five minutes, and that his head was misshapen and remained dark blue for a substantial period after his birth[]" (PCR ROA 1344); that Mr. Honie was present when she attempted to kill herself with a gun, and how Mr. Honie's father kicked open the bedroom door just in time to stop her from shooting herself (PCR ROA 1344); that Mr. Honie's sister Francine attempted to kill herself in her 20s, and that Mr. Honie was profoundly affected by the deaths of three elderly women in the community with whom he was very close (PCR ROA 1344-1345); that Mr. Honie's father and brother Wilfred "Si" were severe alcoholics and that nearly everyone in Franklin's family drank heavily (PCR ROA 1345); that she was an alcoholic throughout Mr. Honie's childhood until he was in high school, and that nearly all the males in her

family were alcoholics (PCR ROA 1345); that she and Franklin were engaged in "bootlegging" until they caught Mr. Honie taking from their inventory, and that Mr. Honie began using alcohol at a much younger age than her other children and he often came home very drunk (PCR ROA 1345); that Mr. Honie witnessed his parents being involved in a terrible car accident with a dump truck, saw his father covered in blood, and that his "personality changed following that incident[]" (PCR ROA 1345); that she suspected Mr. Honie was molested by John Boone, a man whom Mr. Honie considered to be his best friend, and who was a school staff member who was convicted of molesting more than 100 boys on the Hopi Reservation, but that she was in denial about it and never properly pursued it.  (PCR ROA 1346)

Mr. Honie also intended to present the testimony of Roanna Jackson who observed Mr. Honie while drunk on many occasions.  (PCR ROA 1346)  Ms. Jackson also witnessed Mr. Honie falling from First Mesa and landing head-first at the base of the cliff.  (PCR ROA 1346)  The incident resulted in Mr. Honie being airlifted to Flagstaff Medical Center to be treated for head injuries.

Mr. Honie intended to present the testimony of Sankey Jackson, a boyhood friend of Mr. Honie's, who had been molested by John Boone and who would testify that Mr. Honie spent a lot of time at Mr. Boone's house.  (PCR ROA 1347)  Mr. Jackson would also testify that there were several children on the reservation who were also victimized by Mr. Boone but who were too ashamed to come forward.  (PCR ROA 1347)

56

Mr. Honie noted that he had shared with his trial counsel, Dr. Cohn, and Ted Cilwick, the trial investigator, certain mitigating facts that were never investigated and witnesses who were never interviewed.  (PCR ROA 1348-1356)  Mr. Honie also told Mr. Cilwick that he had been abused by Mr. Boone when he was in grade school.  (PCR ROA 1350)  Mr. Honie said that he had gone to Mr. Boone's home one day after playing on the mesa to take a shower because he was dirty and may have even messed his pants.  (PCR ROA 1351)  While Mr. Honie was in the shower, Mr. Boone entered the shower naked and attempted to rape Mr. Honie.  (PCR ROA 1351)  Mr. Honie ran out of the shower before anything could happen.  (PCR ROA 1351)

Mr. Honie provided Mr. Cilwick with detailed information about his alcohol and drug abuse, as well as details about witnessing his parents being involved in a car accident and about his fall from the mesa.  (PCR ROA 1349, 1352-1354)  Mr. Honie also told Mr. Cilwick that as an adult, he had been involved in a car accident in which he injured the front part of his head.  (PCR ROA 1354-1355)  Mr. Honie shared all of the above information with Dr. Cohn as well.  (PCR ROA 1355)

On May 8, 2007, a telephone status conference was held with the district court and the parties.  (PCR ROA 1262)  The minutes from the status conference indicate that PCR counsel submitted another request for additional funds which was pending before the court, and that PCR counsel was "exploring alternatives[]" for funding.  (PCR ROA 1262)  The minutes also indicate that the State intended to file a new motion for summary

judgment.  (PCR ROA 1262)  The district court set the matter for a hearing in sixty days.  (PCR ROA 1262)

On June 22, 2007, the State filed a second motion for summary judgment.  (PCR ROA 1266-1269)  The State noted that since the district court's denial of summary judgment as to certain claims related to ineffective assistance of trial counsel for failing to perform a reasonable mitigation investigation, the State conducted discovery and obtained an affidavit from trial counsel.  (PCR ROA 1267)  The State then argued that based on trial counsel's affidavit and Mr. Honie's proffer of what he could present if he had additional funding to develop his claims, Mr. Honie could not demonstrate either deficient performance or prejudice in trial counsel's sentencing investigation and presentation.  (PCR ROA 1267)  The State noted that just because Mr. Honie was denied funding to develop his claims, his "financial hardship does not excuse his burden to establish prejudice."  (PCR ROA 1312)  The State observed that "[w]ithout the expert testimony, Mr. Honie cannot establish that his counsel in fact overlooked any additional psychological evidence. . . . (citation omitted) [and] Mr. Honie cannot meet his burden of proving a reasonable probability that the outcome of the sentencing hearing would have been different. . . ."  (PCR ROA 1313)

The State also filed a motion to strike the affidavit of Bruce Whitman, pursuant to Rule 56(c) and (e) of the Utah Rules of Civil Procedure.  (PCR ROA 1587-1592)  The State argued that because Mr. Honie lacked the funds to present the testimony of Mr. Whitman, he could not comply with Rule 56 which provides that affidavits submitted in

opposition to summary judgment must "show affirmatively that the affiant is competent to testify to the matters stated therein." (PCR ROA 1589-1592) The district court denied the motion, finding that Mr. Whitman was not incompetent to testify but rather that Mr. Honie lacked the funds to continue to retain him as an expert. (PCR ROA 1604) The district court noted:

> [F]or reasons of fundamental fairness it makes sense not to permit a court to rule on a motion for summary judgment based upon evidence or testimony that *cannot* be admitted or heard at trial because doing so would be inconsistent with constitutional mandates or rules of evidence. But it is not the case that Mr. Whitman *cannot*, for constitutional or evidentiary reasons, testify at a trial. Instead, he *will not* be testifying because [Mr. Honie] is unable to afford him as a witness.

(PCR ROA 1605)

In response to the State's second motion for summary judgment, Mr. Honie filed a Motion for Reasonable Attorneys Fees and Funds to Complete Investigation and to Stay Proceedings, or, in the Alternative, to Allow Counsel to Withdraw. (PCR ROA 1607-1608) Mr. Honie argued that he was unable to "effectively respond to the pending State's [Second] Motion for Summary Judgment without having completed the investigation." (PCR ROA 1610) Mr. Honie noted that his efforts "to obtain additional funding through the administrative process to complete the investigation and retain experts have not been successful to date and relief though [sic] that avenue does not appear be forthcoming." (PCR ROA 1611)

In support of the motion, PCR counsel submitted an affidavit in which he stated that in order to comply with his duties as post-conviction counsel he would be required to

exceed the statutory cap of $20,000 in order to hire necessary experts and complete the investigation.  (PCR ROA 1634-1635)  PCR counsel stated that he petitioned the Division of Finance requesting that the $20,000 cap be lifted in capital cases but had not yet received a response.  (PCR ROA 1635)  He also stated that state defense agencies had been in discussions with the Utah Attorney General's office about increasing funding for capital post-conviction cases as recently at October 16, 2007, but that nothing had been resolved.  (PCR ROA 1635)

PCR counsel also expressed concern that while he was assured by an assistant attorney general for the Division of Finance that there was no communication between the Division of Finance and the State, he believes that the two parties were "acting in concert to prevent Mr. Honie from being able to present his case to the court by delaying or refusing funding."  (PCR ROA 1636)  PCR counsel noted that the State's recent motion to strike the affidavit of Mr. Whitman due to Mr. Honie's inability to pay him to testify was evidence of the collusion between the Division of Finance and the State. (PCR ROA 1636)

PCR counsel noted that the only way he could pursue further funding was to file a civil lawsuit but that he was not willing to bear the financial cost of such an endeavor as he had done so in a prior case and could not afford to do so again.  (PCR ROA 1636-1637)  PCR counsel noted his commitment to representing capital clients but stated that he could not afford to support his family and make necessary monthly payments for his law firm without further compensation.  (PCR ROA 1640)  PCR counsel concluded that

his negative experiences in this matter had persuaded him that he could no longer become involved in capital cases, that the emotional toll and financial losses associated with this type of representation made such continued representation untenable.  (PCR ROA 1640)

Several motions by the State, the Division of Finance, and Mr. Honie ensued throughout 2007 and 2008.  In the interim, the Post-Conviction Remedies Act ("PCRA") was amended and the parties briefed the applicability of 2008 amendments to the PCRA to Mr. Honie's case.  On November 28, 2008, the district court issued its ruling on the applicability of the 2008 amendments to the PCRA.  (PCR ROA 2564-2577)  The applicability of the 2008 amendments to the PCRA to Mr. Honie's case was significant because if it applied, Mr. Honie would be entitled to request additional funding for attorney fees and investigatory funds.  The district court ruled that the funding amendments to the PCRA were procedural in nature, not substantive, and applied retroactively to Mr. Honie's case; therefore, PCR counsel was

> entitled to seek payment consistent with the procedures set forth by the new funding amendments for work performed and litigation expenses incurred on or after the effective date of May 5, 2008, and for all work completed and litigation expenses incurred prior to the effective date for which payment has not been received.

(PCR ROA 2569-2571)  The district court also noted that under the new funding provisions, Mr. Honie would be entitled to "unlimited attorney fees [at] $125 per hour

and unlimited investigative funds to develop potentially meritorious post-conviction claims. . . ."[9]  (PCR ROA 2571)

Thereafter, Mr. Honie submitted an invoice for outstanding attorney fees for work performed from the time of appointment through January 28, 2009, and the court ordered the fees to be paid.  (PCR ROA 2607)  Mr. Honie also submitted a motion requesting approval of funds for experts and investigation.  (PCR ROA 2670-2675)  Mr. Honie requested additional funds so that Mr. Whitman could complete his mitigation investigation.  (PCR ROA 2671-2672)  Mr. Honie specifically noted that Mr. Whitman's work was essential to performing the mitigation investigation and would not be duplicative of work done by the trial team.  (PCR ROA 2672)  Mr. Honie also requested funds to hire several experts to develop mitigation evidence necessary to demonstrate prejudice on his claims of ineffective assistance of counsel for failing to perform an adequate mitigation investigation.  (PCR ROA 2672-2674)

In response to Mr. Honie's request for funding for experts and investigation expenses, two separate attorneys from the Division of Finance filed a morass of multiple motions objecting to the disbursement of funds, requesting receipt of all motions related to disbursement of funds, and objecting to the *ex parte* submission of invoices, to which PCR counsel was required to respond.  (PCR ROA 2619-2625; 2658-2669; 2763-2767; 2768-2772; 2773-2778; 2801-2812)

---

[9] The draft legislation provided that the court could authorize attorney fees of $125 per hour up to $60,000 and litigation expenses up to $20,000, but could "exceed the maximum[s] only upon a showing of good cause. . . ."  S.B. 277. (PCR ROA 2237)

On March 10, 2010, the district court denied Mr. Honie's requests for additional funds, (PCR ROA 2825-2839) finding that Mr. Honie "has not—and cannot—demonstrate good cause to exceed the maximum sums authorized for litigation expenses under the PCRA."  (PCR ROA 2836)  Therefore, even though the district court previously found that Mr. Honie's claims regarding ineffective assistance of trial counsel for failing to adequately investigate and present mitigating evidence "raise[d] a genuine issue with respect to whether trial counsel's less-than-complete investigation was reasonable[,]"  (PCR ROA 1037-1038) the district court nonetheless found that Mr. Honie had not demonstrated good cause to exceed the maximum funding levels under the statute, and denied further funding to develop his claims.  The district court, thereafter, granted the State's second motion for summary judgment, ending Mr. Honie's post-conviction challenges.  (PCR ROA 3315-3348)

Within two months of the district court's grant of summary judgment, Mr. Honie filed a Rule 60(b) motion.  (PCR ROA 3356-3357)  This was a *Menzies*-style motion[10] based on a claim of ineffective assistance of PCR counsel, alleging that PCR counsel had become aware of numerous and substantial issues relating to both his conviction and sentence which had not been investigated by trial counsel, and that PCR counsel had also failed to investigate these claims to present to the district court in his PCR proceedings. (PCR ROA 3358-3374)

---

[10] *See Menzies v. Galetka*, 2006 UT 81 at ¶ 75 (recognizing that Rule 60(b) is an appropriate vehicle for challenging the effectiveness of post-conviction counsel).

The State filed its opposition (PCR ROA 3547-3567) arguing that Mr. Honie was not challenging his attorney's actions but, rather, he only challenged the district court's funding decisions.  (PCR ROA 3557)  Alternatively, the State argued that Mr. Honie failed to support his claim of ineffectiveness against his PCR counsel by proffering evidence despite claiming to have had no ability to continue the investigation, and that the proffers fail to support the claims of ineffectiveness of trial counsel.  (PCR ROA 3561-3565)

The district court ruled on Mr. Honie's 60(b) motion on February 9, 2011.  The order adopted the State's argument and language in denying Mr. Honie's motion.  (Order Denying Motion for Relief From and to Set Aside Judgment, 02/09/11)  Thus, for the second time, due to either a failure or inability of his counsel to conduct an adequate investigation, Mr. Honie was issued a death warrant without having had an opportunity to present his claims to a court for a fair determination on the merits.

### III.    INTRODUCTION TO TABERON HONIE'S BACKGROUND



11

Mr. Honie was born on October 29, 1975 in Keams Canyon, Arizona, to Teresita and Franklin Honie, the fifth of their six children.  (TR ROA 605 at 80)  Mr. Honie and his family are Hopi-Tewa and live on the Hopi Reservation in northeastern Arizona. Hopis are one of the oldest living cultures and have lived for more than 2,000 in the same area where they reside today.[12]  The Hopis live in villages on a high mesa, which originally protected them against other migrating tribes.  *Id.*  The Tewa Indians from the Rio Grande helped the Hopis drive out Spanish missionaries during the Pueblo Revolt of

---

[11] Photo courtesy of the Honie family.
[12] *See* http://grandcanyonhistory.clas.asu.edu/sites_adjacentlands_hopireservation.html (last visited April 29, 2015).

1680 and eventually became part of the Hopi community, but retained their own native language and culture.  *Id.*  The Hopi are a matrilineal society organized by clanships.[13] Mr. Honie is of the Parrott and Kachina Clan, as is his mother.  (Declaration of Teresita Honie, 04/15/15[14])  Mr. Honie grew up learning the spiritual teachings of the Hopi and attended traditional ceremonies and Kachina dances.



[15]

Mr. Honie was raised in his family home on the mesa until he was in the eighth grade.  (TR ROA 605 at 99)  This home is comprised of two rooms, a bedroom where the

---

[13] See hopi.org/about-the-hopi/ (last visited April 29, 2015).

[14] *See* First Rule 7 Motion, Exhibit H.

[15] Photo taken from Hopis Dance at Ancestral Pueblo in Springerville by Barbara Armstrong, September 2001, available at http://www.borderline.us.mensa.org/armstrong/hopiDance.html (last visited April 29, 2015).

entire family slept, and a front room that included the kitchen.  (TR ROA 605 at 101)

The home on First Mesa did not have running water or toilets.  (TR ROA 605 at 98-101)





---

[16] Photos taken by CHU Investigator on 10/11/12.

67

The Hopi community is impoverished.  In 1989, 49.4 percent of people living on the Hopi Reservation lived below the poverty level, with a per capita income of $4,566. ("We the First Americans", issued by the U.S. Department of Commerce, September 1993, at 10[17]) Forty-six point seven percent of homes on the Hopi Reservation in 1989 lacked complete plumbing facilities.  *Id.* at 12.  According to the 1990 Census, 30.6% of all homes on the Hopi Reservation lacked complete kitchen facilities, 49.3% did not have a telephone, and 24% did not have a vehicle.  (Bureau of the Census Statistical Brief, Housing of American Indians on Reservations, at April 1995[18])

Mr. Honie's early years on First Mesa reflected this poverty.  His early childhood records indicate that he was treated for scabies and impetigo on several occasions from 1977 until 1990.  (Hopi Health Care, Childhood Health Records at 12, 13, 21, 22[19]; Hopi Health Records at 53, 59, 64, 69, 72[20])  Mr. Honie described the living circumstances on First Mesa as extremely difficult, "We had no water in the house until 1982.  After that we were able to have a bathroom and toilet in the house.  Prior to the water, we would use an outhouse bathroom and we carried water into the house to cook and bathe.  We got electricity about a year before the water."  (Affidavit of Robert L. Smith, Ph.D., 04/24/2015 at ¶ 37[21])  There were no stores, commercial buildings, healthcare, etc., within the reservation, only one gas station and one coffee shop.  *Id.*  There was also no

---

[17] *See* First Rule 7 Motion, Exhibit FF.
[18] *See* First Rule 7 Motion, Exhibit EE.
[19] *See* First Rule 7 Motion, Exhibit DD.
[20] *See* First Rule 7 Motion, Exhibit CC.
[21] *See* First Rule 7 Motion, Exhibit V.

trash removal so "families just threw trash over the edge of the mesa.  As children, we would dig around and play in the trash."  *Id*.  When Mr. Honie was growing up, there was very little for children to do.  "We had no recreation center, no after school activities, nothing.  We lived at a poverty level below the city slums.  We all had a view that 'I will never amount to anything.  I will never be able to leave the mesa so what is the use?  I will always be looked down on by others and the people in Polacca will be better than me.'"  *Id*.

Mr. Honie's home life as a child was chaotic and traumatic.  Both of Mr. Honie's parents were alcoholics; they often left the children at home alone and argued often, sometime violently, in front of the children.  (PCR ROA 820-821)  It was likely that Mr. Honie's mother drank when she was pregnant with him.  (PCR ROA 3567)  Mr. Honie started drinking when he was five years of age when he took one of his father's beers from the refrigerator.  (Affidavit of Robert L. Smith, Ph.D., 04/24/2015 at ¶ 42)  By the age of ten, Mr. Honie was drinking beer, whiskey, and wine with his friends.  *Id*.  He also began using marijuana at this same time, and soon after began huffing inhalants.  *Id*.  By the age of twelve and thirteen, Mr. Honie had progressed to using cocaine, methamphetamine, and heroin, along with the marijuana, beer, whiskey and wine.  *Id*. at ¶ 43.

The Honie family has a family history of depression and suicidal ideation.  *Id*. at ¶ 40.  When Mr. Honie was ten, his mother attempted to take her life with a gun.  *Id*. at ¶ 40.  Mr. Honie was home at the time and was aware of what she was doing.  *Id*. at ¶ 40.

Mr. Honie's older sister, Francine, also has a history of depression and has been hospitalized and prescribed an antidepressant. *Id.* at ¶ 40. Another sister, Kathryn, was also recently diagnosed with depression and was prescribed an antidepressant. *Id.* at ¶ 40.

Mr. Honie, himself, has a history of depression and attempted suicide in 1989. *Id.* at ¶ 40. Mr. Honie recalls, "We were partying and I was drunk. I took a pistol and put it to my head and I told everyone 'I'll see you on the other side.' My friend hit the gun and when it went off the bullet only grazed my head and I had burn marks on my head." *Id.* at ¶ 40.

Mr. Honie was sexually molested by a man named John Boone, who was convicted of molesting close to one-hundred Hopi children. *Id.* at ¶ 43. Mr. Honie was too ashamed to admit this happened to him as a child and did not disclose this experience until he was an adult. *Id.* at ¶ 43-44. Mr. Boone's actions had a profound effect on the entire community. *Id.* at ¶ 45.

Mr. Honie presents a detailed account of his life history in his mitigation claim below.

IV.    **CLAIMS FOR RELIEF**

## CLAIM ONE

I.    **TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO CONDUCT A REASONABLE INVESTIGATION INTO A VIABLE TRIAL DEFENSE OF VOLUNTARY INTOXICATION PRIOR TO CONCEDING MR. HONIE'S GUILT TO AGGRAVATED MURDER**

Trial counsel was ineffective for deciding to concede Mr. Honie's guilt early in the case, prior to investigating a viable defense of voluntary intoxication under Utah law. *See Strickland*, 466 U.S. at 690-91.  Trial counsel was also ineffective for failing to properly consult with Mr. Honie about his decision to proceed to trial on a concession-of-guilty theory.  *See Florida v. Nixon*, 543 U.S. 175, 186 (2004); *see also Strickland*, 466 U.S. at 688.  Mr. Honie was prejudiced because he had a viable defense of voluntary intoxication that could have negated the existence of the mental state necessary to be convicted of aggravated murder, and should have been presented at trial.  *See* U.C.A § 76-2-306.

Had trial counsel properly investigated the facts and circumstances of the crime and Mr. Honie's arrest, prior to making these decisions, he would have discovered facts and evidence in support of raising a voluntary intoxication defense.  He would have also discovered witnesses who could have refuted the State's claim that Mr. Honie spontaneously admitted at the scene that he killed Ms. Benn.  Finally, he would have realized the impropriety of introducing Mr. Honie's involuntary custodial statements that

71

lacked any indicia of reliability and failed to serve any purpose that was not detrimental to Mr. Honie.

### A.    Exhaustion

Mr. Honie raised this claim during his state post-conviction proceedings to the Fifth Judicial District Court and to the Utah Supreme Court.  (PCR ROA 64-66, 724-726, 733-743, 766-771; Opening Brief of Appellant, 10/01/12, at 22-26, 45-50)  The Utah Supreme Court denied the claim on the merits.  *Honie*, 342 P.3d at 195-97.  The state court's denial of this claim constituted an unreasonable application of clearly-established federal law, 28 U.S.C. § 2254 (d)(1), and an unreasonable determination of the facts.  *Id.* at § 2254(d)(2).

### B.    There was significant evidence that Mr. Honie was extremely intoxicated at the time of the crime.

There was significant evidence of Mr. Honie's level of intoxication at the time of the crime and during his custodial interrogation that was readily available to trial counsel early in the case.  Officers at the scene testified at the preliminary hearing that they smelled alcohol on Mr. Honie and that Mr. Honie made bizarre statements at the scene that were incomprehensible.  (TR ROA 597 at 60-63, 83; TR ROA 607 at 306-307, 326)  Ms. Pikyavet also testified at the preliminary hearing that Mr. Honie was intoxicated when she spoke with him on the evening of the crime.  (TR ROA 597 at 21)  She testified that she had seen him intoxicated before and could tell that he was getting to the point of being extremely intoxicated.  *Id.*  Mr. Sweeney, the taxi driver who drove Mr. Honie on

the night of crime, also testified at the preliminary hearing that he made a statement to the police that Mr. Honie "was really drunk" and that it was his perception that Mr. Honie had had too much to drink that night.  *Id.* at 35.

At the hearing on the motion to suppress statements, Detective Davis also testified that he was aware that Mr. Honie had been drinking that night, "I smelled alcohol on him . . . but I did not feel he was intoxicated to the point that he didn't understand what I was saying or what I was doing, what was going on.  I mean, *he was intoxicated*, yes, but not—he was not inebriated.  I mean, he knew what was going on."  (TR ROA 598 at 49) (emphasis added).  Detective Davis made this assertion despite the fact that he also acknowledged "[Mr. Honie] was bouncing all over the place.  I mean, the first interview, if you would read it, he was jumping from all over the place."  *Id.* at 50.  Detective Davis also testified that Mr. Honie told him that "he couldn't remember what was going on." *Id.* at 53.

The interrogation transcripts themselves reflected the fact that Mr. Honie was extremely intoxicated.  While trial counsel was in possession of these, he failed to question Detective Davis about the details at the suppression hearing.  During the first interrogation, which occurred on July 10, 1998, from approximately 1:30 a.m. until 4:00 a.m., Mr. Honie was incoherent and made several nonsensical statements.  (TR ROA 598 at 36; Cedar City Police Department Records[22] at 301-366)  There are notes in the transcript of the interrogation where Mr. Honie was repeatedly incomprehensible.  *Id.* at

---

[22] *See* First Rule 7 Motion, Exhibit Y.

302-11.  At one point in the interview, Detective Davis believed that Mr. Honie may be referring to the "devil" and believed that Mr. Honie has conjured the "devil" through a Ouija board.  *Id.* at 306.  The following exchange then occurred:

DAVIS:      Did you call him up on the Ouiji [sic]? Or not? (Can't copy).

HONIE:      (Can't copy).  But, yes I did, sir, the occult wanted to (can't copy).  Have you ever read Revelations?

DAVIS:      No.

HONIE:      You know, the end of time.  It's coming, sir.  Satan is getting all powerful.

DAVIS:      So, you're going to have to enlighten me, 'cuz I'm-I'm lost! I mean, excuse me, but I'm (can't copy) I'm lost, I don't know what you're trying to –you're going to have to explain in more detail, I guess . . . [because] I don't understand what you're, where you're . . . ."

HONIE:      (Can't copy). . . I came up here in the middle in [sic] the night, right?  Followed my girlfriend over from the Hopi reservation, she left me.  And I followed her up, got a ride with some Mormons.  And I got out and this dude came up to me and said, we don't need them.  We don't them [sic], come with me.  He showed me this house, this little house around here.  He showed me this house, then he showed me a bunch of food.  I ate, I got my belly (can't copy).  Then he showed what I had to do.  At first, it was fun and games.  A couple of dealers here and there.  I deserve to die, man, no, let's get rid of someone (can't copy).

DAVIS:      Tell me more about tonight, then.

HONIE:      He sent me out there, to the population up there.

DAVIS:      Hmm?

74

> HONIE:      And he sent me out to the population and he sent me to
>             Draper.
>
> DAVIS:      Well you ain't going nowhere until we figure out what the
>             hell's going on here.  You won't be going into Draper for
>             quite a while til [sic] we get all this thing resolved.  Tell me
>             about the house, I'm still confused.  Your girlfriend, what the
>             hell, you (can't copy).

*Id.* at 306-07.  This bizarre exchange continued throughout the first interrogation.  *Id.* at 306-20.

At one point in the middle of the first interrogation, Detective Davis became frustrated because Mr. Honie said he had blacked out and could not remember anything. Detective Davis told Mr. Honie, "I got my camera and I'm going to take a whole bunch of pictures of ya, okay? . . . [I]n the meantime, I want you to try to think about what— what happened inside there and try to . . . ."  *Id.* at 314-15.  Mr. Honie interjected, "Sir, the only way I'm going to figure it out is it will come to me in my sleep.  I know it will.  I know it will."  *Id.* at 315.  Mr. Honie was then stripped naked and Detective Davis photographed his body, including Mr. Honie's genitalia, while he was still interrogating him.  *Id.* at 315-17.

During this same initial multi-hour interrogation, Mr. Honie was bleeding from a large gash on his hand.  *Id.* at 315.  Detective Davis was unaware of this because he left Mr. Honie handcuffed behind his back for the duration of the first interview.  (TR ROA 598 at 34)  Detective Davis only become aware of the cut when he decided to take a break in the interrogation to process Mr. Honie into the jail.  At that point, Detective

Davis asked Mr. Honie if he would consent to be taken to the hospital to administer the rape kit. Mr. Honie replied, "Yeah, 'cuz I don't . . . look it (can't copy) at all the blood that's on me, it's from my cuts." (Cedar City Police Department Records [23] at 315)

The second interrogation occurred once they returned from the hospital, at approximately 5:30 a.m. *Id.* at 321. When asked by Detective Davis how he got to Ms. Benn's house, Mr. Honie said that he thought he flagged down a taxi but was not sure. *Id.* at 321. Mr. Honie told Detective Davis, "To tell you the truth, man I really don't know. I don't know how the hell I got over to her house, man. I snapped. . . . I snapped again." *Id.* at 322. Mr. Honie told Detective Davis that his mind was not clear because he had drunk "two half pints of Everclear, a pint, half pint of Jim Beam and a half pint of Yukon Jack and two cases of beer [and] . . totally blacked out."[24] *Id.* at 322. A little later in the same interrogation, Mr. Honie told Detective Davis that he started drinking at 10:00 a.m. or 11:00 a.m. on July 9, 1998, with eight beers from a twelve-pack of beer. *Id.* at 329. He then bought another twelve-pack, then two half-pints of liquor, then two more half-pints of liquor, after which Mr. Honie blacked out. *Id.* at 330.

When Detective Davis reminded Mr. Honie that he had admitted to killing Ms. Benn prior to going to the hospital, Mr. Honie said that he did not remember that because, "[t]he other day when I talked to you, I was drunken [sic]. And in the hospital, I

---

[23] *See* First Rule 7 Motion, Exhibit Y.

[24] While there are inconsistencies in Honie's recollection of the drugs and alcohol he consumed during the day and evening of the incident, it is clear that he had consumed significant quantities of alcohol and drugs which made him significantly intoxicated.

snapped.  I mean . . . got sober." *Id.* at 332.  Mr. Honie told Detective Davis that he did not have a clear memory of the events because he had blacked out and was tired from being up for two days.  *Id.* at 333.  Detective Davis then asked Mr. Honie what drugs he had taken the day of the incident in addition to all of the alcohol he had drunk, and Mr. Honie responded that he had taken "[b]asically all of them."  *Id.*  Mr. Honie then said that he had smoked marijuana, had taken crank, and then smoked marijuana with cocaine on top of it."  *Id.* at 333-34.  While Mr. Honie told Detective Davis about the extent of his drug and alcohol intake prior to the interrogation, and that he was too drunk to remember what he told Detective Davis during the first interrogation, Detective Davis, nonetheless, failed to read Honie his rights again under *Miranda*.

In addition to the transcripts of the interrogations of Mr. Honie, trial counsel was aware that Mr. Honie was extremely intoxicated at the time of the crime because Mr. Honie gave detailed information to trial counsel and his defense team about the drugs and alcohol he consumed on the day of the incident.[25]  Mr. Honie told counsel that on the day of the incident, he starting drinking at 8:00 a.m.  (PCR ROA 808)  He and a friend consumed an eighteen-pack of Budweiser beer between the hours of 8:00 a.m. and 11:00 a.m.  (PCR ROA 809)  Then they purchased another eighteen-pack between 12:00 p.m. and 1:00 p.m., and continued to drink beer while doing other drugs.  *Id.*  Mr. Honie stated

---

[25] (PCR ROA 808-812)  Affidavit of Taberon Dave Honie, 03/11/05.  Mr. Honie incorrectly stated the relevant dates as being June 10-11, 1998.  He corrected this in a subsequent affidavit stating the relevant dates were July 9-10, 1998.  (PCR ROA 3503-3504)

that along with the beer, he smoked four to five bowls of marijuana.  *Id.*  He and his friend then purchased and consumed two half pints of liquor, and smoked more marijuana.  *Id.*  Mr. Honie then took two lines of methamphetamine and also smoked methamphetamine once.  *Id.*  Later that day, Mr. Honie and his friend purchased and consumed another eighteen-pack of beer.  (PCR ROA 810-809)  Mr. Honie then went to a bar and drank a pitcher of beer with everclear in it.  *Id.* at 810.  While Mr. Honie had no memory after this, he was told that he smoked PCP with a drug dealer and then passed out on the lawn of the home where he was staying.  *Id.*  Mr. Honie stated that he did not remember being advised of his rights by the police and that his mind was not clear until two days later.  *Id.*

Moreover, trial counsel was also aware that the police took a blood sample from Mr. Honie approximately four and one-half hours after the incident, and submitted the blood to be tested for alcohol and THC.  (PCR ROA 814-815)  The testing revealed that Mr. Honie's blood alcohol level was 0.07%, four and one-half hours after the incident.  *Id.*  The blood test also revealed the presence of THC in his blood, both active and metabolized.  (PCR ROA 814)  No testing was requested by the police for the presence of methamphetamine or phencyclidine.  (PCR ROA 815)  Trial counsel failed to move to preserve this evidence.  (PCR ROA 66-68)

During Mr. Honie's Rule 60(b) proceedings, additional evidence was presented about what Mr. Honie's level of intoxication would have been at the time of the crime. Counsel introduced a report from William K. Johnston, Ph.D., a forensic chemist and

toxicologist, who performed a retrograde extrapolation to determine that Mr. Honie's blood alcohol level at the time of the incident was actually 0.15%, which was higher than the police lab report indicated.  (PCR ROA 3471-3472)  Counsel also introduced an affidavit from Robert L. Smith, Ph.D., a clinical psychologist and certified addiction specialist who explained how the synergistic effect of taking multiple drugs and alcohol would have caused Mr. Honie to be more intoxicated and cognitively impaired than if he had consumed one substance alone.  (PCR ROA 3475-3496)

> **C.  Trial counsel was ineffective for failing to investigate a viable trial defense of voluntary intoxication prior to deciding to concede Mr. Honie's guilt to aggravated murder.**

In Mr. Honie's case, trial counsel was on notice that Mr. Honie was extremely intoxicated due to his alcohol and drug use throughout the day, leading up to the time of the crime.  Counsel was aware of statements, at least as early as the preliminary hearing, made by witnesses who had encountered Mr. Honie earlier that evening, as well as the police who stated Mr. Honie smelled of alcohol and made bizarre, nonsensical statements at the scene and during the first custodial interrogation.  (TR ROA 597 at 21, 29, 35, 60-63, 83; TR ROA 607 at 306-307, 326; TR ROA 597 at 21, 35)  Counsel was also informed by Mr. Honie as to the extent of his alcohol and drug use on the day and evening of the crime.  (PCR ROA 808-812, 3503-3504)  Moreover, counsel was aware the State had obtained a blood sample following the incident and that the blood had been tested to a limited extent and was available for further testing.  (PCR ROA 814-815)

Despite all of this evidence, trial counsel did nothing to follow up on these tantalizing indicators that would have led reasonable counsel to investigate whether a voluntary intoxication defense would have been viable. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003). Without investigating any possible defense theories, and before even challenging the admission of Mr. Honie's custodial statements, which trial counsel acknowledged were given involuntarily and in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), trial counsel had settled on his decision to concede Mr. Honie's guilt not just to murder, but to aggravated murder. Counsel's failure to investigate prior to making this decision was unreasonable. *See Strickland*, 466 U.S. at 690-91.

In *Strickland*, the Court recognized that counsel has a duty to make reasonable investigations and that strategic choices made after a less-than-complete investigation are only reasonable to the extent that professional judgment would support such limits to investigation. *Id.* at 691. The Court found that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688 (explaining that prevailing norms of practice as reflected in the American Bar Association standards and the like, are guides to determining what is reasonable). The Court reiterated these principles in *Bobby v. Van Hook*, 588 U.S. 4 (2009), where it acknowledged that "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails. . . where they describe the professional norms prevailing when the representation took place." *Id.* at 7 (citing *Strickland*, 466 U.S. at 688).

80

"Counsel should conduct independent investigations relating to the guilt/innocence phase . . . of a capital trial. . . . [This] investigation[ ] should begin immediately upon counsel's entry into the case and should be pursued expeditiously."  American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty cases 1989 ("1989 ABA Guideline"), 11.4.1(A).  "The investigation for preparation of the guilt/innocence phase of the trial should be conducted regardless of any admission or statement by the client concerning facts constituting guilt."  1989 ABA Guideline 11.4.1(B).  Only after trial counsel has performed the necessary investigations into the facts and circumstances of the crime, should trial counsel "formulate a defense theory . . . and seek a theory that will be effective. . . ."  1989 ABA Guideline 11.7.1(A). A defense theory is particularly important in a capital trial.  Commentary, 1989 ABA Guideline 11.7.1.  "Counsel should discuss the theory and strategy for both phases with the client throughout trial preparation to maintain an effective defense" throughout the capital trial.  Commentary, 1989 ABA Guideline 11.7.1.

Under Utah law at the time, evidence of voluntary intoxication could have negated the existence of the mental state necessary to be convicted of aggravated murder.  *See* U.C.A. § 76-2-306.  Given the strong evidence of intoxication that was available to trial counsel, trial counsel had an obligation to investigate voluntary intoxication as a possible defense at trial before deciding on a concession theory.  *See Strickland*, 466 U.S. at 690-91.  While courts should give wide latitude to counsel's performance, the reasonableness of counsel's decisions is measured by the reasonableness of the investigation done in

81

making such a decision.  *Wiggins*, 539 U.S. 510.  The Supreme Court has stated that

"[s]trategic choices made after less than complete investigation are reasonable precisely

to the extent that reasonable professional judgments support the limitations on

investigation."  *Strickland*, 466 U.S. at 690-91; *see also Wiggins*, 539 U.S. at 528.

Mr. Honie was prejudiced by counsel's deficient performance because he had a

viable defense to murder, which was never presented to the jurors.  Instead, counsel

presented no defense at trial, conceding Mr. Honie's guilt to aggravated murder, which

ensured he would be eligible for the death penalty from the moment the trial began.

During opening statements at trial the prosecutor told the jurors that they needed

to be prepared to hear evidence about this "[h]orrific, bloody, and brutal" case.  (TR ROA

607 at 225)  The prosecutor told the jury that Mr. Honie had been drinking when he went

to the victim's home.  *Id*. at 227-229.  The prosecutor then told the jurors that when the

police arrived, they first found three little children with blood on them.  *Id*. at 231.  The

police then encountered the "horrific and  . . . brutal and  . . . bloody . . . . body of Claudia

Benn in the corner with a knife by her head, with her glasses off reaching for the phone."

*Id.*  The prosecutor said, "She was bitten.  Her throat was sliced.  And she was violated,

both anally and vaginally, with a butcher knife.  And she was dead."  *Id.*  He then

explained how one of the children did not have underwear on and was discovered to have

been sexually violated with a finger.  He also explained how the bite mark on the victim

was consistent with the teeth of the defendant.  (TR ROA 607 at 231-232)  The

prosecutor finally told the jurors that the medical examiner would tell them that "Benn's

82

throat was slit at least three times, and perhaps four times, so deep that it nicked the spine, [and] that she was so violated vaginally and anally that it tore the wall between the anus and the vaginal canal."  (TR ROA 607 at 232)

In response, Stephen McCaughey then stood and told the jurors, "Much of what Mr. Burns says is true."  *Id.*  He then said, "I know in this case there is no question of Mr. Honie's guilt.  You are going to find him guilty.  The question in this case is going to be one of punishment.  And that question is what appropriate punishment is there for Mr. Honie will be [sic] decided by the judge."  (TR ROA 607 at 232-233)  Mr. McCaughey went on to explain that Mr. Honie would have pleaded guilty "because he admits his crime" but because he was contesting some of the aggravating factors he wanted a trial. *Id.*

Mr. McCaughey then explained that while the judge will weigh the aggravating and mitigating circumstances, the jurors would determine which aggravating factors existed.  (TR ROA 607 at 233-234)  Mr. McCaughey told the jurors that Mr. Honie was already guilty "of aggravated murder because there is no question this crime was committed during a course of a burglary, or an aggravated burglary."  (TR ROA 607 at 234)  Mr. McCaughey maintained the theme of Mr. Honie's guilt throughout the trial, including during closing argument, "Mr. Honie's . . . guilty of aggravated murder.  I don't think there is any way that I could stand up here and argue to you that Mr. Honie did not commit a[n] . . . aggravated burglary. . . . He did it. . . . I don't think there is [sic] any justification or excuses."  (TR ROA 608 at 479)

83

The state court held that trial counsel was not objectively unreasonable for failing to consider voluntary intoxication as a possible defense at trial prior to deciding to concede Mr. Honie's guilt. *Honie*, 342 P.3d at 195. In making this holding, the court recognized that "thorough investigation of law and facts" is necessary for counsel's decisions to be considered strategic. *Id.* (quoting *Strickland*, 466 U.S. at 690). However, the court also found that counsel is not required "to raise every available nonfrivolous defense" if he reasonably believes they are "doomed to fail." *Id.* (citing *Knowles v. Mirzayance*, 556 U.S. 111, 124-27 (2009) and *Wiggins*, 539 U.S. 510, 533). The court noted that under state law, Mr. Honie had to prove that his "state of intoxication must have deprived him of the capacity to form the mental state necessary for aggravated murder." *Id.* (citing U.C.A. § 76-2-306). The court further explained that "trial counsel would have needed to present evidence showing that Mr. Honie was so intoxicated that he neither intended to kill nor knew he was killing a person at the time of the murder." *Id.* at 195-96 (citing U.C.A. § 76-5-202).

The state court rejected the evidence Mr. Honie presented in support of his argument including: the testimony of witnesses at the preliminary hearing; Mr. Honie's own bizarre statements at the scene of the crime and during his custodial interrogation; the amount of drugs and alcohol he consumed prior to the crime; and the retrograde analysis indicating his blood alcohol level was 0.15% at the time of the crime. *Id.* at 196. The court noted that none of this evidence was sufficient to overcome the fact that Mr. Honie told police at the scene, "I stabbed her. I killed her with a knife." *Id.* at 197. The

84

court also found that Mr. Honie's threats earlier that evening during a phone call with Ms. Pikyavet demonstrated he had the ability to form the requisite *mens rea* for aggravated murder.  *Id.*  The state court's denial of this claim constituted an unreasonable application of clearly-established federal law, 28 U.S.C. § 2254 (d)(1), and an unreasonable determination of the facts.  *Id.* at § 2254(d)(2).

> **1.      The state court decision was an unreasonable determination of law because it ignored trial counsel's constitutional duty to conduct a reasonable investigation into the case and to consult with his client prior to conceding guilt.**

The state court decision was an unreasonable determination of law because it ignored the fact that trial counsel had made the decision to concede guilt early in the case, prior to conducting an investigation into the facts and circumstances of the crime and Mr. Honie's arrest.  While the state court recognized the need for thorough investigation prior to trial counsel making any decisions about a case, *Honie*, 342 P.3d at 195 (quoting *Strickland*, 466 U.S. at 690), it failed to acknowledge trial counsel's failure to conduct the most cursory investigation into the facts and circumstances of the case, and his failure to investigate possible defenses at trial prior to deciding to concede guilt.

The court also fails to account for the fact that trial counsel made the decision to concede guilt early in the case, without consulting with Mr. Honie about it, and prior to conducting a reasonable investigation into the facts and circumstances of the crime and Mr. Honie's statements.  In doing so, the state court ignored the district court's ruling that trial counsel's concession strategy was not appropriate because it was not clear that trial

counsel "fulfilled his duty under Strickland to explain his concession strategy to Petitioner, or whether Petitioner had a sufficient understanding of the strategy trial counsel intended to employ." (PCR ROA 1004) (citing *Taylor v. Illinois*, 484 U.S. 400, 560 (1988) and *Strickland*, 466 U.S. at 688).

The state court's conclusion that Mr. Honie's statement at the scene would have precluded the presentation of a voluntary intoxication defense at trial, fails to account for the fact that trial counsel had a duty to challenge the admissibility of this statement prior to trial. Had counsel performed the required investigation into the facts and circumstances of the crime and Mr. Honie's arrest, he would have had a basis for the exclusion of Mr. Honie's statement at the scene.

Not only was it clear from the transcript of Mr. Honie's custodial statements that he was extremely intoxicated at the time of the crime, it was also clear that he had blacked out during the crime. During his interrogation, Mr. Honie tells Detective Davis that he had blacked out during the crime and it was only after coming back to consciousness that he saw what had happened. (Cedar City Police Department Records[26], at 326, 345) It was only after Detective Davis had provided details about the crime to Mr. Honie that he came to realize what had happened. Therefore, while he may have come out of his blackout at some point at the scene and become aware of what had happened, it was not a foregone conclusion that he knew what he was doing at the time of the crime. The state court's finding that Mr. Honie had not blacked out during the crime

---

[26] *See* First Rule 7 Motion, Exhibit Y.

because he told Dr. Cohn that he remembered details of the crime, *Honie*, 342 P.3d at 197, does not overcome other facts and evidence supporting the fact that Mr. Honie blacked out during the crime.

Moreover, had trial counsel interviewed the officers at the scene, as well as neighbors who were present and heard officers during Mr. Honie's arrest, he would have had a basis for challenging Mr. Honie's statement at the scene that he killed Ms. Benn. Two neighbors at the scene heard officers saying things to Mr. Honie that would have prompted him to make a statement in reply.  Kerry Jensen heard an officer yell:  "Get down on the ground, you asshole.  You slit her throat from ear to ear.  You're covered in blood."  (Declaration of Kerry Jensen[27], 06/24/13)  Clark Adams heard someone yell, "There's blood everywhere.  Did you kill her?"  (Declaration of Clark Adams[28], 06/23/13)  Had trial counsel interviewed these witnesses, he would have realized there was a reasonable basis for the exclusion of Mr. Honie's statement at the scene because Mr. Honie was under arrest at the time these statements were made and had not been informed of his rights pursuant to *Miranda*.  Moreover, he was too intoxicated to make a voluntary statement.

Trial counsel was also aware that Mr. Honie had been taken to the hospital in the middle of his interrogation.  Had trial counsel interviewed the doctor who treated him, he would have learned that even several hours after Mr. Honie was initially arrested, the

---

[27] *See* First Rule 7 Motion, Exhibit B.
[28] *See* First Rule 7 Motion, Exhibit A.

treating physician believed that "Honie was highly intoxicated.  He looked intoxicated, he smelled intoxicated and he acted intoxicated."  (Declaration of Michael Stutls, M.D.[29], 08/19/13)  Dr. Stults also stated that Mr. Honie "was marginally responsive and answered my questions in monosyllables."  *Id.*  Dr. Stults stated that no one from the prosecution, police, or the defense ever contacted him.  *Id.*  Dr. Stults stated that had he been called to testify, he would have stated that he believed Mr. Honie "had reduced capacity to reliably recall or recount the events of July 10, 1998, and did not seem to have a grasp [of] the details of what transpired."  *Id.*

Had trial counsel attempted to interview any of the people who were with Mr. Honie on the evening of the crime, he would have also learned that two of his friends went to find Mr. Honie that evening and "found him passed out on the lawn of the place he was staying."  (Declaration of Renate Sweeney[30], 09/16/14)  Renate Sweeney stated that at the time she saw Mr. Honie, around 9:00 or 10:00 p.m., he "was stumbling and slurring his words" and needed help walking.  *Id.*  Ms. Sweeney stated, "He seemed barely conscious."  *Id.*

Ms. Sweeney stated that a few days after the homicide a police detective came to speak with her uncle, Rick Sweeney.  *Id.*  Ms. Sweeney told the detective that she "had seen Honie passed out on his lawn and had left him inside that residence, passed out,

---

[29] *See* First Rule 7 Motion, Exhibit C.
[30] *See* First Rule 7 Motion, Exhibit D.

between 9 p.m. and 10 p.m. that night." *Id.* Ms. Sweeney never heard from the police again, nor from the defense prior to trial. *Id.*

Had trial counsel hired an expert with expertise in substance and alcohol abuse, he would have understood that the combination of drugs and alcohol that Mr. Honie consumed prior to the time of the crime "impaired the functioning of Mr. Honie's central nervous system," disrupted his ability to process information, and caused distortions in his "perception and memory." (Affidavit of Robert L. Smith, Ph.D.[31], 04/24/15) Moreover, had trial counsel moved to preserve the blood evidence taken from Mr. Honie, he could have had it tested for the presence of methamphetamine and other substances that Mr. Honie took prior to the crime.

Each of these factors would have provided compelling support to challenge Mr. Honie's statement at the scene. These witnesses would have also provided important background in support of the voluntary intoxication defense. The state court's decision that Mr. Honie had the requisite mental state to commit aggravated murder because of the statement he made at the scene fails to recognize that had counsel performed a reasonable investigation he would have had a basis for challenging the admission of this statement at trial.

Mr. Honie was prejudiced because had counsel performed a reasonable investigation, he would have had a basis for excluding Mr. Honie's statement at the scene, both as involuntarily given due to his extremely intoxicated state, but also because

---

[31] *See* First Rule 7 Motion, Exhibit V.

he was clearly under arrest and the officer present questioned Mr. Honie without

informing him of his rights pursuant to *Miranda*.  Given the State's willingness to

stipulate to the inadmissibility of Mr. Honie's custodial statements, it is quite likely that

had counsel presented this compelling evidence, the State would have also agreed to

stipulate to the inadmissibility of Mr. Honie's statement at the scene.

As the state court notes, this was compelling evidence indicating that Mr. Honie

knew what he was doing.  *Honie*, 342 P.3d at 197.  Without the introduction of this

statement at trial, Mr. Honie would have had a viable involuntary intoxication defense

that could have negated the state of mind necessary for Mr. Honie to be convicted of

aggravated murder, and Mr. Honie would not have been sentenced to death.  The state

court's denial of this claim constituted an unreasonable application of clearly-established

federal law.  28 U.S.C. § 2254 (d)(1).

> **2.     The state court decision was an unreasonable determination of
> the facts because it failed to consider *all* the facts surrounding
> Mr. Honie's "threats" to Ms. Pikyavet prior to the crime.**

The state court also found that despite the vast evidence of Mr. Honie's

intoxication, it was not enough to raise a voluntary intoxication defense because Mr.

Honie had the requisite mental state to commit aggravated murder based on his threats on

the phone to Ms. Pikyavet earlier in the evening on the night of the crime.  *Honie*, 342

P.3d at 197.

With regard to Mr. Honie's threats to Ms. Pikyavet on the phone, the court failed

to account for Ms. Pikyavet's testimony at trial that she did not believe Mr. Honie's

threats because he had made similar threats to her before when he was drinking, and never acted on them.  (TR ROA 607 at 250-251)  Ms. Pikyavet did not call the police after Mr. Honie made this threat, nor was she alarmed by it because she did not believe he would act on this threat.  (TR ROA 607 at 243)  It was clear that Ms. Pikyavet did believe Mr. Honie would act on this threat because she also did not say anything about it to her mother or sister.  (TR ROA 607 at 258-259)  The state court failed to consider this part of Ms. Pikyavet's testimony when it found that despite being intoxicated, Mr. Honie "had the capacity to form an intent to murder the victim, . . . [and] that he in fact acted on that intent."  *Honie*, 342 P.3d at 197.

The state court unreasonably credited only the portion of Ms. Pikyavet's testimony at trial that supported the court's conclusion that Mr. Honie "knew what he was doing and had the intent necessary to commit aggravated murder."  *Id.*  Ms. Pikyavet also offered credible testimony that Mr. Honie had made empty threats to her before when he was intoxicated and she did not believe there was any credibility to his statements to her on the phone.  (TR ROA 607 at 250-251)  It was unreasonable for the state court to consider only the facts that supported its position without explaining why it failed to consider Ms. Pikyavet's other statements that should have carried the same credibility.  Therefore, the state court's decision was an unreasonable determination of the facts and should be accorded no deference.  28 U.S.C § 2254 (d)(2).

**CLAIM TWO**

**I.     TRIAL COUNSEL WAS INEFFECTIVE FOR INTRODUCING MR. HONIE'S INCULPATORY STATEMENTS AT TRIAL DESPITE ACKNOWLEDGING THEY WERE INVOLUNTARILY GIVEN, AND DESPITE THE STATE'S WILLINGNESS TO STIPULATE TO THEIR INADMISSIBILITY**

Trial counsel was ineffective for introducing Mr. Honie's custodial statements at trial, without first investigating the facts and circumstances of the crime, arrest and custodial interrogation, and despite the fact that the State agreed to stipulate to their inadmissibility at trial.  (TR ROA 598 at 7); *see Strickland*, 466 U.S. 690-91; *see also Powell v. Alabama*, 287 U.S. 45, 71-72 (1932).  Trial counsel's reason for wanting to introduce the statements at trial was he thought that two of the three statements made by Mr. Honie were reflective of what actually happened during the crimes.  (TR ROA 598 at 6)  However, trial counsel's decision was unreasonable because the version of events that trial counsel wanted to introduce was inconsistent with the evidence produced at trial through the medical examiner.  (TR ROA 608 at 444)  Had trial counsel read the autopsy report he had in his possession, and interviewed the medical examiner prior to making this decision, he would have seen that the version of events he wanted to introduce was not consistent with the injuries to Ms. Benn.

Trial counsel's decision was also unreasonable in light of Mr. Honie's extreme intoxication at the time of the crime and his arrest, as well as during his custodial interrogation, which called into question his ability to accurately recollect what happened.  Trial counsel should have accepted the State's offer to stipulate to the

92

inadmissibility of Mr. Honie's custodial statements, and investigated the facts and circumstances of the crime and Mr. Honie's arrest before deciding to introduce his statements.  Trial counsel's performance was deficient and prejudiced Mr. Honie because it was only through trial counsel's actions that the jurors heard highly inflammatory and prejudicial details about the crime, through Mr. Honie's own statements, which would never have come into evidence at trial but for trial counsel's actions.

## A.    Exhaustion

Mr. Honie presented this claim during his post-conviction proceedings before the Fifth Judicial District Court and the Utah Supreme Court.  (PCR ROA 66-68,724-733; Opening Brief of Appellant, 10/01/12, at 8-17, 50-56; Reply Brief of Appellant 05/16/13, at 11-20)  The Utah Supreme Court denied this claim on the merits.  *Honie*, 342 P.3d at 198-99.  The state court's denial of this claim constituted an unreasonable application of clearly-established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

**B.    Trial counsel failed to challenge the introduction of Mr. Honie's custodial statements despite recognizing that they were involuntarily given.**

**"I am sort of doing this for the record, so the record's clear that we are aware, that is, there may be some *Miranda* violations in this case . . . . [but] I don't want two years down the road somebody coming back and saying, hey, you should have moved to suppress those statements, because there was no *Miranda* given." --Stephen McCaughey, Motion to Suppress Statements Hearing, TR ROA 598 at 6, 11.**

Prior to trial, Stephen McCaughey filed a motion to suppress the statements Mr.

Honie made to the police, arguing that they were involuntary, they were made without

proper warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and that their

admission would be prejudicial, making them excludable at trial under the Utah Rules of

Evidence.  (TC ROA 089-088, 103-097)  At the hearing on the motion, Mr. McCaughey

informed the court that while he filed a motion to suppress the statements, he really

wanted to introduce two of the three statements at trial and that he filed the motion to

protect himself against a future claim of ineffective assistance of counsel.  (TR ROA 598

at 6)  Mr. McCaughey stated that he thought that the latter two statements of Mr. Honie

were reflective of what actually happened during the crimes so he wanted them to be

introduced into evidence.  *Id.*

In response to Mr. McCaughey's position, the State prosecutor offered to stipulate

to the inadmissibility of the statements, conceding they should be suppressed because

they may have been made in violation of Mr. Honie's constitutional rights.  *Id.* at 7.  Mr.

McCaughey refused the prosecutor's offer to stipulate to the inadmissibility of the

94

statements, despite recognizing that Mr. Honie's statements were involuntarily made.  *Id.*
at 11.  Because the hearing on the motion to suppress statements occurred early in the
case, prior to Mr. McCaughey investigating the facts and circumstances of the crime and
Mr. Honie's arrest (TR ROA 598), it was unreasonable for Mr. McCaughey to refuse the
State's offer to stipulate to the inadmissibility of Mr. Honie's custodial statements.  *See*
*Strickland*, 466 U.S. at 690-91; *see also Powell*, 287 U.S. at 71-72.  Mr. McCaughey had
a duty to perform a reasonable investigation into the case before he would be in a position
to make a strategic decision about conceding Mr. Honie's guilt and introducing his
inculpatory statements at trial.  *See Strickland*, 466 U.S. at 690-91; *see also Powell*, 287
U.S. at 71-72.  Nevertheless, Mr. McCaughey refused the State's offer to stipulate to the
inadmissibility of statements.  (TR ROA 598 at 11)

While trial counsel's intent was clear that he was planning to introduce Mr.
Honie's involuntary statements at trial, he nevertheless asked the court to continue with
the hearing on the motion to suppress statements so that he could avoid an accusation of
ineffective assistance of counsel at a future date.  *Id.* at 6, 11.  The trial court was
completely perplexed by Mr. McCaughey's position, and found that since the motion was
filed, a hearing should be held.  *Id.* at 12.

At the hearing, Mr. McCaughey did little to challenge the admissibility of the
statements.  Mr. McCaughey failed to call the arresting officer and other officers at the
scene who claimed that Mr. Honie spontaneously stated that he killed Ms. Benn.  (TR
ROA 607 at 293, 321)  While there was testimony from several witnesses at the

95

preliminary hearing indicating that Mr. Honie was extremely intoxicated during the time leading up to the crimes, Mr. McCaughey failed to call any of these witnesses to testify at the suppression hearing.  (TR ROA 597 at 21, 29, 35, 62)  While the transcripts of Mr. Honie's statements also indicated he was not clearly coherent during the interrogations, Mr. McCaughey failed to ask Detective Davis at the suppression hearing about Mr. Honie's level of intoxication during questioning.

In fact, it was the trial court that raised the issue of intoxication with Detective Davis at the suppression hearing.  (TR ROA 598 at 48)  Detective Davis stated that Mr. Honie smelled of alcohol when he first interviewed him but he "did not feel that he was intoxicated to the point that he didn't understand what I was saying or what I was doing, what was going on.  I mean, *he was intoxicated*, yes, but not—he was not inebriated.  I mean he knew what was going on."  *Id.* at 49 (emphasis added).

Even though Detective Davis admitted that Mr. Honie was intoxicated during the first interview, the only interview for which Mr. Honie was offered *Miranda*[32] warnings i*d.* at 35-36, Mr. McCaughey failed to follow up on this line of questioning which went directly to Mr. Honie's voluntariness.  Mr. McCaughey also failed to ask Detective Davis if Mr. Honie was given pain medication when he was taken to the hospital following the first interrogation to receive treatment for the gash on his hand.  *Id*. at 37-38.  While there was a wealth of information that could have been introduced at this hearing to challenge the introduction of Mr. Honie's statements, Mr. McCaughey failed to present any of it.

---

[32] *Miranda v. Arizona*, 384 U.S. 436 (1966).

It was clear that Mr. McCaughey was not interested in having the statements suppressed given his complete failure to present readily-available evidence in support of his motion.  His actions at the hearing made it crystal clear that he only asked for the hearing to protect himself from a claim of ineffective assistance of counsel down the road for his decision to introduce his client's involuntary inculpatory custodial statements at trial.  If Mr. McCaughey had actually wanted the statements to be suppressed, all he had to do was accept the State's offer to stipulate to the inadmissibility of Mr. Honie's statements at trial.  There was no need for the hearing.  Trial counsel's decision to go forward with the hearing did absolutely nothing to further his client's interests.  Unsurprisingly, the trial court denied the motion, finding that Mr. Honie's initial waiver of rights under *Miranda* during the first interrogation was valid for all three statements even though he was intoxicated at the time he was informed of these rights.  (TR ROA 209-208, 199-198)

### C. Trial counsel failed to investigate the facts and circumstances of the crime and Mr. Honie's arrest prior to deciding to introduce his inculpatory statements at trial.

The hearing on the motion to suppress statements was held early in the case on January 21, 1999.  (TR ROA 598)  While counsel was in possession of discovery from the State since July 26, 1998 (Cedar City Police Department Records[33] at 393), including a transcript of the custodial interrogation, reports from officers at the scene, and the medical examiner's autopsy report, it is clear that counsel had not reviewed the

---

[33] *See* First Rule 7 Motion, Exhibit Y.

discovery, or conducted the necessary investigation required of reasonable counsel prior

to deciding to concede guilt and introducing his client's inculpatory statements at trial.

*See Strickland*, 466 U.S. at 690-91; *see also Powell*, 287 U.S. at 71-72.

In the autopsy report, the description of the injuries to Ms. Benn's neck are

inconsistent with the version of the facts of the crime the defense introduced at trial:

> <u>SHARP FORCE INJURIES</u>:  A 30 cm long incision crosses the neck, from
> ear to ear.  On the left side, the incision begins below and slightly anterior
> to the earlobe.  On the right side it ends below the earlobe.
> . . .
>
> On the left side there are four V[-]shaped notches, and the right side is one
> V-shaped notch.
>
> The incision passes completely through the anterior cervical compartment
> and terminate [sic] in the vertebral column. . . .  A second line of incision
> passes through the upper part of the thyroid cartilage above the vocal cords.
>
> The internal carotid arteries and jugular veins are transected.
>
> The esophagus is transected.

(Cedar City Police Department Records at 204-05)

Had Mr. McCaughey reviewed the autopsy report and interviewed the medical

examiner prior to the motion to suppress, he would have realized that the version of

events that Mr. Honie told to Detective Davis while he was intoxicated was not consistent

with the evidence.  In fact, the medical examiner testified at trial that Ms. Benn's injuries

could not have resulted from a fall, as described in Mr. Honie's statement, and that a

single fall especially would not account for the multiple cuts to Ms. Benn's neck.  (TR

ROA 608 at 444)  The medical examiner then offered her own theory, without objection

from the defense, stating that the injuries were consistent with someone standing behind the victim and reaching around and cutting the neck.  *Id.* at 444.

Additionally, Mr. McCaughey never interviewed witnesses about Mr. Honie's allegedly spontaneous statement at the scene, that he killed Ms. Benn.  In a report by Officer Robinson, he states that he made contact with a witness named Kerry Jensen who stated that "he heard [ ] a male voice saying, 'You asshole, get on the ground.'"  (Cedar City Police Department Records[34] at 32, 48)  Officer Robinson states that he gave Mr. Jensen a written statement form to fill out and told him he would be back later to pick it up.  *Id.*  Mr. Jensen also appears on several police witness lists in the police file as a neighbor who made a statement.  *Id.* at 53, 55, 57, 88.

Had Mr. McCaughey interviewed Mr. Jensen, he would have learned that Mr. Jensen heard an officer yell:  "Get down on the ground, you asshole.  You slit her throat from ear to ear.  You're covered in blood."  (Declaration of Kerry Jensen[35], 06/24/13)  Mr. Jensen would have also informed counsel that while an officer left a statement form for him to fill out and told him he would return to pick it up, no one ever returned to retrieve his statement.  *Id.*

Had Mr. McCaughey interviewed other neighbors who were in the vicinity of the scene, he would have learned that Clark Adams heard someone yell, "There's blood

---

[34] *See* First Rule 7 Motion, Exhibit Y.
[35] *See* First Rule 7 Motion, Exhibit B.

everywhere.  Did you kill her?" (Declaration of Clark Adams[36], 06/23/13)  Mr. Adams

would have also told him that Sergeant Terry Petersen lives just down the street from

him, and Ms. Benn's house, and stopped by that evening to see if he and his family were

okay. *Id*

 Had Mr. McCaughey called these witnesses at the motion to suppress, he could

have also moved to challenge Mr. Honie's allegedly spontaneous admission at the scene

after he was arrested.  Instead, the officers at the scene testified at trial, without objection,

that Mr. Honie spontaneously stated, "I stabbed her.  I killed her with a knife." (TR ROA

607 at 293, 321)

  **D.** **Trial counsel was ineffective for failing investigate the facts and circumstances of the crime prior to deciding to introduce Mr. Honie's version of the events at trial, and for introducing Mr. Honie's inculpatory statements when he recognized they were involuntarily made.**

 Mr. Honie argued in state court that it was unreasonable for Mr. McCaughey to

fail to challenge the admission of these statements, and likewise, to fail to accept the

State's offer to stipulate to their inadmissibility at trial given the fact that he knew the

statements were not voluntarily made. (Opening Brief of Appellant, 10/01/12, at 51-53)

Mr. Honie noted that Mr. McCaughey admitted to the trial court that he believed there

was a *Miranda* violation because Mr. Honie was only offered *Miranda* warnings during

the first interrogation, a time during which Detective Davis, himself, admitted that Mr.

Honie was intoxicated. *Id.* at 52.  Mr. McCaughey also admitted that Mr. Honie's

---

[36] *See* First Rule 7 Motion, Exhibit A.

statements were rendered involuntary because he was too intoxicated to validly waive his constitutional rights. *Id.* Despite both of these factors, Mr. McCaughey failed to present readily-available testimony and evidence to support his challenge to the voluntariness of Mr. Honie's statements. *Id.* Moreover, because the State offered to stipulate to the inadmissibility of Mr. Honie's statements at trial, all Mr. McCaughey had to do was accept the State's offer to prevent the statements from being introduced at trial.

Mr. Honie also argued in state court that Mr. McCaughey was ineffective for failing to investigate the facts and circumstances of the crime prior to deciding to admit Mr. Honie's statements at trial as an accurate version of the events of the crime. *Id.* at 52-53. Mr. Honie pointed out that it was clear from Mr. McCaughey's statements during the suppression hearing that he had already decided on his infelicitous concession strategy because he was intending to introduce these statements at trial. *Id.* at 52. Mr. Honie noted that this was unreasonable given how early in the case the hearing occurred, that the trial was still four months away, and Mr. McCaughey had not yet conducted crucial investigation that was necessary before making this decision. *Id.* at 52. Mr. Honie concluded that given the fact that the State agreed to stipulate that the statements would be inadmissible at trial, counsel should have agreed to the stipulation to keep the statements out of evidence until he had performed the necessary investigation to support his decision to concede guilt and introduce the his client's statements at trial. *Id.* at 52-53 (citing *Strickland*, 466 U.S. at 690-91).

The state court rejected this claim, holding "Trial counsel's strategic choice to voluntarily admit Mr. Honie's inculpatory statements was not objectively unreasonable[,]" because trial counsel "believed the statements exhibited remorse." *Honie*, 342 P.3d at 198.  In support of its holding, the court found that "[t]rial counsel may make the strategic choice to use potentially inculpatory evidence if it furthers the client's interest." *Id.* (citing *Ayala v. Hatch*, 530 F. App'x 697, 701 (10th Cir. 2013)). The court further noted, "As long as such evidence furthers his client's interests, the use of the potentially damaging evidence is not objectively unreasonable." *Honie*, 342 P.3d at 198 (citing *Gardner v. Ozmint*, 511 F.3d 420, 430 (4th Cir. 2007)).  The state court's denial of this claim constituted an unreasonable application of clearly-established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

The court relies on the cases of *Ayala* and *United States v. Fulks*, 683 F.3d 512 (4th Cir. 2012), to support its position.  In *Ayala*, trial counsel did not file a motion to suppress the statements made by the defendant to the police and child welfare officials related to his child abuse charges.  530 F. App'x at 701.  During state post-conviction proceedings, trial counsel testified that the reason he did not file a motion to suppress the defendant's statements was because the defendant admitted to his wife, to authorities, and to trial counsel that he had hit his daughter, and never recanted this admission to trial counsel.  *Id.*  Trial counsel also testified that he determined, based on his view of the evidence, that defendant's best course of action would be to accept responsibility for the

102

abuse by pleading guilty, and focus on sentencing.  *Id.*  Trial counsel wanted to negotiate a favorable plea agreement with the State and did not think that filing a motion to suppress would advance this strategy.  *Id.*  It is clear from the record that trial counsel in *Ayala* had a reasonable strategic reason for not filing a motion to suppress the defendant's statements.  Unlike in Mr. Honie's case, there is nothing in the record that indicates there were concerns about the voluntariness of the confession.  Additionally, trial counsel felt that in light of the facts and circumstances of the case, it was in the defendant's best interest to plead guilty, and that filing a motion to suppress would not aid in plea negotiations.

In *Fulks*, trial counsel encouraged the defendant to make a statement to the police without an agreement that would reduce his sentence or limit the admissibility of the statement.  683 F.3d at 517.  Trial counsel did this knowing that it committed the defendant to pleading guilty in the case, but did so because he did not see "any credible defense or issue that would lead to a verdict of not guilty."  *Id.* at 518 (internal quotations omitted).  The statements at issue consisted of the defendant's own version of events, which demonstrated he was less culpable than his confederate, including the fact that he was not the actual killer.  *Id.*  Trial counsel's reasoning for doing this was to demonstrate "acceptance of responsibility" and "remorse" to the jury during sentencing.  *Id.*  Trial counsel believed this was the best option to avoid getting the death penalty.  *Id.*

Unlike in *Ayala* and *Fulks*, in Mr. Honie's case there were serious concerns about the validity and voluntariness of his inculpatory statements.  Trial counsel believed that

103

Mr. Honie's statements were involuntarily made because he was extremely intoxicated and they were made without proper warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and that their admission would be prejudicial.  (TR ROA 103-097)  Additionally, unlike in *Ayala* and *Fulks*, Mr. McCaughey offered no legitimate strategic reason for introducing Mr. Honie's inculpatory statements.  The state court noted in its opinion that because trial counsel was dealt an "unpalatable hand" by being "presented with a client who was clearly guilty of committing a[n] heinous crime[,]" it was reasonable for Mr. McCaughey to adopt a mitigation strategy that focused on remorse. *Honie*, 342 P.3d. at 199.

The position of the state court is untenable in light of the actual facts and circumstances of Mr. Honie's case.  First, using a defendant's statements as evidence of remorse, a mitigation theory, is inappropriate and highly prejudicial when the jury hearing this evidence is not deciding the penalty.  Unlike in *Fulks*, the jury in Mr. Honie's case was not making a sentencing decision or sentencing recommendation.  Therefore, there was no legitimate purpose for them to hear this highly prejudicial evidence during the merits phase of the trial.  In fact, evidence of remorse in these circumstances was unmitigated evidence of guilt.  Moreover, unlike in *Fulks*, there was nothing in Mr. Honie's statements that would have lessened his responsibility for the crimes.  Instead, Mr. Honie's statements provided the only version of events because there were no witnesses to the crime.  Therefore, even if a jury was determining the

penalty, there was nothing in the statements that would have presented a better picture of Mr. Honie to the jurors.

If, as the state court believes, this evidence was reasonably presented as evidence of remorse, then the statements should have been introduced during the penalty phase, where evidence of mitigation was being considered.  The jurors at the merits phase of the trial were only determining guilt or innocence and whether the State had presented evidence in support of aggravating circumstances.  The jurors were not considering mitigation and, therefore, evidence of remorse could not be considered by them.

Mr. Honie's case can be analogized more appropriately with the case of *Gardner*, 511 F.3d 420, to which the state court cites.  *Honie*, 342 P.3d at 198.  In *Gardner*, the court held, "An attorney's insistence upon the admission of evidence that significantly damages his client, without using that evidence in any manner to further his client's interests, cannot be considered 'sound trial strategy' and certainly does not comport with 'prevailing professional norms.'"  *Id.* at 430 (quoting *Strickland*, 466 U.S. 689). Similarly to *Gardner*, Mr. McCaughey had no strategic reason for introducing these inculpatory statements during the merits phase of the trial.  As previously noted, because the jury was not deciding the sentence or recommending a sentence to the judge, there was no need to front-load this evidence, which Mr. McCaughey characterized as "mitigation evidence" of remorse.  Therefore, if admitted at all, the statements should have been introduced at sentencing before the judge without prejudicing the jurors during the merits phase.

In Mr. Honie's case, his inculpatory statements were introduced at the merit's phase to the jurors by his own counsel.  Because the jurors could not consider evidence of remorse at this stage of the trial, these statements could only work against Mr. Honie as proof that he committed the murder and to further the State's allegations of aggravating circumstances.  As in *Gardner*, trial counsel's decision "cannot be considered 'sound trial strategy' and certainly does not comport with 'prevailing professional norms.'"  *Id.* at 430 (quoting *Strickland*, 466 U.S. 689).  Mr. Honie was prejudiced by trial counsel's deficient performance because it was only through trial counsel's actions that the jurors heard this highly inflammatory evidence.  *See Strickland*, 466 U.S. at 694-95.

Consistent with his position prior to trial, the prosecutor did not introduce Mr. Honie's statements on direct examination at trial.  (TR ROA 607 at 341-45)  Despite this, co-counsel, Susanne Gustin-Furgis, elicited testimony from Officer Davis on cross-examination about Mr. Honie's statements.  *Id*. at 345-62.  Having opened the door to the statements, the prosecutor then went into great detail about Mr. Honie's statements on re-direct examination.  *Id*. at 362-72.  Ms. Gustin-Furgis initially objected on the basis that she was concerned that Honie's statements about being involved in the occult would come in, as well as other bizarre statements he made during his first interrogation.  *Id*. at 363-64.  The prosecutor pointed out that he had previously offered to stipulate that the statements would not come in at all at trial, but that the defense chose to introduce the statements.  *Id*. at 364.  Ms. Gustin-Furgis agreed with the prosecutor that the door had been opened, giving him the right to question Detective Davis about Mr. Honie's

statements, and only asked that any reference to the occult be prohibited.  *Id*. at 366.  The court expressed its opinion that "this case is unusually graphic and grotesque" but held that because defense counsel opened the door to the statements, the prosecutor could question Detective Davis about them.  *Id*. at 367.

Because the defense opened the door to the introduction of Mr. Honie's statements, the State was able to introduce other statements by Mr. Honie that supported the State's allegations of guilt as well as aggravating circumstances.  *Id*. at 367.  The State elicited extremely prejudicial and inflammatory details about the crime that, otherwise, never would have come into the record.  *Id*. at 370.  Detective Davis testified that Mr. Honie told him that he thought about having anal intercourse with Ms. Benn, but changed his mind when he realized she was dead.  *Id*. at 370.  Mr. Honie told Detective Davis that he had pulled his pants down and was "getting ready to stick it in her."  *Id*. at 370.  Detective Davis asked Mr. Honie, "So you put your fingers inside of her anal, but you never did put your . . . dick inside of her?"  *Id*. at 371.  Mr. Honie answered, "Uh-uh[.]"  *Id*. at 371.  Mr. Honie then told Detective Davis that the reason there was blood on the back side of Ms. Benn was because he was holding his penis with his injured hand that was bleeding while he was "trying to stick it in."  *Id*. at 372.

As the Court explained in *Arizona v. Fulminante*, 499 U.S. 279 (1991), "[a] defendant's confession is 'probably the most probative and damaging evidence that can be admitted against him,' . . . so damaging that a jury should not be expected to ignore it even if told to do so, . . . and because  . . . it is impossible to know what credit and weight

107

the jury gave to the confession." *Id.* at 292 (internal citations omitted).  Given the powerful nature of Mr. Honie's inculpatory statements, it was unreasonable for Mr. McCaughey to introduce Honie's custodial statements at trial to demonstrate remorse, when remorse was a sentencing factor to be considered by the judge.  *See Strickland*, 466 U.S. at 686-87.  Mr. Honie was prejudiced because the version of events that trial counsel introduced were not supported by the evidence presented at trial by the medical examiner and opened the door to introducing highly inflammatory facts about the crime that supported the State's position that Mr. Honie was guilty, and supported the State's allegations with regard to aggravating circumstances.  *Fulminante*, 499 U.S. at 292.

The state court's denial of this claim constituted an unreasonable application of clearly-established federal law.  28 U.S.C. § 2254(d)(1).  The cases that the state court relied on to deny this claim were inapposite to this issue.  Moreover, the state court failed to recognize that trial counsel had a duty to investigate the facts and circumstances of the case prior to deciding to concede guilt and introducing his client's inculpatory statements at trial.  *See Strickland*, 466 U.S. at 690-91; *see also Powell*, 287 U.S. at 71-72.  Finally, the state court also failed to recognize that the jurors could not consider this evidence as mitigating evidence of remorse, and that the introduction of these statements at the merits phase only served to prove the State's theory that Mr. Honie was guilty, and to support the State's allegations of aggravating circumstances.

In *Strickland*, the Court found that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  466 U.S. at 690-91

108

(explaining that prevailing norms of practice as reflected in the American Bar Association standards and the like are guides to determining what is reasonable).  The Court also explained that counsel has a duty to make reasonable investigations and that strategic choices made after a less-than-complete investigation are only reasonable to the extent that professional judgment would support such limits to investigation.  *Id.* at 691.  The Court reiterated these principles in *Bobby v. Van Hook*, 558 U.S. 4 (2009), where it acknowledged that "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails. . . where they describe the professional norms prevailing when the representation took place."  *Id.* at 7 (citing *Strickland*, 466 U.S. at 688).  Mr. McCaughey's failure to investigate the facts and circumstances of the crime violated the basic duty of counsel to "conduct independent investigations relating to the guilt/innocence phase . . . of a capital trial."  *See* 1989 ABA Guideline 11.4.1(A) (Investigation); *see also Strickland*, 466 U.S. at 691.  This investigation "should be conducted regardless of any admission or statement by the client concerning facts constituting guilt."  *See* 1989 ABA Guideline 11.4.1(B) (Investigation).

In Mr. Honie's case, it was clear that Mr. McCaughey failed to conduct necessary investigation prior to deciding to concede guilt and introducing Mr. Honie's inculpatory statements at trial.  As noted above, Mr. McCaughey failed to interview witnesses who could have provided a basis for challenging the introduction of Mr. Honie's admission at the time of his arrest.  Most importantly, had Mr. McCaughey reviewed the autopsy report, which was in his possession, and interviewed the medical examiner, he would

have realized that Mr. Honie's recollection of the events was not credible given the evidence. Had this happened, Mr. Honie's statements would not have been introduced during the merits phase.

The state court's decision is also an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). The state court believed the sole basis for introducing the statements was to demonstrate remorse; however, during the hearing on the motion to suppress, Mr. McCaughey informed the court that he wanted to introduce the statements because he believed they accurately reflected what happened. (TR ROA 598 at 6) As pointed out above, the decision was unreasonable because Mr. McCaughey failed to investigate the facts and circumstances of the crime before making this decision. And, in fact, the facts as presented at trial were not consistent with Mr. Honie's version of the events. (TR ROA 608 at 444) Therefore, there was no reasonable basis in federal law for the introduction of Mr. Honie's statements at trial, and the state court's decision warrants no deference.

## CLAIM THREE

**I.    TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO PROPERLY ADVISE MR. HONIE OF HIS RIGHT TO HAVE A JURY DETERMINE HIS PENALTY, RESULTING IN A JURY WAIVER THAT WAS NOT KNOWNINGLY AND VOLUNTARILY GIVEN**

Trial counsel was ineffective for failing to properly and adequately advise Mr. Honie of his right to have a jury determine his sentence, and for failing to move to withdraw his jury waiver upon the request of Mr. Honie prior to trial. *See Strickland*, 466

U.S. 668; *see also Alvord v. Wainwright*, 469 U.S. 956, 960 (1984) (finding that the decision to waive a jury belongs to the defendant and that counsel's role with regard to jury waivers is to assure that the "waiver is voluntary and intelligent" and "that the accused is reasonably well informed.")  *Id.* at 959-60 (citation omitted).

Because the State of Utah provides a right to jury sentencing in its capital murder sentencing statute, U.C.A. § 76-3-207(1)(c) and (5), any waiver of this right is required to comport with Fourteenth Amendment Due Process and Equal Protection principles.  *See Evitts v. Lucey*, 469 U.S. 387, 393 (1985).  Moreover, because this right relates to a capital sentencing procedure, the Eighth Amendment requirement for reliability in capital cases is also implicated.  *See Gregg v. Georgia*, 428 U.S. 153 (1976) (finding that when a defendant's life is at stake, a court must be "particularly sensitive to insure that every safeguard is observed.")  *Id.* at 187; *see also Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (finding that capital proceedings must aspire to a heightened standard of reliability because "execution is the most irremediable and unfathomable of penalties; that death is different.")  *Id.* (citations omitted).

Mr. Honie was prejudiced by trial counsel's actions, because but for trial counsel's deficient performance, he would have withdrawn his jury waiver and had his sentence decided by a jury of twelve peers, rather than one judge.  *Strickland,* 466 U.S. at 694; *see also Hill v. Lockhart*, 474 U.S. 52, 59 (1985) (holding that *Strickland* prejudice turns on "whether counsel's constitutionally ineffective performance affected the outcome of the [proceeding addressing the waiver of a constitutional right].")  *Id*.

111

### A.    Exhaustion

Mr. Honie presented this claim during his post-conviction proceedings to the Fifth Judicial District Court and the Utah Supreme Court.  (PCR ROA at 68, 752-766; Opening Brief of Appellant, 10/01/12 at 17-22, 67-75)  The Utah Supreme Court denied the claim on the merits.  *Honie*, 342 P.3d at 200-02.  The state court's denial of this claim constituted an unreasonable application of clearly-established federal law, 28 U.S.C. §2254(d)(1), and an unreasonable determination of the facts.  *Id.* at §2254(d)(2).

### B.    Trial counsel encouraged Mr. Honie to waive a jury at sentencing so that the trial would go more quickly.

**"We anticipate waiving the jury in the penalty phase . . . [to] short circuit things quite a bit, especially the death qualification of the jury." --Stephen McCaughey, Waiver of Jury Hearing, TR ROA 602 at 3-4.**

At a pre-trial scheduling conference held approximately two weeks before trial, trial counsel informed the trial court that he anticipated waiving the jury in the penalty phase in order to "eliminate the need to death qualify this jury" and so that the evidence would only have to be put on once, thereby simplifying the process.  (TR ROA 602 at 3-4)  Trial counsel described it as "short circuit[ing] things quite a bit, especially the death qualification of the jury."  *Id.* at 4.  Trial counsel informed the court that he had discussed the waiver with Mr. Honie who agreed to it and that the State had provided the necessary statutory consent.  *Id.* at 4-5.  The prosecutor then asked the court for assurances that the court would consider imposing the death penalty and the court stated that it would impose

112

the death penalty if it felt it was appropriate and the facts and circumstances of the case warranted it. *Id.* at 7-8.

Because Mr. Honie was not present when the jury waiver was discussed, the court and parties reconvened after a short break to go over the waiver. *Id.* at 8. Trial counsel again expressed his interest in streamlining the trial and noted that the parties would have to call fewer witnesses during the penalty phase if the judge, rather than the jurors were to consider sentencing. *Id.* at 9. The trial court agreed to allow Mr. Honie to waive jury sentencing, and after trial counsel spent a brief moment with Mr. Honie reviewing the jury waiver form[37], the following colloquy occurred:

| MR. McCAUGHEY: | Right. Mr. Honie, you have executed a document entitled Waiver of Jury in the Penalty Phase. You have read that document, have you not? |
|---|---|
| THE DEFENDANT: | Yes, sir. |
| MR. McCAUGHEY: | And you have talked to me about it? |
| THE DEFENDANT: | Yes. |
| MR. McCAUGHEY: | And I have asked you if you had any questions about it. And you said you do not. Is that right? |
| THE DEFENDANT: | Yes. |
| MR. McCAUGHEY: | Do you understand what that does? |
| THE DEFENDANT: | Yes. |

---

[37] (TR ROA 425-423; PCR ROA 804-806)

MR. McCAUGHEY:     You understand you are giving up your right to have a jury of 12 people decide the penalty aspect of this case if, in fact, you are convicted, and agree to allow the judge to decide what penalty would be imposed if there is a conviction?

THE DEFENDANT:     Yes.

MR. McCAUGHEY:     And you and I have talked about that. In fact, we talked about it for a while last night, did we not?

THE DEFENDANT:     Yes, we did.

MR. McCAUGHEY:     And I explained to you the ramifications of the 12 person jury, if one person descends [sic], then the death penalty won't be imposed, and that 10 people can agree and impose life in prison without parole. I have explained that to you?

THE DEFENDANT:     Yes.

MR. McCAUGHEY:     And if 10 or more people do not agree, then life imprisonment with the possibility of parole will be imposed?

THE DEFENDANT:     Yes.

MR. McCAUGHEY:     In spite of that, it's your decision to waive your right to have a jury decide to waive [sic] the penalty and have the court decide the penalty?

THE DEFENDANT:     Yes.

MR. BURNS:     You are doing that voluntarily?

THE DEFENDANT:     Yes.

MR. McCAUGHEY:     Nobody's coerced you or forced you?

114

THE DEFENDANT:      No.

MR. McCAUGHEY:      You are not under the effects of any alcohol or drugs; is that correct?

THE DEFENDANT:      No.

MR. McCAUGHEY:      Are you thinking clearly today?

THE DEFENDANT:      Yes.

MR. McCAUGHEY:      Any questions you want to ask me or the judge about this?

THE DEFENDANT:      Not right now.

MR. McCAUGHEY:      Okay. So there is no doubt in your mind that this is what you want to do; is that correct?

THE DEFENDANT:      Yes.

MR. McCAUGHEY:      And it's based on my advice as I explained to you last night.  It has to be your decision and not mine?

THE DEFENDANT:      Yes.

MR. McCAUGHEY:      And it is your decision?

THE DEFENDANT:      Yes, it is.

MR. McCAUGHEY:      And that's what you want to do?

THE DEFENDANT:      Yes.

TR ROA 602 at 11-13.

Following the colloquy, the trial court addressed Mr. Honie:

115

THE COURT:          Let me just add a couple of follow-up questions. You said you weren't on any drugs, and that includes any prescription medication I assume; is that right?

THE DEFENDANT:      Yes, sir. No drugs at all.

THE COURT:          And, then, do you understand that to not receive the death penalty you would have to have—I don't know quite how to put this in layman's terms and still be accurate legally—but with a judge, there is just one person you would have to convince. There is a reasonable doubt with 12 jurors, you got 12 chances to convince somebody that there is a reasonable doubt there. So do you understand that you are reducing your field there for 12 down to one?

THE DEFENDANT:      Yes.

THE COURT:          I don't want to insult your intelligence, but do you understand that?

THE DEFENDANT:      Yes, I do.

THE COURT:          And you still want to go ahead with the waiver of the jury for the penalty phase?

THE DEFENDANT:      Yes, sir.

THE COURT:          Mr. Burns, do you want to ask any additional questions?

MR. BURNS:          I think the court and Mr. McCaughey have covered it. And just supplemented [sic] the record again by saying that the only reason the state has consented and stipulated and agreed to this is because it is this defendant's choice and desire.

(TR ROA 602 at 14-15)

116

In an affidavit presented to the district court during post-conviction proceedings, Mr. Honie stated that his trial counsel encouraged him to waive jury sentencing because "the judge was young and likely to go for a life without parole sentence." (PCR ROA 811) Mr. Honie stated that he did not understand, and that trial counsel failed to explain to him, what the terms mitigation and aggravation meant or "what would be the jury's role in sentencing and what was necessary for a death penalty sentence . . . ." *Id.* Mr. Honie also told trial counsel a week later, which was the first time he saw him following the execution of his jury waiver, that he had changed his mind and wanted to withdraw the waiver, but trial counsel told Mr. Honie that it was too late, even though the trial was still a week away. *Id.*

### C.   Trial counsel failed to adequately advise Mr. Honie of his right to jury determination of his sentence.

Trial counsel encouraged Mr. Honie to waive jury sentencing in favor of having the trial court determine the appropriate penalty without adequately informing Mr. Honie about the trial and sentencing process in his case and the consequences of his waiver. Because Mr. Honie had a state statutory right to be sentenced by a jury in his capital murder case, it was incumbent upon counsel to ensure that Mr. Honie was fully informed about his options and the consequences of waiving a jury. *See Lucey*, 469 U.S. at 393. The jury waiver form that was executed and the colloquy that occurred were inadequate to ensure that Mr. Honie's waiver of jury sentencing was made knowingly, intelligently

and voluntarily, in contravention to the Eighth and Fourteenth Amendments of the United States Constitution.

The specific defects at issue include the fact that Mr. Honie was never informed of his right to be sentenced by an *impartial* jury.  (PCR ROA 759)  Mr. Honie argued in state court that he "was not advised that he and his counsel would have a part in picking [the] jury and that the persons who demonstrated bias against Mr. Honie to the point they could not fairly consider and weigh the evidence would not be allowed to sit in judgment."  *Id.*  Additionally, the trial court erroneously told Mr. Honie at the jury waiver hearing that he would "have to convince" either the judge or jury that there was a reasonable doubt that he should not receive the death penalty, in contravention to the state capital sentencing statute.  (TR ROA 602 at 14)  Mr. Honie argued that this statement led him to believe that it would be easier for him to convince the judge rather than twelve jurors.  (PCR ROA 762)  Importantly, Mr. Honie also was not informed that the jurors would have to find that the totality of aggravating factors outweighed the mitigating factors beyond a reasonable doubt for the death penalty to be considered.  *See* U.C.A. § 76-3-207(5)(b);  *see also State v. Wood*, 648 P.2d 71 (Utah 1981), cert. denied, 459 U.S. 988 (1982).  Therefore, he was unaware that the State had the burden of proving that the death penalty was appropriate.  (PCR ROA 762)  Mr. Honie also argued that neither the court nor trial counsel explained what aggravating and mitigating evidence was and failed to determine whether Mr. Honie understood these terms.  (PCR ROA 763)

118

The state court rejected Mr. Honie's argument that his jury waiver was not knowingly and voluntarily given, finding that the only relevant consideration in his decision to waive a jury at sentencing "was the difference between a single judge and a twelve-person jury[,]" which was, according to the court, adequately explained during his colloquy. *Honie*, 342 P.3d at 201. The court noted, "The trial judge specifically asked whether Mr. Honie understood that he was reducing his chances of *convincing* a person to vote against the death penalty from '12 [sic] down to one.'" *Id.* (emphasis added)

The state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). While there is no federal constitutional right to jury sentencing, Utah law provides that capitally convicted defendants have a statutory right to have a jury determine their penalty. U.C.A. § 76-3-207(1)(c)(i) and (5). Therefore, the procedures used to either grant or waive this right must comply with due process, equal protection, and the need for reliability in capital cases under the United States Constitution. *See Lucey*, 469 U.S. at 393; *see also Gregg*, 428 U.S. at 187; *Ford*, 477 U.S. at 411.

This argument can be analogized to the United States Supreme Court's treatment of direct appeals in criminal cases. *See Lucey*, 469 U.S. 387. In *Lucey*, the United States Supreme Court held that even though the Constitution does not require states to grant appeals of right to criminal defendants, once a state provides a criminal defendant a right of appeal, the procedures used to guarantee this right "must comport with the demands"

119

of due process.  *Id.* at 393.  The Court therefore found that where a state affords a right of appeal, it must supply an attorney to an indigent appellant to make the right to appeal more than a "meaningless ritual."  *Id.* (quoting *Douglas v. California*, 372 U.S. 353, 358 (1963)).  Just as in *Lucey*, the right in Utah to have a jury determine sentencing in capital cases takes on a constitutional dimension, which requires the waiver of this right to comport with the due process and equal protection principles within the Fourteenth Amendment.  Moreover, because Mr. Honie was facing the death penalty, and his waiver directly implicated his sentence, the Eighth Amendment required a more thorough colloquy to ensure his waiver was validly given.  *See Gregg*, 428 U.S. 153; *see also Ford*, 477 U.S. 399.

The state court unreasonably held that the "right to an impartial jury and the use of aggravating and mitigating factors is not relevant to his choice between a judge and a jury in terms of sentencing."  *Honie*, 342 P.3d at 201.  The state court noted, "With either a judge or jury at sentencing, Mr. Honie was guaranteed the right to an impartial sentencer who would weigh the aggravating and mitigating factors."  *Id.*  However, the court failed to explain how Mr. Honie would know that he was entitled to an unbiased jury when he was never informed of the jury selection procedure in a capital case and he had no way of knowing that he had a right to select an unbiased jury through an extensive capital voir dire process.  *See Witherspoon v. Illinois*, 391 U.S. 510 (1968); *see also Wainwright v. Witt*, 469 U.S. 412 (1985); *Morgan v. Illinois*, 504 U.S. 719 (1992).

In *Morgan*, the Court acknowledged "that there is not 'any one right way for a State to set up its capital sentencing scheme,' . . . and that no State is constitutionally required by the *Sixth Amendment* or otherwise to provide for jury determination of whether the death penalty shall be imposed on a capital defendant[.] . . ." *Id.* at 725-26 (quoting *Spaziano v. Florida*, 468 U.S. 447, 464 (1984) (alteration in the original)). However, the Court emphasized that where a State has chosen "to delegate to the jury this task in the penalty phase of capital trials in addition to its duty to determine guilt or innocence of the underlying crime[,]" it must do so in a manner that comports with the Due Process Clause of the Fourteenth Amendment.  *Id.*  It, therefore, follows that once a state provides the right to jury sentencing in a capital case, it must comply with due process when a defendant chooses to waive this right, to ensure that he is properly informed of the rights he is waiving.  In this case, the right to an impartial jury was a crucial right in a capital case that should have been explained to Mr. Honie in order for him to be able to make a knowing and voluntary waiver of a jury.

**D.    Trial counsel's reasons for recommending Mr. Honie to waive a jury and proceed to sentencing with the judge were objectively unreasonable.**

The state court presumed that trial counsel's reasoning for encouraging Mr. Honie to waive a jury at sentencing was because he reasonably believed that Mr. Honie "would fare better at sentencing with a judge rather than with a jury[,]" given "the overwhelming evidence of Mr. Honie's guilt and the gruesome nature of the crime. . . ."  *Honie*, 342 P.3d at 201.  However, there is no indication in the record that this was the reason for Mr.

McCaughey to advise Mr. Honie to waive a jury at sentencing.  Therefore, the state court's decision also constituted an unreasonable determination of the facts.  *See* 28 U.S.C. §2254(d)(2).

Throughout the hearing on the jury waiver, Mr. McCaughey repeatedly told the court that waiving a jury would "streamline the proceedings" and "eliminate the need to death qualify this jury."  (TR ROA 602 at 3-4)  He also noted that he would call fewer witnesses to testify at the penalty phase if the judge, rather than a jury, was determining the penalty.  *Id.* at 9.  He never mentioned the gruesome nature of the crime or the overwhelming evidence of Mr. Honie's guilt.  A little later in the hearing, Mr. McCaughey made further remarks, indicating his desire to get through jury selection quickly.  During a discussion of individual voir dire, Mr. McCaughey stated, "I just think there won't be much to ask them[.]"  *Id.* at 17.  When the judge notified the parties that he was planning to allot twelve minutes per juror for questioning, Mr. McCaughey stated, "[T]his isn't going to happen.  You don't see 12 minutes per juror, do you?  I see about two at the most."  *Id.* at 18.

Two days later, the day that jury selection occurred, Mr. McCaughey stated that he thought they could get through the first two groups of jurors by 1:30 p.m. "because my guess is we'll move pretty quickly and we can start the selection around 2:30."  (TR ROA 604 at 45.  The court responded that he thought they might get to selection by 3:30, but "maybe we can move it up."  *Id.*  McCaughey then stated, "Unless I miss my guess, we'll be down [sic] pretty quick.  As soon as the 1:30 group comes in, we can start right away."

*Id.* It is clear from the record that at least one of Mr. McCaughey's reasons for recommending a judge over a jury at sentencing was to get through the trial more quickly.

Moreover, in Mr. Honie's affidavit, which the state court assumed as true, he stated that Mr. McCaughey told him he would fare better with a judge, not because the judge would be less likely to be influenced by the facts of the crime or the evidence of his guilt, but because the "the judge was young and likely to go for a life without parole sentence." (PCR ROA 811)  Mr. McCaughey had no reasonable basis for making this assumption, especially in light of the court's assertions that he would impose the death penalty if he felt it was appropriate and the facts and circumstances warranted it. (TR ROA 602 at 7-8)  The state court unreasonably attributed to Mr. McCaughey what a reasonable attorney would have done in Mr. McCaughey's position.  There is nothing in the record to support the state court's finding.  Therefore, the state court's decision constituted an unreasonable determination of the facts. *See* 28 U.S.C. § 2254 (d)(2).

### E.    Mr. Honie was prejudiced by trial counsel's deficient performance

Mr. Honie argued in state court that he was prejudiced because, but for trial counsel's error, he would have not waived his right to a jury determination of sentence. (PCR ROA 811-812)  In an affidavit presented to the district court during post-conviction proceedings, Mr. Honie averred, "If I had understood the differences between a judge determination and jury determination, I would have gone with the jury in the penalty phase and not waived the jury." (PCR ROA 812)  Mr. Honie also said that he attempted

123

to withdraw his jury waiver about one week after he entered it, which was the first time he had seen his counsel since entering the waiver, and trial counsel told him, "[I]t was too late." (PCR ROA 811)

The state court accepted Mr. Honie's assertion that he attempted to withdraw his jury waiver, and that his counsel refused to act on his request telling him it was too late, even though the trial was still a week away. *Honie*, 342 P.3d at 201. However, the state court did not decide whether this amounted to ineffective assistance of counsel because it found that Mr. Honie was not prejudiced because he did not establish "that the outcome of his sentencing would have been different had he opted for jury sentencing." *Id.* The state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), because it applied an incorrect prejudice standard in the context of a waiver of a constitutional right. *See Hill*, 474 U.S. at 59.

In *Hill*, the Court applied the *Strickland* prejudice standard in the context of a challenge to a guilty plea and concluded that the "defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* The Court in *Hill* focused on the outcome of the guilty plea proceeding, rather than requiring the defendant to demonstrate that but for counsel's error, he would not have pleaded guilty and would have achieved a better

outcome at trial.  *Id.*  Therefore, Mr. Honie only needed to demonstrate that if not for

counsel's deficient performance, he would have withdrawn his jury waiver and proceeded

with a jury during the penalty phase of his trial.  Mr. Honie demonstrated this in state

court and the state court accepted his assertion that he would have withdrawn his jury

waiver.  *Honie*, 342 P.3d at 201.  Therefore, this court should find that Mr. Honie has

demonstrated that he was prejudiced by trial counsel's deficient performance.

**CLAIM FOUR**

**I.**   **TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE EVIDENCE OF AGGRAVATED SEXUAL ABUSE OF A CHILD, WHICH THE STATE INTENDED TO INTRODUCE AS AN AGGRAVATING CIRCUMSTANCE IN SUPPORT OF THE DEATH PENALTY, AND FOR INTRODUCING THIS EVIDENCE DURING THE PENALTY PHASE DESPITE THE FACT THAT THE JURY DID NOT FIND IT AS AN AGGRAVATING CIRCUMSTANCE DURING THE MERITS PHASE**

Trial counsel was ineffective for failing to investigate evidence that Mr. Honie

sexually abused a minor at the scene of the crime, which the State intended to introduce

at trial as an aggravating circumstance, despite being in possession of a state report that

the minor told authorities her father, not Mr. Honie, molested her.  *See Strickland,* 466

U.S. 668; *see also Rompilla v. Beard*, 545 U.S. 374 (2005).  This error was exacerbated

when, after the jury failed to find this as an aggravating circumstance during the merits

phase of the trial, trial counsel, nonetheless, introduced an alleged statement by Mr.

Honie through the defense psychologist that he committed this offense; and the

sentencing court used this evidence as a basis for imposing the death penalty.

125

### A.     Exhaustion

Mr. Honie presented this claim during his post-conviction proceedings before the

Fifth Judicial District Court and the Utah Supreme Court.  (PCR ROA 65, 743-747;

Opening Brief of Appellant, 10/01/12, at 25-26, 56-67)  The Utah Supreme Court denied

this claim on the merits.  *Honie*, 342 P.3d at 199-200.  The state court's denial of this

claim constituted an unreasonable application of clearly established federal law.  28

U.S.C. § 2254(d)(1).

### B.     Trial counsel failed to investigate potentially exculpatory evidence that implicated someone else in the sexual molestation of D.R.

Trial counsel was aware the State intended to introduce evidence that Mr. Honie

sexually abused D.R., a minor who was present at the scene of Ms. Benn's murder.  Prior

to trial, counsel filed a motion to exclude this as evidence of aggravation in support of the

death penalty.  (TR ROA 112-111, 120-113)  In the memorandum in support of the

motion, trial counsel acknowledged:

> At the preliminary hearing, the evidence indicated that one of the children
> had been sexually molested by someone, but did not indicate when the
> child was molested, that the child was necessarily molested by a male, or
> who was with the child when the molestation occurred, and did not include
> any testimony directly accusing Mr. Honie of having molested her.

(TR ROA 119)  The trial court denied the motion and held that the evidence could be

presented at Mr. Honie's trial.  (TR ROA 179-176)  Despite this, trial counsel failed to

follow up on potentially exculpatory information that was provided to the defense

through discovery.  In a Child Abuse Neglect Report that was part of the Cedar City

Police Department homicide file, it was reported that Tom Vaughn, the on-call worker

for the Department of Child and Family Services ("DCFS"), reported to the scene at the

request of the Cedar City Police Department to take custody of the three children who

were present.  (PCR ROA 3518; Cedar City Police Department Records[38] at 139-140)

According to the report:

> In route to the Family Support Center, [D.R.] told this worker her daddy
> (name unknown at the time of intake) does this to her: "my daddy does this
> to me", she then demonstrated with her hand the finger[.]  We were
> discussing the circus when [D.R.] out of the blue mentioned her daddy does
> the finger to her.

(PCR ROA 3518; Cedar City Police Department Records at 140)

While the sole purpose of proceeding with the first phase of the trial was to

challenge the aggravating circumstances (TR ROA 607 at 233-34), there is no evidence

that trial counsel investigated this important evidence that could have exculpated Mr.

Honie as to the charge of aggravated sexual abuse of a child.  Moreover, trial counsel did

not ask any of the witnesses presented by the State at trial about this report and D.R.'s

statement.  *Id.* at 373-400.

### C. Trial counsel was responsible for the introduction of evidence of aggravated sexual abuse of a child during the penalty phase, despite the existence of evidence that someone else was responsible for molesting D.R.

The jurors did not find aggravated sexual abuse of a child as an aggravating

circumstance during the merits phase of the trial.  (TR ROA 608 at 496)  Despite this,

---

[38] *See* First Rule 7 Motion, Exhibit Y.

during the penalty phase of the trial, Mr. McCaughey introduced an alleged statement

made by Mr. Honie to the defense psychologist, Nancy Cohn, Ph.D., that he had molested

D.R.  (TR ROA 605 at 192)  While Dr. Cohn characterized Mr. Honie's statements with

regard to D.R. as an admission of guilt, she stated he told her that he had pushed D.R.

away from him when he realized the police were at the house, but could not explain why

he would have touched her.  *Id.* at 192.  Dr. Cohn testified that Mr. Honie told her, "That

happened to me and I can't believe I did that.  I don't know why I did that.  I can't

believe I did that."  *Id.*

In his penalty-phase closing statement, Mr. McCaughey argued that this

"admission" indicated that Mr. Honie was remorseful.  (TR ROA 606 at 76)  Trial

counsel also admitted during his penalty-phase closing statement that he introduced this

statement knowing that the State's evidence supporting this allegation was weak and that

D.R. had implicated her father, not Mr. Honie, in the molestation:

> Mr. Honie made th[is] admission of sexually violating that young girl.
> That's something he never had to do.  We were aware early on that the
> evidence on that particular aggravating circumstance was not very strong.
> They had—in fact, Mr. Burns is aware and I'm sure would not even
> disagree there was a statement from the girl, from [D.R.], that her dad had
> done that.
> . . .
> I think that's part of his remorse, coming forward and admitting to
> something that basically the State could not prove and I think remorse is a
> vital piece of mitigation that the Court has to consider.

*Id.*

128

In fact, the State was aware of the statement made by D.R. and the problems it posed to their case.  (Iron County Attorney Records[39] at 52, 61)  In a memorandum to the prosecutor, a staff member informed him, "If put on the stand, [D.R.'s] testimony may be prejudicial to the State's case.  For instance, at one point she stated, 'my daddy does this to me,' and showed her middle finger.  This statement could create doubt as to who sexually assaulted her."  (Iron County Attorney Records, Memorandum to Scott Burns, 04/09/99 at 52)  In a list included in the same memorandum, the DCFS worker, Tom Vaughn, was listed as the person who took the children from the scene.  *Id.* at 61.  The notes related to Mr. Vaughn read:  "It may be good to avoid Mr. Vaughn as a witness [sic] he could be asked regarding Dakota's statements regarding her 'daddy' (although they should be inadmissible because there was not medical diagnosis or treatment occurring at that point)."  *Id.*

Trial counsel also admitted during his closing argument that he was unprepared for the testimony during the penalty phase of D.R.'s father's mother, Karen Mayo, who was D.R.'s grandmother.  (TR ROA 606 at 76)  During her victim impact testimony, Ms. Mayo testified that D.R. told her that Mr. Honie had hurt her.  (TR ROA 605 at 67) There was no objection to this testimony by the defense.  In his closing argument, Mr. McCaughey stated, "I was not aware of the statement that she made to her grandmother. So I guess the easiest way out of that would have been just to hey, deny it."  (TR ROA 606 at 76)

---

[39] *See* First Rule 7 Motion, Exhibit AA; Exhibit Z (Declaration of Jeremy Voas).

The trial court relied on the evidence that Mr. Honie committed aggravated sexual abuse of a child as a non-statutory aggravating circumstance supporting the death penalty.  (TR ROA 549-548)  The trial court also referred to aggravated sexual abuse of a child in its Statement of Conviction and Judgment of Death.  (TR ROA 554)

### D.   Trial counsel was ineffective for failing to investigate D.R.'s statement that her father, and not Mr. Honie, was responsible for molesting her.

Trial counsel was ineffective for failing to investigate the facts and circumstances behind this allegation when he knew that that D.R. had made a statement to social services staff that her father was the one who molested her.  *See Rompilla*, 545 U.S. 374; *see also Strickland*, 466 U.S. at 690-91.  In *Rompilla*, the Court held that trial counsel was ineffective for failing "to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."  545 U.S. at 377.  The Court found that because counsel knew the State would rely on his client's significant felony history in asking for the death penalty, it was unreasonable for counsel to fail to obtain the client's prior conviction file, which was readily available.  *Id.* at 383-84.  The Court noted, "[I]t is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation."  *Id.* at 386.  The Court also noted that obtaining information that trial counsel knows the State will use against his client "is not simply a matter of common sense[,]" but an obligation under the American Bar Association (ABA) Standards for Criminal Justice which state:

130

> It is the duty of the lawyer to conduct a prompt investigation of the
> circumstances of the case and to explore all avenues leading to facts
> relevant to the merits of the case and the penalty in the event of conviction.
> The investigation should always include efforts to secure information in the
> possession of the prosecution and law enforcement authorities.  The duty to
> investigate exists regardless of the accused's admissions or statements to
> the lawyer of facts constituting guilt or the accused's stated desire to plead
> guilty.

*Id.* at 387 (quoting ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)).  The

Court concluded, "It flouts prudence to deny that a defense lawyer should try to look at a

file he knows the prosecution will cull for aggravating evidence . . . . No reasonable

lawyer would forego examination of the file . . . ."  *Id.* at 389.

In Mr. Honie's case, trial counsel was in possession of information that was

potentially exculpatory as to one of the most serious aggravating circumstances against

Mr. Honie.  As in *Rompilla*, he had a duty to seek out further reports or other information

in possession of the State about this allegation.  545 U.S. at 377.  He also had a duty to

interview the DCFS worker, Tom Vaughn, who heard D.R. make the statement, and a

duty to investigate the father of D.R. to see if the statement was credible.  *See Strickland*,

466 U.S. at 690-91.  Trial counsel's performance was deficient because he failed to

follow-up on obvious "red flags" indicating that someone other than Mr. Honie was

responsible for molesting D.R.  *See Rompilla*, 545 U.S. at 392-93.

E.   **Trial counsel was ineffective for failing to consult with Mr. Honie about this allegation before admitting his alleged statement during the penalty phase.**

Another troubling aspect to this claim is the fact that trial counsel introduced this statement without having ever spoken with Mr. Honie about whether he had actually committed this crime.  This was especially important because Mr. Honie always maintained his innocence as to this charge.  Mr. Honie never told the police that he had violated D.R.  During the interviews with Detective Davis, Mr. Honie told Detective Davis that he did not sexually abuse any of the children and that they were "the gems of my eyes."  (TR ROA 607 at 356, 359)  Mr. Honie also never admitted to violating D.R. during his trial.  During his allocution at the penalty phase, Mr. Honie expressed remorse and asked for forgiveness for his actions, specifically for killing Benn.  (TR ROA 606 at 26-28)  However, Honie did not say that he violated D.R.

During post-conviction proceedings, Mr. Honie presented an affidavit to the district court in which he stated that trial counsel "never talked to me about the State's allegation that I had sexually assaulted [D.R.] or asked me if I had done that."  (PCR ROA 3512 at ¶ 3)  Mr. Honie stated that he "did not molest or sexually assault [D.R.] on the night of the homicide . . . [or] at any time prior to that date."  *Id.* at ¶ 2.  Mr. Honie explained that he informed the defense investigator that both he and Carol Pikyavit, D.R.'s aunt, "had been suspicious that [D.R.'s] biological father, Jamie Rogers, had been sexually abusing D.R."  (PCR ROA 3513 at ¶ 4)  Mr. Honie further added that neither

132

counsel nor his investigator showed him the "Child Abuse Neglect Report" implicating

D.R.'s father in the molestation.  *Id.* at ¶ 5.

In his affidavit, Mr. Honie also stated that he told Dr. Cohn that he did not molest

or sexually assault D.R., but that he felt pressured by Dr. Cohn to falsely admit that he

did.  (PCR ROA 3514 at ¶8)  Mr. Honie stated that during the psychological evaluation,

Dr. Cohn told Mr. Honie that the only way he would be able to get a life sentence was to

admit to everything the State was alleging against him.  *Id.* at ¶8.  Mr. Honie told Dr.

Cohn that he "did not remember many of the events that occurred at Claudia Benn's

home on the night of the murder due to [his] alcohol and drug consumption, but that [he]

knew [he] did not molest or sexually assault [D.R.]."  *Id.* at ¶9.  Nonetheless, Dr. Cohn

continued to put pressure on Mr. Honie saying, "[J]ust give them what they want to make

it easier on them and you."  *Id.* at ¶ 9.  Mr. Honie also stated that Dr. Cohn never told him

about the Child Abuse Neglect Report or that D.R. had implicated her biological father in

the molestation.  (PCR ROA 3515 at ¶11)

In *Strickland*, the Court recognized certain basic duties of counsel representing a

criminal defendant: the duty of loyalty, the duty to avoid conflicts of interest, and the

duty "to consult with the defendant on important decisions and to keep the defendant

informed of important developments in the course of the prosecution."  466 U.S. at 688.

While the Court found that more specific guidelines were not appropriate and that "[t]he

proper measure of attorney performance remains simply reasonableness under prevailing

professional norms."  *Id.*  (explaining that prevailing norms of practice as reflected in the

American Bar Association standards and the like are guides to determining what is reasonable).  The Court also explained that counsel has a duty to make reasonable investigations and that strategic choices made after less than complete investigation are only reasonable to the extent that professional judgment would support such limits to the investigation.  *Id.* at 691.  The Court reiterated these principles in *Van Hook*, 558 U.S. 4, where it acknowledged that "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails. . . [where] they describe the professional norms prevailing when the representation took place."  *Id.* at 7 (citing *Strickland*, 466 U.S. at 688).

Trial counsel's failure to consult with Mr. Honie about using this statement during the penalty phase violated one of the basic duties of counsel recognized specifically in *Strickland* which is "to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland*, 466 U.S. at 688; *see also* Commentary, 1989 ABA Guideline 11.4.2 ("Counsel has a duty to interview the client, to keep the client informed of developments and progress in the case, and to consult with the client on strategic and tactical matters."); 1989 ABA Guideline 11.4.2 ("Trial counsel should maintain close contact with the client throughout the preparation of the case, discussing (inter alia) the investigation, potential legal issues that exist or develop, and the development of a defense theory.")

Moreover, trial counsel had a duty to ask Mr. Honie about his statement to Dr. Cohn to determine its veracity, especially in light of the fact that trial counsel was aware

134

that D.R. had said that her father, and not Mr. Honie, had molested her.  Commentary,

1989 ABA Guideline 11.4.1 ("Client interviews are vital for establishing the trust

between attorney and client necessary to allow the attorney to learn the facts.  Counsel

cannot frame an adequate defense without knowing what is likely to develop at trial,

including information that is or appears to be incriminating.")  These duties and

requirements were even more essential in Mr. Honie's case as he was facing the death

penalty.  *See* Commentary, 1989 ABA Guideline 11.4.2 ("Counsel's general duty to

maintain client contact is compounded in a capital case.  The complexity and unique

nature of the legal proceedings, stemming from their potentially lethal outcome, mandate

careful consultation with the person who may be killed.")

### F. Trial counsel's deficient performance prejudiced Mr. Honie because the trial court relied on the evidence of aggravated sexual molestation of a child in its calculus to impose the death penalty.

Mr. Honie was prejudiced by trial counsel's failure to investigate D.R.'s statement

that her father molested her, because it allowed the State to present evidence at trial that

was unchallenged and unquestioned.  This was especially troubling in light of the State's

recognition that D.R.'s statement could undermine this aspect of their case.  (Iron County

Attorney Records at 52, 61)  Mr. Honie was further prejudiced when trial counsel then

introduced, at the penalty phase of the trial, an alleged statement that he molested D.R., to

demonstrate remorse, even though the jury failed to find this evidence beyond a

reasonable doubt at trial, and even though trial counsel, himself, recognized that this

evidence was weak.  (TR ROA 606 at 76)

135

Trial counsel's deficiencies resulted in the trial court finding aggravated sexual abuse of a child as a non-statutory aggravating circumstance in support of the death penalty.  (TR ROA 549-548)  In the court's Findings of Fact and Conclusions of Law, the trial court found aggravated sexual abuse of a child by clear and convincing evidence, citing to the evidence presented by the state during trial.  *Id.*  The court noted, "It is not plausible to believe anyone other than the defendant injured the child."  (TR ROA at 548) The court also relied on the fact that trial counsel introduced evidence against his client during the penalty phase, noting, "Finally, Dr. Cohn testified that during one of her interviews with the defendant, he admitted to fondling [D.R.]."  *Id.*

### G.      The state court's decision was an unreasonable application of clearly established federal law.

The state court held that trial counsel's introduction of Mr. Honie's alleged statement through Dr. Cohn to demonstrate remorse was not "objectively unreasonable" because it fell "within the category of legitimate trial strategy."  *Honie*, 342 P.3d at 199-200.  The state court's decision was an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1), because it ignores the well-established fact that trial counsel had a duty to investigate this evidence before making any decisions on how to proceed with it at trial or during the penalty phase.  *See Rompilla*, 545 U.S. at 387-89; *see also Strickland*, 466 U.S. at 690-91.

In *Strickland*, the Court outlined the test for determining whether counsel has provided ineffective assistance.  As described by the Court, "the benchmark for judging

any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  466 U.S. at 686. Under *Strickland*, counsel is ineffective if: (1) "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 688, 694.

Of particular relevance to this claim, *Strickland* holds that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Id.* at 691.  In Mr. Honie's case, trial counsel failed to do either.  It was unreasonable for trial counsel to fail to investigate D.R.'s statement that her father, and not Mr. Honie, molested her.  *See Rompilla*, 545 U.S. at 377.  This was especially true in light of the State's own recognition that this aspect of their case was weak, and their decision not to call Tom Vaughn or D.R. as witnesses at trial because of it.  Trial counsel's failure to pursue this evidence left the State's presentation of this evidence unchallenged.  Despite the jury's failure to find this evidence beyond a reasonable doubt, the trial court found this by clear and convincing evidence and used it as a basis to support the imposition of the death penalty.  (TR ROA 549-548) Exacerbating this was trial counsel's decision to present Mr. Honie's alleged admission to this crime through the testimony of the defense psychologist even though trial counsel recognized the evidence was extremely weak.  (TR ROA 606 at 76)  Such actions by

137

counsel were a complete betrayal of his client and a derogation of his duty to serve as an advocate to Mr. Honie.

## CLAIM FIVE

## I.     TRIAL COUNSEL FAILED TO CONDUCT A REASONABLE MITIGATION INVESTIGATION

Mr. McCaughey failed to conduct an adequate mitigation investigation in Mr. Honie's case. *See Strickland*, 466 U.S. 668; *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins*, 539 U.S. 510; *Rompilla*, 545 U.S. 374. Rather than fulfilling his duty to conduct an independent mitigation investigation, he relinquished this duty to people who were not qualified to perform a mitigation investigation, and who did not perform a reasonable mitigation investigation. Importantly, neither of the people Mr. McCaughey relied on to perform the mitigation investigation understood their roles in the case as being responsible for mitigation investigation. Moreover, Mr. McCaughey failed to follow up on red flags revealed during the investigation that warranted further exploration. *See Wiggins*, 539 U.S. at 523-24; *see also Rompilla*, 545 U.S. at 390-91. Mr. Honie was prejudiced by Mr. McCaughey's deficient investigation because there was compelling and relevant information about Mr. Honie that Mr. McCaughey failed to discover that would have changed the evidentiary picture during the penalty phase, resulting in a life sentence. *See Strickland*, 466 U.S. at 693-94; *see also Wiggins*, 539 U.S. at 538. The state district court recognized the deficiencies in Mr. McCaughey's mitigation investigation and found the "'mitigation case presented an incomplete picture

138

of his life experience as a child and an adult,' . . . and that trial counsel 'did not present the most important mitigating evidence—the correlation between [Honie's] unconventional social behavior throughout his life and credible scientific explanations for these behavior patterns.'"  (PCR ROA 1035) (internal reference omitted)

### A.    Exhaustion

Mr. Honie presented this claim during his post-conviction proceedings before the Fifth Judicial District Court and the Utah Supreme Court.  (PCR ROA 65-68, 766-784; Opening Brief of Appellant, 10/01/12, at 76-91; Reply Brief of Appellant, 05/16/13, at 26-33)  The Utah Supreme Court denied this claim on the merits.  *Honie*, 342 P.3d at 192-95.  The state court's denial of this claim constituted an unreasonable application of clearly established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

### B.    Mr. Honie raised a colorable claim of ineffective assistance of counsel for failing to conduct an adequate mitigation investigation during his post-conviction proceedings.

During state post-conviction proceedings, Mr. Honie challenged trial counsel's mitigation investigation as being constitutionally inadequate.  In support of this claim, he introduced the affidavit of the post-conviction mitigation investigator, Bruce Whitman, who identified several areas of the mitigation case that were inadequate given Mr. Honie's background, life history and experiences.  (PCR ROA 817-830)  Mr. Whitman noted that given Mr. Honie's childhood and family background, further investigation and expert analysis was necessary to determine whether Mr. Honie suffered from Post-

139

Traumatic Stress  Disorder (PTSD), Fetal Alcohol Syndrome (FAS), and Attention

Deficit Hyperactivity Disorder (ADHD).  (PCR ROA 819)

Mr. Whitman noted that both of Mr. Honie's parents were alcoholics and often left

the children at home alone.  (PCR ROA 820)  Mr. Whitman noted, "Mr. Honie's parents

would often argue and fight, sometime violently, in front of the children, further

contributing to instability at home and to Mr. Honie's  . . . anxiety as a child."  (PCR

ROA 821)  Mr. Whitman stated that on one occasion, Mr. Honie's mother attempted to

kill herself with a gun; and on another occasion, "Mr. Honie had to call police to prevent

his father from further attacking his mother."  *Id.*

Mr. Whitman pointed out that "Mr. Honie may have been molested as a pre-

adolescent by a school staff member eventually linked to the molestation of 142

children."  (PCR ROA 822)  Mr. Whitman noted that while trial counsel raised the

possibility that Mr. Honie was molested, he failed to introduce the testimony of a child

abuse expert to explain the symptoms Mr. Honie had that demonstrated he had been

sexually molested.  *Id.*  Mr. Whitman explained that children who are victims of

molestation can become hyper-vigilant, which in turn can cause them to overreact in

violent and emotionally-reactive ways.  *Id.*  Mr. Whitman noted that this should have

been introduced at trial to explain Mr. Honie's violent and unpredictable reaction when

confronted by Ms. Benn with a knife.  (PCR ROA 822-823)

Mr. Whitman then went on to describe Mr. Honie's significant and extensive

alcohol and drug abuse that began when he was a child.  (PCR ROA 823)  Mr. Whitman

explained that Mr. Honie's increased use of drugs and alcohol may have contributed to his depression.  *Id.*  Mr. Whitman noted that while trial counsel referred to Mr. Honie's alcohol and drug abuse, he did not present testimony from an expert who could have explained "the full significance of these factors on the conduct of Mr. Honie."  (PCR ROA 824)  This included, according to Mr. Whitman, the need "to investigate the alcohol and drug levels of Mr. Honie at the time of the commission of the offense[,]" which would have been "vital" to his mitigation presentation at trial.  (PCR ROA 829-830)

Mr. Whitman discussed Mr. Honie's history of depression and attempted suicide and noted that trial counsel should have investigated the family's medical and mental health history for indications of a family history of depression and other mental illnesses that could have explained Mr. Honie's history and behavior at the time of the crime. (PCR ROA 825)

Mr. Whitman described the Honie family's battle with alcohol and substance abuse, which would have required trial counsel to look into the possibility that Mr. Honie suffered from alcohol exposure *in utero*.  (PCR ROA 825-826)  Mr. Whitman noted that Mr. Honie's early medical history reflects general poor health, which is a symptom of FAS and other alcohol-exposure-related disorders.  *Id.*  Mr. Whitman stated that had Mr. Honie been exposed to alcohol *in utero*, it would have had an effect on his behavior as an adult and would have been highly relevant to Mr. Honie's case.  (PCR ROA 826)  Mr. Whitman stated that this was an area that trial counsel should have explored, but did not.

141

Mr. Whitman stated that these issues were "just some of the most critical areas of discovery that needed more thorough investigation and expert analysis in order to provide a complete mitigation defense."  (PCR ROA 828)  Mr. Whitman concluded, "Mr. Honie's original mitigation case presented an incomplete picture of his life experience as a child and an adult . . . . [and] the defense team did not present the most important mitigating evidence—the correlation between Mr. Honie's unconventional social behavior throughout his life and credible scientific explanations for these behavior patterns"  (PCR ROA 828-829)

While the State moved to dismiss Mr. Honie's Amended Petition and moved for partial summary judgment on most of Mr. Honie's claims, including his mitigation claims (PCR ROA 212-217), the state district court denied the State's motion as to Mr. Honie's claims involving ineffective assistance of counsel for failing to conduct an adequate mitigation investigation because the district court found that they "raise[d] a genuine issue with respect to whether trial counsel's less-than-complete investigation was reasonable and, therefore, whether he failed to comply with prevailing norms of professional practice in conducting his mitigation workup."  (PCR ROA 1037-1038)

The district court found following issues warranted further investigation: (1) trial counsel failed to develop any evidence or raise any issue regarding Mr. Honie's intoxication at the time of the incident or explain his extensive polysubstance abuse and the impact it likely had on him at the time of the incident; (2) trial counsel failed to develop any evidence or raise any issue regarding Mr. Honie's mental illnesses; (3) trial

counsel failed to have Mr. Honie evaluated for the long-term effects of polysubstance

abuse or for brain damage; (4) trial counsel failed to investigate and present expert

testimony on Mr. Honie's level of intoxication at the time of the offense, during the

subsequent police interrogations, and during the time he waived his rights pursuant to

*Miranda*;  and (5) trial counsel failed to investigate and present relevant mitigating

evidence and expert testimony related to Mr. Honie's background and experiences,

family history, social situation, and mental state.  (PCR ROA 1040, 1064, 1066, 1068-

1069)

      In reaching its conclusion, the district court recognized the duty of defense

attorneys to conduct a reasonable mitigation investigation.  (PCR ROA 1033) (citing

*Strickland*, 466 U.S. at 688-90; *Wiggins*, 539 U.S. 510).  The district court relied on the

affidavit of Mr. Whitman, who "opined that [Honie's] 'original mitigation case presented

an incomplete picture of his life experience as a child and an adult,' . . . and that trial

counsel 'did not present the most important mitigating evidence—the correlation between

[Honie's] unconventional social behavior throughout his life and credible scientific

explanations for these behavior patterns.'"  (PCR ROA 1035)  The district court

specifically noted:

> Whitman indicates that the deficiency of trial counsel's mitigation workup
> is clearly demonstrated by counsel's failure to investigate and seek expert
> analysis of [Honie's] various psychological disorders and depression,
> failure to seek expert analysis of alleged child abuse committed against
> [Honie], failure to investigate and seek proper expert analysis of [Honie's]
> interpersonal relationships and his alcohol and substance abuse, failure to
> investigate and present mitigating evidence with respect to the relationship

143

between [Honie's] cultural background and his dysfunctional and traumatic upbringing and family life as contributing factors to his conduct at the time of the homicide, and failure to fully investigate and present mitigating evidence concerning the nature and extent [of Honie's] alcohol and drug intoxication at the time of the offense affected his judgment and mental state.

(PCR ROA 1035-1036)

The district court reasoned that under *Wiggins*, "if evidence known to trial counsel 'would lead a reasonable attorney to investigate further,' . . . by force of logic, because trial counsel had information suggesting that additional investigation into mitigating evidence was warranted, counsel's failure to conduct a more thorough mitigation investigation was unreasonable and constitutes deficient performance under *Strickland*." (PCR ROA 1037)  The district court noted that "based upon the pleadings, there is little to suggest that Mr. Whitman is not correct in his assessment, for the most part, that trial counsel did not investigate potentially significant areas of mitigation."  *Id.*  The district court then concluded that "Whitman's affidavit raises a genuine issue with respect to whether trial counsel's less-than-complete investigation was reasonable and, therefore, whether he failed to comply with prevailing norms of professional practice in conducting his mitigation workup."  (PCR ROA 1037-1038)

144

**C.**   **The state district court refused to provide Mr. Honie with funding to develop his mitigation claims despite finding that Mr. Honie had raised a genuine issue of material fact with regard to "whether trial counsel's less-than-complete investigation was reasonable and, therefore, whether he failed to comply with prevailing norms of professional practice in conducting his mitigation workup."  (PCR ROA 1037-1038)**

While these claims survived the State's first motion for summary judgment, Mr. Honie was initially unable to receive additional funding to develop these claims because he had already exceeded the statutory maximum for funding.  (PCR ROA 1246)  As noted above in the Procedural History, Mr. Honie moved for additional funding (PCR ROA 1139-1154), informing the district court that investigative "expenses submitted for payment have exceeded the amount allowed by the regulations of the Division of Finance[,]" and that additional funds were needed for "costs associated with the completion of the investigation including expert fees for consultation and related services."  (PCR ROA 1143)  Mr. Honie provided an additional affidavit from Mr. Whitman, as outlined in the Procedural History, in support of his motion for additional funds.  (PCR ROA 1147-1154)  The district court denied Mr. Honie's request for additional funds to develop the claims, even though the court had found these claims had merit and warranted further investigation.  (PCR ROA 1246)

The State then filed a second motion for summary judgment (PCR ROA 1266-1362), arguing that Mr. Honie failed to demonstrate either deficient performance or prejudice in trial counsel's sentencing investigation and presentation.  (PCR ROA 1267) The State noted that just because Mr. Honie was denied funding to develop his claims,

145

his "financial hardship does not excuse his burden to establish prejudice." (PCR ROA 1312) The State observed that "[w]ithout the expert testimony, Honie cannot establish that his counsel in fact overlooked any additional psychological evidence. . . . (citation omitted) [and] Honie cannot meet his burden of proving a reasonable probability that the outcome of the sentencing hearing would have been different. . . ." (PCR ROA 1313) Of course, without funding to develop his mitigation claims, Mr. Honie could not have met this burden. The State failed to explain how Mr. Honie could have demonstrated prejudice without funding to develop his mitigation claims.

In support of his motion, the State also introduced an affidavit from trial counsel who stated that he turned the mitigation investigation over to the Nancy Cohn, Ph.D., the psychologist he hired to perform an evaluation of Mr. Honie, and that he relied on the expertise of both Dr. Cohn and his fact investigator Ted Cilwick in determining what was necessary to investigate mitigation in Mr. Honie's case. (PCR ROA 1334-1336) Despite trial counsel's assertion, neither Dr. Cohn nor Mr. Cilwick understood that Mr. McCaughey had assigned his duty to investigate mitigation to them. (Declaration of Nancy Cohn[40], Ph.D., 11/24/14; Declaration of Ted Cilwick[41], 04/21/15; PCR ROA 3241)

In his affidavit, Mr. McCaughey states that early in the case he hired Nancy Cohn, Ph.D., as both a mental health expert and mitigation consultant. (PCR ROA 1335) Mr.

---

[40] *See* First Rule 7 Motion, Attachment Q.
[41] *See* First Rule 7 Motion, Attachment R.

McCaughey stated that he "charged Dr. Cohn with exploring . . . mitigation. *Id.*   Mr.
McCaughey stated that "[t]o the best of my recollection, Dr. Cohn suggested no areas of
mitigation investigation, including mental health mitigation, that I chose not to
investigate." *Id.*  Mr. McCaughey also stated that he and Dr. Cohn visited Mr. Honie's
family on the reservation where they lived and interviewed potential witnesses, including
family members.  (PCR ROA 1335)  Mr. McCaughey stated that neither Mr. Honie nor
his family members identified any potential witnesses whom they did not contact.  (PCR
ROA 1336)  Mr. McCaughey also stated that he hired Mr. Cilwick as an investigator and
that "Mr. Cilwick suggested no areas of mitigation that I chose not to investigate." *Id.*
Without any funding to develop his colorable claims, Mr. Honie was unable to rebut the
affidavit of Mr. McCaughey.

During the pendency of Mr. Honie's post-conviction proceedings, the Post-
conviction Remedies Act was amended in 2008, increasing the amount of funding
available to post-conviction petitioners and also allowing funding beyond the statutory
maximums upon a showing of good cause.  (PCR ROA 2236-2239)  The district court
held that the 2008 Amendments "apply retroactively to [Honie's] pending cause of action
for post-conviction relief."  (PCR ROA 2570)  The district court specifically noted,
"[C]ounsel for [Honie] is entitled to seek payment consistent with the procedures set
forth by the new funding amendments for work performed and litigation expenses
incurred on or after the effective date of May 5, 2008, and for all work completed and
litigation expenses incurred prior to the effective date for which payment has not been

received." (PCR ROA 2570-2571)  The district court also noted that under the new

funding provisions, Mr. Honie would be entitled to "unlimited attorney fees [at] $125 per

hour and unlimited investigative funds to develop potentially meritorious post-conviction

claims. . . ."  (PCR ROA 2571)

Following the district court's ruling, Mr. Honie submitted a request for approval of

funds for experts and investigation to develop his mitigation claims.  (PCR ROA 2670-

2675)  The district court denied Mr. Honie's requests for additional funds (PCR ROA

2825-2839), finding that Mr. Honie "has not—and cannot—demonstrate good cause to

exceed the maximum sums authorized for litigation expenses under the PCRA."  (PCR

ROA 2836)  While the court found that both of Mr. Honie's requests for funding were

legitimate, it found that it could not grant funding because Mr. Honie failed to

demonstrate "that the work done to date and the future work identified is reasonably

likely to develop evidence or legal arguments in support of his claim[s]" of ineffective

assistance of counsel for failing to conduct an adequate mitigation investigation.  (PCR

ROA 2835-2836)

The district court's ruling denying funding is inconsistent with its previous ruling

finding that these claims presented a genuine issue of material fact.  In its ruling on the

State's first motion for summary judgment, it found that "trial counsel did not investigate

potentially significant areas of mitigation[,]" and that "trial counsel's mitigation

investigation was less-than-complete."  (PCR ROA 1037)  Despite this earlier ruling, the

district court concluded that Mr. Honie failed to demonstrate that it was reasonably likely

148

that any of the investigation performed by Mr. Whitman or any of the future investigation to be performed by Mr. Whitman or any other expert would develop evidence or legal arguments that would support his claims.  (PCR ROA 2836-2837)  In reaching its decision, the district court relied on the affidavit from trial counsel, that was presented in the State's second motion for summary judgment, to find that trial counsel relied on the expertise of Dr. Cohn, "a qualified mental health expert and mitigation consultant," as well as Mr. Cilwick, the fact investigator who also "assist[ed] in conducting the mitigation investigation into Petitioner's social history and family background."  (PCR ROA 2836)  The district court found it significant that neither Dr. Cohn nor Mr. Cilwick "suggested areas of mitigation, including mental health mitigation, that trial counsel chose not to investigate[,]" and that similarly, neither Mr. Honie nor his family identified any mitigation witnesses or areas of mitigation that should be investigated.  (PCR ROA 2836)

In a footnote, the district court attempted to explain the reasoning behind its inconsistent position:

> There is little question but that the facts of the case as they existed in February 2006, or as they existed when payment for the February 2006 work was initially requested in June 2006, suggests that the work performed by Mr. Whitman would have been viewed as reasonably likely to develop evidence or argument in support of the ineffective assistance of counsel claims.  After all, in December 2005 the Court had denied summary judgment on six claims related to whether trial counsel performed ineffectively in conducting the mitigation investigation and, therefore, it would have been reasonable for Petitioner to have requested Mr. Whitman to do additional work in preparation for a possible evidentiary hearing on these claims.  Nevertheless, since payment of litigation expenses was

governed by administrative rule prior to May 2008, and because the
$20,000 cap on litigation funding had been reached prior to the February
2006 work being performed, Petitioner could not have had any reasonable
expectation that compensation for the February 2006 work would ever be
authorized.  As noted in the body of the decision, the 2008 funding
amendments to the PCRA clearly suggests that the relevant time period for
determining whether good cause exists is the date on which the request for
payment is made and not the date on which the work was performed.
Petitioner may argue that, since the Court has held that the 2008 funding
amendments should be applied retroactively, they should apply at the time
Petitioner originally sought payment for the February 2006 work.
However, in deciding that the amendments applied retroactively, the Court
specifically stated that Petitioner was entitled to seek payment "for all <u>work</u>
completed and litigation expenses incurred prior to the [May 5, 2008]
effective date for which payment ha[d] not yet been received."  Mem.
Decision Re: Applicability of the 2008 Funding Amendments to the PCRA
at 13 (emphasis added).  The Court did not hold that the 2008 amendments
applied to payment requests already made, but which had been denied or
which had been dismissed.

(ROA 2837, n.5.)

### D.    Mr. McCaughey's performance fell below reasonable professional norms.

**"[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long.  Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.  Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."** *Woodson v. North Carolina*, **428 U.S. 280, 305 (1976).**

The nature, quality and gravity of the death penalty make the defense of capital

cases fundamentally unlike any other practice of the law.  The decision to choose life or

death is driven by powerful concepts such as redemption, remorse, retribution and human

dignity: "The basic concept underlying the [Eighth Amendment] is nothing less than the

dignity of man." *Furman v. Georgia*, 408 U.S. 238, 270 (1972) (Brennan, J., concurring) (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)).  Given the enormity of the decision to judicially take a human life, a capital decision maker must be allowed to consider any aspect of a defendant's background and character that would favor a life sentence.  *See Woodson*, 428 U.S. at 304; *see also Lockett v. Ohio*, 438 U.S. 586, 604.  It is up to trial counsel to ensure that all relevant information about his client is before the sentencing body.

The United States Supreme Court has clearly established that a capital defendant has a Sixth Amendment right to the effective assistance of counsel in his sentencing proceedings. *See Strickland*, 466 U.S. 668; *Williams*, 529 U.S. 362; *Wiggins*, 539 U.S. 510; *Rompilla*, 545 U.S. 374.  As described by the Court in *Strickland*, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  466 U.S. at 686.  In determining whether counsel was ineffective, this Court must determine whether: (1) counsel's performance was deficient; and (2) the errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.

In *Strickland*, the Court found that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Id.* at 688 (explaining that prevailing norms of practice as reflected in the American Bar Association standards and the like are guides to determining what is reasonable).  The

151

Court also explained that counsel has a duty to make reasonable investigations and that strategic choices made after a less-than-complete investigation are only reasonable to the extent that professional judgment would support such limits to the investigation.  *Id.* at 691.  The Court reiterated these principles in *Van Hook*, 558 U.S. 4, where it acknowledged that "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails. . . where they describe the professional norms prevailing when the representation took place."  *Id*. at 7 (citing *Strickland*, 466 U.S. at 688).  The Supreme Court expounded on the *Strickland* standard in *Williams*, 529 U.S. 362.  There the Court concluded that counsel's failure to discover and present mitigating evidence could not be justified as a tactical decision because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background."  *Id.* at 396.

Effective representation of a capital client requires defense counsel to conduct a thorough investigation of the client's life, which "generally involves a multigenerational inquiry into the biological, psychological, and social influences on the development and adult functioning of the accused."  (Declaration of Russell Stetler[42], 04/27/15, at 2)  The investigation into a client's background "involves parallel tracks of collecting and analyzing life-history records, and conducting multiple, in-person, face-to-face interviews."  *Id.*  This enables counsel "to develop evidence that will humanize the defendant, help sentencers to understand why he may have committed the capital offense,

---

[42] *See* First Rule 7 Motion, Exhibit X.

and to evoke compassion and empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage." *Id.* "[A] thorough mitigation investigation not only provides capital defendants with the effective representation to which they are entitled under the Sixth Amendment, but assure[s] sentencers of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just." *Id.* at 2-3.

According to the 1989 ABA Guidelines, which were in effect at the time of Mr. Honie's sentencing trial, defense counsel are required to begin investigation into the penalty phase of the trial "immediately upon counsel's entry into the case" and investigation "should be pursued expeditiously." 1989 ABA Guideline 11.4.1(A). This investigation is extensive and constitutionally required, and cannot be waived by counsel. *See Williams*, 529 U.S. 362. Sentencing phase investigation "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced" by the prosecution. 1989 ABA Guideline 11.4.1(C). According to the ABA Guidelines, a thorough penalty-phase investigation must include, but not be limited to:

> [M]edical history, (mental and physical illness or injury of alcohol and drug use, birth trauma and developmental delays); educational history (achievement, performance and behavior) special educational needs [(]including cognitive limitations and learning disabilities); military history (type and length of service, conduct, special training); employment and training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or

153

emotional abuse); prior adult and Juvenile record; prior correctional experience (including conduct or supervision and in the institution/education or training/clinical services); and religious and cultural influences.

1989 Guideline 11.4.1.2(C).  Counsel must "explore the existence of other potential sources of information relating to the offense, the client's mental state, and the presence or absence of any aggravating . . . [or] mitigating factors."  1989 Guideline 11.4.1.2(B). Counsel should also "seek necessary releases for securing confidential records relating to any of the relevant histories[ ]" and [o]btain names of collateral persons or sources to verify, corroborate, explain and expand upon information obtained. . . ."  1989 Guideline 11.4.1.2(D-E).  Among the witnesses counsel should interview are "witnesses familiar with aspects of the client's life history that might affect the likelihood that the client committed the charged offense(s), possible mitigating reasons for the offense(s), and/or other mitigating evidence to show why the client should not be sentenced to death[.] 1989 Guideline 11.4.1.3(B).  Counsel should also seek expert assistance in the presentation of mitigation.  1989 Guideline 11.4.1.7(D).

These professional norms were well established in 1999, at the time of Mr. Honie's trial.  (Declaration of Russell Stetler, 04/27/15, at 1)  Mr. McCaughey's failure to conduct a reasonable mitigation investigation "result[ed] in a penalty-phase presentation [that] fell far below th[e]se norms."  *Id*. at 3.  Mr. McCaughey's failure to discover and present relevant mitigating evidence could not be justified as a tactical decision because he had not fulfilled his "obligation to conduct a thorough investigation of the defendant's

154

background." *Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)).

> **E.   Mr. McCaughey unreasonably relinquished his duty to investigate mitigation to people who were not qualified to perform a thorough mitigation investigation and who did not understand their role as being responsible for the mitigation investigation.**
>
> > **1.   Dr. Cohn and Mr. Cilwick were not qualified to perform a mitigation investigation and did not perceive their roles in Mr. Honie's case as being mitigation investigators.**

The state court rejected Mr. Honie's claim that it was unreasonable for Mr. McCaughey to relinquish his duty to investigate mitigation to people who were unqualified to perform an adequate mitigation investigation. *Honie*, 342 P.3d at 193-195. The state court held that it was reasonable for Mr. McCaughey to rely on Dr. Cohn given Dr. Cohn's education and experience as a forensic psychologist. *Id*. at 194. The state court found that Mr. McCaughey was not deficient for failing to hire a mitigation specialist because it found that Dr. Cohn was a mitigation specialist. *Id.* The state court also found that in any event "trial counsel is not required to hire a mitigation specialist in order to comply with his Sixth Amendment obligations." *Id.* The court noted that so long as the person charged with performing the mitigation investigation did not "render[ ] unreasonabl[e] deficient performance or . . . failed to pursue leads that a reasonably trained mitigation specialist would have pursued[,]" there was no constitutional infirmity. *Id.* (internal citation omitted). The state court held that Mr. Honie failed to establish that Dr. Cohn and Mr. Cilwick rendered unreasonably deficient performance or failed to

155

pursue valid mitigation leads.  *Id.*  The state court's denial of this claim constituted an unreasonable application of clearly-established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts.  28 U.S.C. § 2254 (d)(2).

Despite Mr. McCaughey's assertions in the affidavit he provided to the State during Mr. Honie's post-conviction proceedings, that he relied on Dr. Cohn as a mitigation consultant and that he relied on Dr. Cohn and Mr. Cilwick to advise him how to proceed with the mitigation investigation (PCR ROA 1334-1336), neither Dr. Cohn nor Mr. Cilwick believed that they were responsible for the mitigation investigation in Mr. Honie's case, even though they developed some evidence that could be used as mitigation.

Mr. Cilwick provided a declaration that was admitted as part of Mr. Honie's Rule 60(b) motion, stating that while he assisted with the mitigation investigation, he was not qualified to do so, "I am not now nor have I ever been a mitigation expert.  I am not trained in that discipline and would not and could not advise a defense attorney on mitigation development, analysis or strategy."  (PCR ROA 3241)  Mr. Cilwick also stated that he was not compensated as a mitigation investigator for the work he did in Mr. Honie's case, "Mitigation experts and private investigators are compensated at different rates. . . .  I was compensated as a private investigator, not as a mitigation expert[.] . . ." (PCR ROA 3241)

In a more recently obtained declaration, Mr. Cilwick states that Mr. McCaughey did not provide him with any specific instructions on what to investigate in the case. (Declaration of Ted Cilwick, 04/21/15, at 1)  Mr. Cilwick also acknowledges:

> While I gathered some records, my record collection was far from complete.  I did not attempt to collect records for any of Tate's family members.  I do not recall attempting to get any records for Tate's parents' car accident or records related to Tate's fall from the mesa.  Because I was not a mitigation investigator, nor was I trained as one, I was unaware of the universe of records that needed to be collected in a capital case.

*Id.*  Mr. Cilwick also added, "It was never my understanding that Nancy Cohn, Ph.D., was a mitigation investigator.  I never heard her promote herself as a mitigation investigator." *Id.*

In a declaration recently obtained from Dr. Cohn, she states that she was retained by Mr. McCaughey to perform a psychological evaluation of Mr. Honie and to present a sentencing recommendation to Mr. McCaughey.  (Declaration of Nancy Cohn, Ph.D., 11/24/14)  Dr. Cohn further states, "While I met with Mr. Honie's family for one day and discussed mitigating factors in my report, I was not retained as a mitigation investigator in Mr. Honie's case and was not expected to conduct the mitigation investigation in Mr. Honie's case." *Id.*  Dr. Cohn further adds, "I did not perform a mitigation investigation in Mr. Honie's case. . . . It is my understanding that Ted Cilwick was responsible for collecting mitigating evidence in the case." *Id.*

It was unreasonable for Mr. McCaughey to turn over the responsibility of the mitigation investigation in Mr. Honie's case to people who were not qualified to perform

157

a mitigation investigation and who did not understand that performing such an investigation was required of them.  While Dr. Cohn and Mr. Cilwick assisted Mr. McCaughey in developing mitigating evidence, it was unreasonable for Mr. McCaughey to fail to pursue an independent mitigation investigation that went beyond what Dr. Cohn and Mr. Cilwick recommended.  *See Wiggins*, 539 U.S. at 523-24 (holding it is unreasonable for counsel to abandon the investigation into a client's background after acquiring only rudimentary knowledge of his history from a narrow set of sources).  The state court's denial of this aspect of the claim constituted an unreasonable application of clearly-established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts.  28 U.S.C. § 2254 (d)(2).

> **2.    Mr. McCaughey's reliance on Mr. Honie and his family for mitigation leads was unreasonable where he did not pursue an independent investigation into other mitigation leads not recommended by the family.**

The state court also held that it was reasonable for trial counsel to rely on Mr. Honie and his family for "potential mitigation leads."  *Honie*, 342 P.3d at 195 (citing *Strickland*, 466 U.S. at 691).  The court noted, "Indeed, it would be difficult to conceive of a more appropriate source of information as to the defendant's personal background and mental state."  *Id.*  The state court's denial of this claim constituted an unreasonable application of clearly-established federal law, 28 U.S.C. § 2254(d)(1).

Trial counsel has a duty to conduct an independent mitigation investigation.  *See Strickland*, 466 U.S. at 690-91; *see also Wiggins*, 539 U.S. at 520-23; *Williams*, 529 U.S.

158

at 390-91.  Even if the client and his family suggest no further mitigation leads, trial

counsel is still required to independently investigate mitigating evidence.  *See Rompilla*,

545 U.S. at 377-79.  Of course, interviewing the client and his family are an essential part

of reasonable mitigation investigation; however, trial counsel cannot forego further

mitigation investigation based solely on the statements of his client or his client's family

members that no mitigating evidence exists.  *Id.*

     **F.**     **The mitigation investigation that was performed in Mr. Honie's case**
                   **was unreasonably limited and prejudiced Mr. Honie.**

Mr. Honie argued in state court that trial counsel failed to conduct a reasonable

mitigation investigation.  (Opening Brief of Appellant, 10/01/12, at 76-91)  Mr. Honie

also argued that it was unreasonable for the state district court to deny him funding to

develop his mitigation claims, which the district court ruled had "raise[d] a genuine issue

with respect to whether trial counsel's less-than-complete investigation was reasonable

and, therefore, whether he failed to comply with prevailing norms of professional practice

in conducting his mitigation workup."  (Opening Brief of Appellant, 10/01/12, at 76)  Mr.

Honie argued that given the district court held that the 2008 amendments to the PCRA

applied to Mr. Honie's case, and that Mr. Honie would be entitled to "unlimited

investigative funds to develop potentially meritorious post-conviction claims" (PCR

ROA 2571), it was unreasonable, even nonsensical, that the district court would then

refuse to provide any funding to develop the mitigation claims that survived the State's

first motion for summary judgment.  (Opening Brief of Appellant, 10/01/12, at 81, 83,

84-85)

The state court rejected Mr. Honie's claim.  *Honie*, 342 P.3d at 192-195.  The state

court held that it was reasonable for Mr. McCaughey to rely on Dr. Cohn to perform the

mitigation investigation, and that Dr. Cohn performed a reasonable mitigation

investigation.  *Honie*, 342 P.3d at 194.  The state court noted that Dr. Cohn reviewed the

discovery in the case, Mr. Honie's criminal history, his counseling records from the Hopi

Guidance Center, his medical records, and "what school records were available."  *Id.*

The state court noted that she visited the reservation to interview family members and

that she "conducted 'a very detailed psychological evaluation' of Mr. Honie over the

course of two days."  *Id.*  The state court found that "[g]iven this extensive examination

of Mr. Honie and his personal history, we cannot say that Dr. Cohn's mitigation

investigation was deficient or that trial counsel was objectively unreasonable in relying

on her conclusions."  *Id.*  The court found that in Mr. Honie's case, Dr. Cohn investigated

all relevant aspects of Mr. Honie's life.  *Id.* at 194-95.  The court stated, "Mr. Honie

points to no specific facts that would support a finding that they performed deficiently or

failed to follow up on valid leads."  *Id.* at 195.

The state court faulted Mr. Honie for failing to provide any evidence that would

demonstrate trial counsel's failures in his mitigation investigation, despite the fact that

the state district court refused to provide funding for him to develop his claims.  *Id.*  Even

though the state district court had initially found that Mr. Honie "raise[d] a genuine issue

160

with respect to whether trial counsel's less-than-complete investigation was reasonable and, therefore, whether he failed to comply with prevailing norms of professional practice in conducting his mitigation workup[ ]" (PCR ROA 1037-1038),  the state court found that post-conviction counsel failed to demonstrate that his investigation was "reasonably likely to develop evidence or legal arguments in support of [his] claim that trial counsel was ineffective in conducting the mitigation investigation and presenting the mitigation case during trial." *Honie*, 342 P.3d at 202.  The court noted that "Mr. Honie was required to show how the additional funding would have likely supported [his] claim[,]" but all Mr. Honie demonstrated was that additional funding would allow him to "conduct a different mitigation investigation[]" than that conducted by trial counsel. *Id.* at 203.  The court, therefore, found that Mr. Honie failed to demonstrate good cause for exceeding the presumptive statutory limit on funding for litigation costs. *Id.*  The state court's denial of this claim constituted an unreasonable application of clearly-established federal law.  28 U.S.C. § 2254(d)(1).

## 1.   Mr. McCaughey and Dr. Cohn spent one day interviewing family members on the Hopi Reservation to develop mitigation leads.

In her declaration, Dr. Cohn states that she met with Mr. Honie's family for one day to discuss mitigating factors for her report.  (Declaration of Nancy Cohn, Ph.D., 11/24/14)  While several of Mr. Honie's family members were present when Dr. Cohn visited, she only interviewed Mr. Honie's parents, Franklin and Teresita, and his oldest brother, Si.  (PCR ROA at 3623)  Dr. Cohn's interview with Franklin and Teresita lasted

from 10:45 a.m. until 12:20 p.m.  (Cohn Interview Notes Re Teresita & Franklin Honie[43], 03/23/98, at 1)  Dr. Cohn's interview with Mr. Honie's brother, Si, lasted from 12:20 p.m. until 1:50 p.m.  *Id.* at 7.  On the same day, Dr. Cohn travelled to Tuba City to interview Mr. Honie's aunt, Dellarita.  (PCR ROA at 3623)  Dr. Cohn's interview with Dellarita last from 3:15 p.m. until 3:45 p.m.  (Cohn Interview Notes Re Teresita & Franklin Honie, 03/23/98, at 8)  Her notes of this interview are comprised of two paragraphs.

In a declaration provided by Teresita Honie during Mr. Honie's post-conviction proceedings, she states that Ted Cilwick came to their home to introduce himself prior to the visit by Dr. Cohn.  (PCR ROA 3467)  Teresita says, "Cilwick didn't ask any questions about Tate's childhood and upbringing."  *Id.*  Teresita also stated that the second time Mr. Cilwick came to the reservation, was when Dr. Cohn and Mr. McCaughey also came.  *Id.*  Teresita's recollection of the visit with Dr. Cohn and Mr. McCaughey was that their visit only lasted a few minutes and "was just kind of an introductory meeting."  *Id.*  Teresita noted that Mr. Cilwick spoke with Si for about thirty minutes during this visit.  *Id.*

This was the extent of the interviews with Mr. Honie's family to support the mitigation investigation in Mr. Honie's case, as well as to support Dr. Cohn's mental health assessment.  Such brevity is inadequate to constitute the reasonable mitigation investigation contemplated by the Sixth Amendment.  *Strickland*, 466 U.S. at 690-91; *see*

---

[43] *See* First Rule 7 Motion, Exhibit BB.

*also Wiggins*, 539 U.S. at 520-23; *Williams*, 529 U.S. at 390-91; *Rompilla*, 545 U.S. at 377-79.  Mitigation interviews should be conducted by "skilled interviewers who can recognize and elicit information about mental health signs and symptoms . . . that may manifest over the client's lifetime."  (Declaration of Russell Stetler, 04/27/15, at 19)  The interviewers "must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures."  *Id.*  A thorough social history investigation in a capital case is essential to "ascertain[ing] the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the [sentencer] to vote for a life sentence."  *Id.* at 20.  In order to be able to approach sensitive information about the client and his family, the defense must spend adequate time with the family so they are comfortable opening up about very personal and private experiences.  "A social history cannot be completed in a matter of hours or days. . . . [I]t takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history."  *Id.*  "It is quite typical, in the first interview with clients and their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members."  *Id.*

163

## 2.   The record collection performed in Mr. Honie's case was inadequate to develop important information about Mr. Honie's background.

In her report, Dr. Cohn notes that she reviewed Mr. Honie's counseling records and records from his time during drug and alcohol rehabilitation programs. (PCR ROA 3623) In Mr. Cilwick's recent declaration, he states that while not specifically instructed to do so, he "gathered some records" but that his "record collection was far from complete." (Declaration of Ted Cilwick, 04/21/15, at 1) Mr. Cilwick states that he "did not attempt to collect records for any of Tate's family members[ ]" and that he did "not recall attempting to get any records for Tate's parent's car accident or records related to Tate's fall from the mesa." *Id.* Mr. Cilwick stated that he "was unaware of the universe of records that needed to be collected in a capital case." *Id.* In fact, the paucity of records in Mr. Honie's case undermined Mr. McCaughey's belief that he had done that all that was necessary to investigate mitigation in Mr. Honie's case because without adequate records he would not be in a position to know this. The absence of records also emphasizes that Dr. Cohn's assessment of Mr. Honie was incomplete and did not present an accurate picture of his background and mental health issues. The state court's finding that it was acceptable for Dr. Cohn to have reviewed "what school records were available[,]" *Honie*, 342 P.3d at 194, is not supported under federal law.

The adequate collection of records is essential to developing a useful social history of the client. *See Rompilla*, 545 U.S. at 390; *see also Williams*, 529 U.S. at 362. The United States Supreme Court has found life-history records are powerful mitigating

evidence.  *See Williams*, 529 U.S. at 395 n.19.  In Mr. Honie's case, there was at least one

significant life event that could have benefitted from the collection of records: Mr.

Honie's fall from the mesa at First Mesa in 1993, for which he was airlifted to Flagstaff

for medical treatment.  While these records likely would have been available at the time

of trial, they have since been destroyed.  (Declaration of Joylina Gonzalez[44], 04/09/15)

### 3.     Dr.Cohn's evaluation failed to explain how Mr. Honie's life experiences, mental health issues and substance abuse affected his behavior at the time of the crime.

In an affidavit presented during Mr. Honie's Rule 60(b) proceedings, Robert

Smith, Ph.D., noted that while Dr. Cohn provided a brief account of Mr. Honie's early

use of alcohol and drugs, sexual molestation by John Boone, the loss of the three elderly

women in the community with whom Mr. Honie was close, and Mr. Honie's parents'

abuse of alcohol and neglect of their children, she failed to explain how these factors

"contributed to Mr. Honie's development of depression and his early abuse of alcohol

and other drugs."  (PCR ROA 3490)  Dr. Smith also noted that Dr. Cohn failed to explain

that the fact that Mr. Honie's parents were alcoholics made him predisposed to

developing an addiction to alcohol as well.  *Id.* at 3490-3491.  Dr. Smith stated that while

Dr. Cohn reviewed Mr. Honie's counseling and treatment records as an adolescent, she

failed to explain how the risk factors in Mr. Honie's life, including his mental health

issues, contributed to his drug and alcohol abuse, making his addiction outside of this

control.  *Id.* at 3491.  Most importantly, Dr. Smith found that Dr. Cohn failed to explain

---

[44] *See* First Rule 7 Motion, Exhibit U.

how Mr. Honie's drug and alcohol abuse, along with his mental health issues, interacted with one another, which could have given the judge a better understanding of Mr. Honie's "cognitive functioning, decision making and behavior at the time of the offense." *Id.* at 3491-3492.  Indeed, the state district court made the same finding when it found Mr. Honie's mitigation claims had merit during post-conviction proceedings.  The state district court found, "[T]rial counsel 'did not present the most important mitigating evidence—the correlation between [Honie's] unconventional social behavior throughout his life and credible scientific explanations for these behavior patterns.'"  (PCR ROA 1035) (internal reference omitted)

### 4.    "Red Flags" that should have prompted further investigation.

There were several aspects of Mr. Honie's background that warranted further investigation.  *See Wiggins*, 539 U.S. at 525; *see also Rompilla*, 545 U.S. at 390-91. Given the sexual aspect of the crime, trial counsel "should have conducted a careful investigation of what happened to Mr. Honie at Mr. Boone's house."  (Declaration of Russell Stetler, 04/27/15, at 47-50)  Trial counsel was in possession of Mr. Boone's federal case file which identified potential witnesses who should have been interviewed to try to corroborate Mr. Honie's own statement that he had been molested.  *Id.* at 50-51. Mr. Honie also suffered several traumatic experiences that "should have been investigated more thoroughly[,]" including Mr. Honie witnessing his parents' car accident, and the loss of three of this closest friends.  *Id.* at 51.  The details of these experiences should have been explored "because of the close association between trauma

166

and substance abuse." *Id.*  Another "glaring deficiency" in the mitigation investigation

was the failure to develop the family history of alcohol and drug abuse, which were

recognized at the time of trial.  *Id.* at 52-53.

Even though trial counsel was aware of the fact that Mr. Honie's parents were

alcoholics and that his siblings similarly suffered, there was no investigation into whether

Mr. Honie had been exposed to alcohol *in utero*.  *Id.*  In a declaration presented to the

state court during Rule 60(b) proceedings, Teresita Honie stated:

> I never consumed alcohol until 1974 or 1975. . . .  I preferred hard liquor,
> rum or Jack Daniels.  I became so dependent upon it that there were times
> when I would take liquor to work in a Coke can and sip it throughout the
> day.  I had a group of friends with whom I would party regularly. . . . There
> were times when I stayed up all night partying and went to work without
> going to sleep.  It's possible, even probable, that I drank alcohol when I
> was pregnant with Tate. . . . My menstrual cycle was highly irregular, so it
> was not uncommon for me to miss two or three periods before I would
> begin to become concerned that I was pregnant.

(PCR ROA 3469)

Additionally, trial counsel did not investigate Mr. Honie's impairment at the time

of the offense.  (Declaration of Russell Stetler, 04/27/15, at 53)  Trial counsel failed to

interview Dr. Stults, the emergency room physician who examined Mr. Honie during a

break in his custodial interrogation.  *Id.*  Dr. Stults stated in his declaration that even

several hours after the crime, Mr. Honie was intoxicated and that he believed Mr. Honie

"had reduced capacity to reliably recall or recount the events of July 10, 1998, and did

not seem to have a grasp of the details of what transpired."  (Declaration of Michael

Stutls, M.D., 08/19/13, at 3)  Trial counsel failed to retain an expert to perform a

retrograde extrapolation to determine the level of alcohol in Mr. Honie's system at the time of the crime, demonstrating that Mr. Honie was much more intoxicated at the time of the crime than at the time his blood was drawn and tested by police.  (Declaration of Russell Stetler, 04/27/15, at 53) Trial counsel also failed to interview friends and other witnesses who were with Mr. Honie prior to the crime, and who knew Mr. Honie was extremely drunk that evening.  *Id.* at 53-54.

> **G.      Mr. Honie was prejudiced by Mr. McCaughey's deficient mitigation investigation, which failed to uncover substantial evidence of the facts and circumstances of Mr. Honie's background and his mental issues, including frontal lobe brain damage.**

In rejecting Mr. Honie's mitigation claim, the state court noted that it was not unreasonable for the state district court to deny funding to Mr. Honie to develop his meritorious mitigation claims because all Mr. Honie demonstrated was that additional funding would allow him to "conduct a different mitigation investigation[]" than that conducted by trial counsel.  *Honie*, 342 P.3d at 203.  However, demonstrating that a different mitigation investigation should have been performed by trial counsel is the essence of establishing the prejudice prong of an ineffective assistance of counsel claim. *See Strickland*, 466 U.S. at 693-94.

Given the new mitigating evidence discovered by federal habeas counsel, Mr. Honie can now demonstrate that he was prejudiced by trial counsel's deficient mitigation investigation because the sentencing judge had less-than-complete evidence before him that would have weighed in favor of a life sentence.  *See Wiggins*, 539 U.S. at 538.

Federal habeas counsel have located and interviewed several witnesses who were readily accessible at the time of Mr. Honie's trial but who were never interviewed by trial counsel. These witnesses provide details about the dysfunction within the Honie family, including the family's history of alcoholism and depression, the effects on Mr. Honie (and his siblings) of having alcoholic parents who were absent from the home, neglected their children, and often fought violently in front of their children causing trauma. These witnesses also describe the extent of alcohol and drug abuse within the family, including Mr. Honie.

These witnesses also provide important details about the effects on Mr. Honie of other trauma and loss he experienced. Because his parents were absent, Mr. Honie sought out the affections of three elderly tribal women, all of whom died, leaving Mr. Honie feeling further abandoned by people for whom he cared. The witnesses also describe in detail the traumatic effect of Mr. Honie's parents' vehicle accident. Mr. Honie was extremely traumatized by this event and it profoundly affected his personality and behavior. The witnesses provide important details about the severity of Mr. Honie's fall from the mesa. This was never developed by trial counsel. The witnesses describe his fall as being a total of 121 feet from the top of the mesa to where Mr. Honie landed, unconscious. The witnesses provide further information about the effects of this fall on Mr. Honie and how his personality and behavior changed after this event.

Importantly, the witnesses provide further support for Mr. Honie's admission that he was sexually molested by John Boone when he was a child. This was an extremely

169

important aspect of Mr. Honie's background that trial counsel (and Dr. Cohn) were aware of from the time they met with the family on the reservation.  (Cohn Interview Notes Re Teresita & Franklin Honie, at 2)  Despite this, trial counsel failed to develop this evidence, and as a result, the sentencing court did not accord it any weight in its sentencing decision.  (TR ROA 544)

The information within these declarations would have provided important details and context for the sentencing court to get a clear picture of Mr. Honie's childhood and background.  While Dr. Cohn touched on some of this evidence, she failed to provide details and failed to explain how Mr. Honie's background affected his behavior at the time of the crime.

### 1.    Declarations from family members

#### *Teresita Honie*

Teresita Honie, Mr. Honie's mother, was interviewed by trial counsel and Dr. Cohn on one brief occasion.  In a recently obtained declaration, she states that "there is a long history of alcoholism in my family." (Declaration of Teresita Honie[45], 04/13/15, at 1)  Teresita states that her father was a binge drinker who hit her mother.  *Id.*  She also states that all four of her brothers were/are alcoholics, and that only one is living today. *Id.*  Teresita notes that her parents fought when her father drank and her father physically abused her mother on one occasion with a two-by-four board, and on another occasion he attempted to run over her mother with a car.  *Id.*  Teresita states that when she was twelve

---

[45] *See* First Rule 7 Motion, Exhibit H.

or thirteen years of age, her father burned down the family home.  *Id.* at 2.  Teresita states that her parents had been fighting and her mother left her father.  *Id.*  Her father became so angry that he set the house on fire.  *Id.*

Teresita states that after she married Franklin, he began to drink heavily and often stayed up all night drinking.  *Id.*  Franklin also disappeared on drinking binges, sometimes for up to a week.  *Id.*  Teresita states that when Franklin drank he became verbally and physically abusive.  *Id.*

Teresita notes that she and Franklin and her first two children moved into Franklin's family home on the mesa in 1970.  *Id.*  The home on the mesa had no running water.  *Id.*  They lived there until 1987.  *Id.*  Teresita states that during this time, Franklin was not working and would drink for days at a time, then stop for a while.  *Id.*  Teresita states that she began drinking in 1974, and became dependent on alcohol.  *Id.*  She did not stop drinking until the mid-1990s.  *Id.* at 3.  Teresita states that it is "probable that I drank when I was pregnant with [Mr. Honie] because I was drinking regularly at that time.  *Id.*  She notes that she had "a long and difficult labor" with Mr. Honie, and that he was "blue in color and did not cry" when he was delivered.  *Id.*

Teresita notes that she and Franklin fought a lot and that she moved out of the home on two occasions.  *Id.* at 4.  The first time she moved out, Mr. Honie was ten years of age.  *Id.*  Franklin had been drinking when she came home and she made a remark about it while the family was having dinner.  *Id.*  Franklin ordered her to leave the house and physically pushed her out of the house.  *Id.*  She lived at her mother's home for

171

approximately three months.  *Id.*  She remembers on one occasion looking out of the

window and seeing Mr. Honie looking back at her.  *Id.*  Teresita told him it was okay to

come inside and talk with her.  *Id.*  Franklin kicked Teresita out of the house on another

occasion but it only lasted a couple of weeks.  *Id.*

Teresita states that she and Franklin argued about their drinking and their marital

infidelities.  *Id.*  She admits that she had an affair that lasted five or six years.  *Id.*  She

notes the affair happened because a man she worked with paid her compliments.  *Id.*  She

always thought of herself as homely and his remarks made her feel good.  *Id*.  She notes,

"Franklin was always on my case and accusing me of sleeping with every man in town,

so I finally figured I might as well."  *Id.*  Teresita states that Franklin "was not very subtle

about carrying on with other women.  *Id.*  The children were aware of his infidelities.  *Id.*

Teresita acknowledged that "[i]n retrospect, I can see that there was a lack of respect in

our marriage.  The resulting strife took a toll on all of our kids."  *Id.*

Teresita recalls that in the mid-1980s, John Boone, a teacher at Polacca Day

School, was arrested for molesting children at the school.  *Id.*  Teresita states that Mr.

Honie occasionally went to Mr. Boone's home to play video games.  *Id.* Teresita asked

Mr. Honie if anything had ever happened to him when he was there, but "[h]e denied

being touched or abused by Boone[.]"  *Id.*  Teresita states that she is not confident that

Mr. Honie was truthful about this because he was "very upset and angry about what

Boone had done."  *Id.* at 4-5.

172

Teresita states that she attempted suicide when Mr. Honie was ten or eleven years of age.  *Id.* at 5.  She recalls that she and Franklin were arguing and Franklin accused her of cheating on him.  *Id.*  She states that she went into the bedroom and cried, took a gun from the dresser and put bullets into the gun, and sat on the bed with the gun in her hand. *Id.*  Teresita states that Franklin came into the bedroom and took the gun from her.  *Id.*

Teresita notes that when Mr. Honie was in junior and senior high school, he kept getting suspended from school and was not coming home at night.  *Id.*  Teresita believed it was because he was drinking, which was a problem that persisted.  *Id.*

Teresita stated that when Mr. Honie was twelve years of age, she and Franklin were involved in a serious vehicle accident with a large dump truck on the road up to the mesa.  *Id.*  The dump truck's brakes had failed and it struck the vehicle Teresita and Franklin were in.  *Id.*  Teresita was pinned under the steering wheel and she recalls Mr. Honie coming up to the driver's side of the car.  *Id.*  "He was very upset, banging on the truck and crying and screaming."  *Id.*  When she looked at Franklin, he was having a seizure.  *Id.*  Franklin had made a dent in the dashboard from the impact of the collision and "was bleeding heavily and was having trouble breathing."  He "was lapsing in and out of consciousness."  *Id.*  As the rescue workers were pulling Franklin from the vehicle, Mr. Honie yelled, "Dad! Wake up, dad!"  *Id.*  Teresita tried to talk with Mr. Honie about the accident but he would not talk about it.  *Id.*  He told Teresita, "I don't want to remember, there was a lot of blood."  *Id.*  Teresita states that Mr. Honie "seemed to be

very traumatized by the accident and his personality changed after this.  He became more withdrawn." *Id.*

Teresita also recalls that when Mr. Honie was a teenager, "he fell off a steep cliff from the mesa."  Mr. Honie "had been drinking and was being chased by a police officer when he fell." *Id.* at 6.  Teresita states that Mr. Honie "landed quite a ways below, at the bottom of the mesa.  He was unconscious and had to be airlifted to Flagstaff." *Id.* Teresita states that while he survived, "his personality seemed to change after this.  He seemed to be angry all the time." *Id.*  She states that Mr. Honie also started stealing things from their home after this. *Id.*  Teresita believes that Mr. Honie acted out because "he believed we never wanted him." *Id.*

Teresita states that she met with members of the defense team only twice before trial. *Id.* at 7.  Teresita notes that she was asked to testify, and it was not until the morning of her testimony that the defense team met with her and told her they would be asking her about what Tate was like as a child. *Id.*  She recalls the meeting lasted only a few minutes. *Id.*  Teresita states that Mr. McCaughey told her not to worry because Mr. Honie "was going to get a life-without-parole sentence that would be changed to life-with-parole after twelve years." *Id.*  Of course, there is no truth to Mr. McCaughey's statement regarding the sentence.

174

### *Franklin Honie*

Franklin Honie is Mr. Honie's father.  (Declaration of Franklin Honie, Sr.[46], 04/14/15, at 1)  Franklin recalls that after the accident on the mesa road, he had a seizure disorder and had to stop working as a maintenance worker.  *Id.*  Franklin states that the accident affected the entire family.  *Id.*  He states that everyone was scared and could not enjoy themselves after the accident.  *Id.* at 1-2.

Franklin states that he began drinking alcohol when he was seventeen years of age, and that his drinking was the worst around the time that Mr. Honie was born.  *Id.* at 2.  He notes that at the extreme, he "would drink for a week straight."  *Id.*  As he was given more responsibilities within the community he drank less, and stopped in 1983, when Mr. Honie was about eight years of age.  *Id.*

Franklin states that he and Teresita argued a lot and that at one point, she moved out of the house.  *Id.*  Franklin states that the children missed her and that Mr. Honie, who was about five years of age, "would cry at night because he missed his mother."  *Id.*  Franklin was aware that the children knew he and Teresita argued.  *Id.*  He admits they shouted sometimes.  *Id.*  They argued about Teresita being out drinking with friends and not coming home.  *Id.*

When Mr. Honie was young he believed that Franklin was not his biological father.  *Id.*  Franklin states that they never talked about it.  *Id.*

---

[46] *See* First Rule 7 Motion, Exhibit I.

As a small child, Mr. Honie "grew close to three elderly women in our community who he referred to as his 'grandmas.'" *Id.* All three of these "grandmas" died over a period of time. *Id.* After the second "grandma" died, Mr. Honie told his father that "he did not want to have any more grandmas because every time he got close to someone, they left him." *Id.* at 2-3. Mr. Honie was a pre-teen when the third "grandma" died; Mr. Honie stated that "he felt they abandoned him." *Id.* at 3

Franklin recalls that when Mr. Honie was about seven years of age, he often left the house early in the morning and did not return until dinner time. *Id.* Mr. Honie often came home with cuts and bruises on his head because he played a game with other children "where they threw stones at one another." *Id.* Franklin states that Mr. Honie started getting in to trouble at school when he was about twelve years of age. *Id.* Mr. Honie would not go to school "and would come home late." *Id.*

Franklin states that Teresita asked Mr. Honie whether he had been abused by John Boone, but that Mr. Honie denied anything happened. *Id.* Franklin states, "I am not sure if [he] told the truth about this." *Id.* Franklin notes, "I knew he had been at Boone's house when he was in grade school. Many of Tate's friends died due to drug- or alcohol-related accidents, or suicide. Some of those friends were abused by Boone." *Id.*

Franlin states that he met with members of the defense team briefly on two occasions. *Id.* at 4. He recalls that while he was asked to testify, "no one from the defense team spoke with me prior to my testimony." *Id.*

### Wilfred Honie ("Si")

Si is Mr. Honie's oldest brother.  (Declaration of Wilfred Honie[47], 04/14/15, at 1)
Si recalls that his parents fought a lot when he was small, "mostly over my father's
drinking.  He drank all the time."  *Id.*  Si states that when he was ten or eleven years of
age, his mother often sent him out to look for his father when he did not come home.  *Id.*
Si states that he often did not find him but that when he did, he "would cry and ask him to
stop drinking."  *Id.*  Si states that his parents "frequently left us kids home alone.  My
father was usually off somewhere drinking."  *Id.*  His mother would also often drink and
stay out late.  *Id.*  Si states, "It was left to me to take care of my siblings in my parents'
absence."  *Id.*  He started cooking for himself and his siblings when he was about eight
years of age.  *Id.*  He notes that while there was always something to eat, there was no
"parental oversight[.]"  *Id.* at 1-2.  Si recalls,

> When I was small, I thought my parents hated me.  I often cried myself to
> sleep.  My father owned a couple of shot puts, heavy steel balls, and I
> would lay on my back and hoist them over my chest and let them drop onto
> my sternum, hoping it would kill me.  I tried to kill myself in this manner
> perhaps five different times.  I was distraught over the turmoil in my
> family.  I thought that if I was dead my parents would not fight so much.  I
> thought maybe if I was dead my dad would not drink.

*Id.* at 2.  Si states that he and his siblings thought that they were to blame for their
parent's absence, drinking and fighting.  *Id.*

Si recalls that he drank his first beer in the fifth grade and tried marijuana when he
was in the sixth grade.  *Id.*  Si states that when it came time to attend junior high, he

---

[47] *See* First Rule 7 Motion, Exhibit J.

chose to go to Keams Canyon, which is a few miles away from First Mesa, so he could stay with his grandparents. *Id.* He notes he made this decision because he "was tired of the responsibility of taking care of my family." *Id.* He later went to boarding school in California but was expelled for smoking and drinking. *Id.* He notes that he "partied a lot when [he] was in high school." He also notes that he drank frequently when he was in junior high school. *Id.* at 2-3.

Si states that his parents fought a lot about their marital infidelities. *Id.* at 2. On one occasion, Teresita sent Si "to a woman's house to retrieve my father." *Id.* Si recalls, "My siblings and I were often in tears when my parents fought." *Id.* at 3. Si recalls Mr. Honie, when he was ten or twelve years old, telling Si that he did not like his parents' fighting and his father's drinking, and that Mr. Honie was "really affected" by their parents' fighting. *Id.* Si says that Mr. Honie "felt abandoned and acted out because of it. He started getting into trouble, hanging around the wrong people, and drinking and doing drugs." *Id.*

Si recalls Mr. Honie's reaction to their parents' car accident. *Id.* He notes that "in the aftermath of the wreck, [Tate was] crying and running around in circles." *Id.* Si says that none of the siblings talked about the accident, "or about how we felt about our parents' drinking, their absence from the home, and their fighting." *Id.* He states that his sister, Francine, tried to overdose on their father's pills. *Id.* Si also recalls that Mr. Honie began acting out more after the accident; he was drinking and smoking pot a lot more. *Id.* Si states, "It had a big effect on him." *Id.*

178

Si states that while he was away at school around the time his mother was drinking; he still recalls occasions when she did not come home at night. *Id.* On one occasion, "my dad took a rifle and shot toward the house where he thought she was. He was drunk at the time." *Id.*

Si states that he briefly met with the defense team when they visited the family, and also later met with Mr. Cilwick. *Id.* at 4. Si states that the defense team briefly met with him on the morning of the day he was supposed to testify. *Id.*

### Martina Honie

Martina is Mr. Honie's older sister. (Declaration of Martina Honie[48], 04/15/15, at 1) Martina recalls that her father drank a lot and was not working when she was young. *Id.* She states that her brother Si "raised us more than our mother and father did. Si would discipline us and make sure we had something to eat when our parents were not around." *Id.* She states that their parents argued a lot over her father's drinking and both of their infidelities, "They yelled about getting divorced, and we children would discuss which parent we would live with if they did get divorced. I recall thinking I would just stay with Si." *Id.* at 1-2.

Martina recalls that Mr. Honie was "traumatized" by her parents' accident. *Id.* at 2. She states, "He changed a lot. He stayed away from home. He would not talk much or say how he was feeling." *Id.* She recalls that Mr. Honie began getting into trouble around this time, drinking and stealing. *Id.* She states that while her parents would get

---

[48] *See* First Rule 7 Motion, Exhibit K.

179

upset with him, "they would not truly discipline him." *Id.*  She states that Mr. Honie told

her that he took LSD once and was up all night. *Id.* at 3.

Martina states that she, her mother, and her sister, Kathryn, all suffer from

depression. *Id.*  Martina states that while she was present when the defense team came to

meet with her family, no one ever interviewed her. *Id.*

### Francine Honie

Francine is another of Mr. Honie's older sisters.  (Declaration of Francine Honie[49],

04/16/15, at 1)  Francine states, "My siblings and I witnessed much turmoil at home

when we were young.  My parents . . . frequently fought[,] [and] also drank at one time or

another during my childhood." *Id.*  She notes that at one time both parents drank

regularly, "but for the most part it was my father who drank when I was younger, then it

was my mother who drank when I got a little older." *Id.*

Francine states that "[a]lcohol was the cause of much of the troubles in our home.

I believe that my parents had a major argument at least once a week, sometimes more . . .

. [these] were traumatic for me and my siblings." *Id.* at 2.  Francine recalls an incident

when her mother had been drinking and did not come home the night before. *Id.*  She

states that the family had finished dinner and was eating ice cream when her mom

returned home. *Id.* Her parents began fighting and her mother turned around and left

again. *Id.* Her father threw a bowl of ice cream at her mother "that shattered against the

---

[49] *See* First Rule 7 Motion, Exhibit L.

door as she left the house.  My father followed her outside and they continued to fight." *Id.*

Francine believes "that my mother would sometimes start arguments with my father so she could leave and go drink with her friends." *Id.*  Francine states that her father was still drinking around this time.  *Id.*  Francine states that her father did not drink at home and that if he was not there when they returned from school, they knew he was drinking with friends.  *Id.*

Francine states that her parents sometimes left them at home alone and that her brother Si "became like a surrogate parent." *Id.*  She recalls on one occasion, her father disappeared for a week and they later learned he was arrested for drinking and was in jail. *Id.*  Francine remembers her parents' separation and her mother moving out.  *Id.* at 3. She states that while the home was finally peaceful because there was no arguing, it was difficult for them and made her parents depressed.  *Id.*  Francine states that the separation was traumatic for her and caused her to withdraw from everyone.  *Id.*

Francine recalls on one occasion when she was in the fourth grade, her mother had been out all night and came home with hickeys on her.  *Id.*  While Francine was aware of her parents fighting over their infidelities, she did not believe it until she saw the hickeys on her mother.  *Id.*  Francine states that her family never discussed their problems in a constructive way, which caused her to withdraw from all of them.  *Id.*

Francine states that her parents' accident caused the whole family to change, and that the older kids had to grow up quickly to take care of their parents when they came

181

home from the hospital.  *Id.* at 4.  Francine states that she "bathed her mother and helped

her to walk.  [She] also pushed her father around in his wheelchair[,] [and] . . . helped to

take care of [her] younger brothers and sisters."  *Id.*  She states that "the accident tore

everybody apart.  We all struggled with it."  *Id.*  Francine notes that before the accident,

"Tate was always walking, singing and humming.  He was always visiting the old people,

helping them, always doing something."  *Id.*  However, after the accident, she recalls:

> Tate began to act strangely.  Sometimes he would just sit in a stupor instead
> of running around like he used to.  He became more of a loner.  Once he
> started junior high school, his personality changed.  By the time he was in
> high school, he was stealing things from our house and selling them so he
> could buy drugs and alcohol.

*Id.*

Francine also remembers the impact John Boone's crimes had on the community.

*Id.* at 4.  Francine states:

> The whole community was shattered when we learned that a teacher named
> John Boone had molested scores of young children over a period of many
> years.  Many of the victims were my classmates.  After the news of
> Boone's molestations got out, my male classmates grew meaner and picked
> on the girls in our class more.  One boy, who everyone thought was a
> victim of Boone's, took his own life.  Suspicions ran rampant and people
> started whispering about who the victims might be.  Everybody started
> saying things.  They started cutting each other down.  Another boy named
> Perry Kinale confided in me that he had been molested by Boone.  I told
> him he should tell his parents.  The next thing I knew, he was dead.  He
> shot himself.
>
> . . .
>
> I know that Tate, like most of the kids, had been to Boone's home on
> several occasions, watching movies or playing video games.  Tate told me
> that something happened when he was there once.  He got scared and left

> Boone's residence.  I cannot recall for sure what Tate told me.  It was either
> that he saw Boone touching somebody or that Boone had tried to touch
> Tate.  I just remember him saying he left Boone's house because he was
> scared.

*Id.* at 4-5.  Francine thinks that the change in Mr. Honie's personality could have

been related to Mr. Boone.  She notes that after Mr. Honie shared this experience

with her, she "noticed he was different."  *Id.* at 5.  She says he became more

withdrawn and started getting into trouble.  *Id.*

Francine states that she suffered from depression when she was a child and

went to see a counselor but later learned that the counselor shared her confidential

information with her mother, so she never went back.  *Id.*  She also recalls

attempting suicide when she was nineteen years of age.  *Id.* at 6.

Francine states that she was present when the defense team came to meet her

family but no one ever interviewed her.  *Id.*

### *Kathryn Honie*

Kathryn is Mr. Honie's younger sister.  (Declaration of Kathryn Honie[50], 04/10/15,

at 1)  Kathryn also recalls her father's drinking and her parents' fighting about his

drinking.  *Id.*  She states that when she was in the fourth or fifth grade, she "became

aware that my father was 'messing around' on my mom[.]"  *Id.*  She says that she "was

very confused by this and did not really understand what was going on."  *Id.*  She

believes her mother confronted her father about it and that her father left the home for a

---

[50] *See* First Rule 7 Motion, Exhibit M.

while.  *Id.*   She states that her mother also left the home when she was in junior high.  *Id.*
Kathryn recalls that her parents often were not at home after school and that her older
brother Si cared for her and Mr. Honie.  *Id.*

Kathryn states that "[w]hen I was growing up, I felt unwanted and as though I was
left out of things.  My parents were doing their own thing and were in a world of their
own.  I did not feel like they cared about me or Tate."  *Id.* at 2.  Kathryn states that Mr.
Honie started acting out after their parents' accident.  *Id.*  She say that he "never really
expressed what he was feeling[,] . . . [and] kept a lot of his feelings inside."  *Id.*

Kathryn states that she started drinking and using marijuana when she started high
school.  *Id.*  She states that she "often would skip school to go drinking and get high."  *Id.*
She also drank a lot when she was away at college.  *Id.*   She stopped attending classes
and her G.P.A. dropped so low that she lost her scholarship through the tribe.  *Id.* at 3.
She continued to drink and moved to Las Vegas with an aunt.  *Id.*  During this time, she
was battling depression.  *Id.*  Kathryn states that she attempted suicide in 2006 or 2007.
*Id.*  She was depressed and "tried to walk across a busy street."  *Id.*  Police arrived and
stopped her and she was placed on a seventy-two hour hold in a psychiatric hospital.  *Id.*
None of her family visited her while she was in the hospital.  *Id.*   Kathryn states that she
continues to suffer from depression and believes that her mother and sisters also suffer
from depression.  *Id.*

Kathryn states that no one from Mr. Honie's defense team ever interviewed her.
*Id.*

184

### *Maudine James*

Maudine is Mr. Honie's maternal aunt, and Teresita's sister.  (Declaration of Maudine James[51], 04/14/15, at 1)  Maudine states that her father was a binge drinker and that whenever he drank, he would hit her mother.  *Id.*  She states that both of her father's brothers were heavy drinkers and would drink with her father when they visited.  *Id.* at 1-2.  Maudine also states that several of her siblings were alcoholics.  *Id.* at 2.  Her brother, Murray, would go on drinking binges and "disappear for months at a time, even up to a year[.]"  *Id.*  She states her brother, Dave, was an alcoholic who "was violent when he drank."  *Id.*  She recalls that she, her mother, and her siblings would hide from him whenever he came home from drinking.  *Id.*  She states that another brother, Ebin, also drank but was not violent; and that her only living brother, Sherwin, is an alcoholic who is "verbally abusive when he drinks."  *Id.*

Maudine was aware of Teresita's drinking and "[s]ometimes . . . would go looking for Teresita when she had been out drinking and did not return home."  *Id.*  Maudine was also aware that Franklin physically abused Teresita, "however, Teresita was reluctant to give [her] specific details about this."  *Id.* at 3.  Maudine says that Franklin's infidelities were painful to Teresita and that "it was known in our community that Franklin slept with other women."  *Id.*

Maudine notes that her son, Raphael, and one of her nephews who is the son of her sister, Dellarita, have problems with alcoholism.  *Id.*

---

[51] *See* First Rule 7 Motion, Exhibit N.

Maudine says that she was present when the defense team met with the family on the reservation, but no one ever interviewed her.  *Id.*

### Raphael ("Mike") James

Mike James is Mr. Honie's cousin.  (Declaration of Raphael James[52], 04/14/15, at 1)  He is the son of Maudine James.  *Id.*  Mike grew up with Mr. Honie and recalls that Mr. Honie began drinking and smoking marijuana when he was in the sixth grade.  *Id.*  Mike also recalls Mr. Honie taking methamphetamine in front of him when Mr. Honie was seventeen years of age.  *Id.*  Mike states that Mr. Honie lived with his family in Flagstaff in 1995 and drank regularly when he lived with them.  *Id.*  Mr. Honie also told Mike that he had also "tried heroin and speedballs" (a combination of heroin and cocaine).  *Id.* at 2.

No one from Mr. Honie's defense team ever spoke with Mike.  *Id.*

### David Leslie

David is Mr. Honie's cousin.  (Declaration of David Leslie,[53] 04/22/15, at 1)  He is the son of Dellarita.  *Id.*  David spent a lot of time with Mr. Honie when he was growing up.  *Id.*  Mr. Honie was a role model to David when they were young and "was a positive influence on [him]."  *Id.*  Mr. Honie lived with his family in 1993.  *Id.*  David notes he never saw Mr. Honie doing drugs or drinking alcohol when he lived with them; although, when David was older, he became aware that Mr. Honie drank and smoked marijuana,

---

[52] *See* First Rule 7 Motion, Exhibit O.
[53] *See* First Rule 7 Motion, Exhibit P.

and once saw him taking something that looked like cocaine.  *Id.*   David says that once

Mr. Honie left his family's home and returned to Polacca, "he drank a lot and did drugs.

He also stole from his family to buy drugs and alcohol."  *Id.* at 2.

David states that his mother's deceased brothers were all alcoholics and that his

remaining living uncle is also an alcoholic.  *Id.*  He states that he was not close with his

aunts.  *Id.*  He recalls that his mother had to assume the caretaking for his grandmother

from Teresita because she "was not used to staying at home and taking on that kind of

responsibility[.]"  *Id.*

David states that no one from the defense team ever interviewed him.  *Id.*

### 2.   Declaration from friend who witnessed Mr. Honie's fall from the mesa
#### *Roanna Jackson*

Roanna Jackson witnessed Mr. Honie fall from the mesa.  She has provided a

video declaration[54] describing what she witnessed from the scene of the fall.  (Declaration

of Jeremy Voas[55], 04/08/15, at 1)  Based on Ms. Jackson's description of the fall, the

distance from where Mr. Honie lost his balance and where he landed was 121 feet.  *Id.* at

2.

---

[54] *See* First Rule 7 Motion, Exhibit T; *see also* Notice of Conventional Filing.
[55] *See* First Rule 7 Motion, Exhibit S.

### 3. Declarations from witnesses who could have corroborated Mr. Honie's admission that he was molested by John Boone when he was a child

The following information comes from witnesses who were either directly involved with John Boone's crimes or knew about them. In Mr. Honie's case, there was some question about whether he had actually been molested because he denied it at the time to his parents, and only much later, as an adult, did he tell Ms. Pikyavet about it. While Mr. Honie's sister, Francine, recalls that Mr. Honie told her about something that happened at Mr. Boone's house that traumatized him, contemporaneous to the time that it happened, because trial counsel never interviewed her, this was never developed or presented at the time of Mr. Honie's trial. (Declaration of Francine Honie, 04/16/15, at 4-5) These declarations provide context for how Mr. Boone's actions affected the community and the victims. In the case of Mr. Jackson, it is notable that even though he was a victim of Mr. Boone's, to this day he does not directly admit it. The victims of Mr. Boone were ashamed and ridiculed by their peers, as well as adult members of their community. Therefore, many victims never came forward about being molested, and those who did were extremely reluctant to talk about it with family or friends, and in some cases, never did.

188

***Sankey Jackson***

Sankey was one of Mr. Honie's friends.  (Declaration of Sankey Jackson[56],

04/15/15, at 1)  Sankey states that "[w]hen we were teenagers, there was a lot of alcohol

and drug use on the reservation because there was nothing else to do but to drink and get

high."  *Id.*  Sankey says that he and Mr. Honie began drinking and using drugs when they

were around thirteen years of age.  *Id.*  Sankey states that while Mr. Honie huffed gas

with another friend, Sankey did not do that.  *Id.*  Sankey states that many boys on the

reservation "had been sexually molested by John Boone. . .  and were negatively affected

by their experiences with him."  *Id.*  Sankey states:

> There was a lot of teasing that went on after Boone was arrested.  It came
> mostly from the older men in the community.  During ceremonies, the men
> would hang around the kivas and say, "He got Booned."  Tate was teased a
> lot about this because his mother was close to Boone.
>
> Tate and I never discussed whether we had been molested by Boone,
> mainly because we were teased a lot by others about whether we had been.
> I don't know if Tate was molested by Boone but it is possible.  Nobody
> ever talked about it.  It was a very negative experience.  Everyone wanted
> to pretend it never happened and just tried to sweep it under the rug.
> Everybody wanted to forget it ever happened.
>
> My parents never asked me if I was sexually abused or touched by Boone,
> but we received a letter in the mail asking us to go to Flagstaff to be
> questioned about Boone.  I filled out a questionnaire and was questioned by
> someone who was either a counselor/psychologist or from the police.
>
> I was never asked to testify against Boone but I was offered counseling
> through the Hopi Guidance Center.  I also receive a monthly check as part
> of a civil suit against the tribe.

---

[56] *See* First Rule 7 Motion, Exhibit E.

189

> I do not believe the counselors at the Hopi Guidance Center were qualified
> to deal with sexual abuse.  The counselors were from our community and
> would not have kept the information they were told confidential.  If people
> saw someone going to the Hopi Guidance Center, they would speculate
> about why they went there.  Nobody went there for counseling, especially
> for something as sensitive as sexual abuse.  I do not recall there ever being
> any other counseling offered beyond that which was offered through the
> Hopi Guidance Center.

*Id.* at 1-2.

Sankey also notes, "All of Tate's friends from this time period are deceased.  One of his friends, Michael Torovio, stabbed his other friend, Wendell Kie Poleahla.  Michael later died in a car accident.  Tate's friend Merrill Pavatea also died in a car accident, and my cousin, Valentino Antone, committed suicide." *Id.* at 2.  Sankey was also aware that "Tate's parents did their own thing, leaving Tate on his own.  Tate felt quite neglected." *Id.*

Sankey states that no one from the defense team ever interviewed him.  *Id.*

### *Deborah Hood*

Ms. Hood was the mother of Jason Yniguez, who was a victim of Mr. Boone.  (Declaration of Deborah Hood[57], 04/16/15, at 1)  Ms. Hood states:

> I first became aware of Mr. Boone's actions in 1985 when my son came to
> me and told me that Mr. Boone had touched him inappropriately.  I
> immediately went to the school principal, Mr. Geoff, with my mother,
> Bernice Addington, to tell him what my son had told me.  Mr. Geoff
> became very angry by the accusations and did not believe me.  Mr. Geoff
> called Mr. Boone into his office and asked him if he had sexually abused
> my son Jason.  Mr. Boone denied this abuse.

---

[57] *See* First Rule 7 Motion, Exhibit F.

I was very upset and Mr. Geoff called the superintendent, Albert Sinquah, who told him to fire Mr. Boone.  Mr. Geoff never did this.

. . .

My daughter, Alma Hood, witnessed Mr. Boone grooming the boys who became his victims.  Most of the people who lived on the reservation did not have running water so their kids would use the showers at the school.  Mr. Boone was in charge of the boys' showers at the school.  Mr. Boone took photographs of the boys while they showered and kept the photos in a photo album.  Mr. Boone also kept a list of about 142 boys whom he molested, but I am positive there are more boys that he molested who were not on that list.

After Mr. Boone was convicted, the tribe offered counseling to the victims through the Hopi Guidance Center, but they did not know what they were doing.  They did not have the expertise to provide counseling to victims of sexual abuse.  Two years later, two white men came to the Hopi Reservation and offered counseling.  Their names were David Bereault and Kenneth Hodder.  They were a little better but did not do enough and it was too late.  The boys were already traumatized.

My son Jason was never the same.  After the abuse, he did poorly in school, and struggled with drug and alcohol addiction.  He was also in and out of jail.  Eight years ago he took his own life.  A whole generation of Hopi men are gone.  Many of the boys committed suicide, died from alcohol- or drug-related accidents, or are in prison.  There is a huge hole in the community of men in Polacca.  So many are gone.

I believe that the tribe never offered enough care or support.  They pushed this horrible incident under the rug.  Teachers and teachers' aides at the school knew about the abuse, but did not want to get involved.  Nobody ever talks about what happened to the boys in our community.  The abuse destroyed our community and continues to affect our community today, through the abuse of alcohol, drugs, and now some of the victims of Mr. Boone have become perpetrators themselves.

*Id.* at 1-2.

Ms. Hood states that no one from the defense team ever interviewed her.  *Id.* at 2.

*William Deere*

Mr. Deere was one of Mr. Honie's teachers at Hopi Junior/Senior High.

(Declaration of William Deere[58], 04/24/15, at 1)  Mr. Deere states:

> When I was first hired at Hopi High, the community was recovering from the crimes of a man named John Boone who had been convicted of molesting about 100 boys on the Hopi Reservation.  Boone was a teacher at Polacca Day School.  Because of this incident, I was required to undergo special training related to appropriate interactions and behaviors with students when I first started my position with the school.

> I recall the aftermath of Boone's crimes.  Many boys soiled their pants because they had trouble with their bowels from being sodomized; and many boys had identity problems and wore make-up, including lipstick.  There was an air of uneasiness in the community because so many of the boys had been abused by Boone.  I recall one student named Perry Kinale who killed himself with a gun at a school bus stop.  Another student, Gene Austin, was accused of raping a woman in her 60s.

> While the school had a community liaison named Sylvia Lomahaptewa, who provided counseling, none of the kids wanted to come forward because they were embarrassed.  I was not aware that Taberon Honie ("Tate") had been sexually abused by Boone, but would not be surprised if he had been.

> I remember Tate.  His family called him Tatsie.  I had Tate in my middle school science class.  Like all the boys his age, Tate was immature.  I later heard that Tate was acting out but do not know if this was related to his immaturity or because he had been abused by Boone.

*Id.*

Mr. Deere states that no one from the defense team ever interviewed him.

*Id.* at 2.

---

[58] *See* First Rule 7 Motion, Exhibit G.

### 4.   Mr. McCaughey failed to present an accurate picture of Mr. Honie's background and experiences at trial.

These declarations present a picture of Mr. Honie's life that was never presented to the sentencing judge.  At trial, Mr. McCaughey presented testimony from Mr. Honie's family members that focused on the fact that Mr. Honie was a sweet child who helped elders in his community and who loved and helped animals.  While Mr. Honie's mother and father briefly spoke about some of the traumatic events in Mr. Honie's life, they failed to provide any detail that would have conveyed an accurate picture of what was really going on in the Honie home and how it profoundly impacted their son.  Because the defense team only visited the family once, and in the case of Si, twice, they had insufficient information about Mr. Honie and his family to present an accurate mitigation picture at trial.

Mr. McCaughey failed to interview readily available family members and other witnesses who could have provided important details about Mr. Honie and his life that would have helped the sentencing judge to better understand his addiction to alcohol and drugs and how that could have had an effect on Mr. Honie at the time of the crime.  Importantly, even though Mr. McCaughey planned to call a few family members to testify, he did not spend any time explaining to them what the purpose of their testimony was and only briefly met with some of them just prior to their testimony on the day of trial.  In one case, Mr. McCaughey allowed Mr. Honie's aunt, Maudine, to testify because she asked to do so on the

day of trial, even though Mr. McCaughey had never interviewed her before and had no idea what she would say on the stand.  In fact, she stated that she did not believe her nephew was guilty, which undermined the defense's position that Mr. Honie had accepted responsibility for the crime and was remorseful.

Mr. McCaughey's mitigation investigation was deficient and prejudiced Mr. Honie because he failed to introduce readily available evidence that would have changed the evidentiary picture at trial and warranted a life sentence.  *See Williams*, 529 U.S. at 399.  Mr. McCaughey's failure to discover and present relevant mitigating evidence could not be justified as a tactical decision because he had not fulfilled his "obligation to conduct a thorough investigation of the defendant's background."  *Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed. 1980)).  Mr. McCaughey failed to convey the trauma experienced by Mr. Honie throughout his childhood that left him feeling abandoned by his parents and hopeless about his life.  As Deborah Hood noted, "A whole generation of Hopi men are gone. Many of the boys committed suicide, died from alcohol- or drug-related accidents, or are in prison.  There is a huge hole in the community of men in Polacca."  (Declaration of Deborah Hood, 04/16/15, at 2)  Mr. Honie is part of this lost generation of Hopi men.

### 5.   Expert opinions explaining how Mr. Honie's background and mental health issues affected him at the time of the crime.

Federal habeas counsel has also retained two experts to assess Mr. Honie for the effects his background, mental health and drug and alcohol abuse had on him at the time

of the crime.  Because Mr. Honie was denied funding during his post-conviction proceedings, he was never able to develop his mitigation claims and was never able to demonstrate "that trial counsel 'did not present the most important mitigating evidence—the correlation between [Honie's] unconventional social behavior throughout his life and credible scientific explanations for these behavior patterns.'"  (PCR ROA 1035) (internal reference omitted).  Mr. Honie has now established this important correlation that helps to explain his actions at the time of the crime.

### Robert L. Smith, Ph.D.
### Clinical Psychologist & Certified Addiction Specialist

During Mr. Honie's Rule 60(b) proceedings, Dr. Smith provided an affidavit (PCR ROA 3475-3496), based on a review of documents relevant to the mitigation evidence presented at trial, opining on the inadequacies of the mitigation investigation in Mr. Honie's case.  (PCR ROA 3496)  Dr. Smith also explained the "synergist effect" of taking multiple drugs, along with alcohol, and how this could have had a significant effect on Mr. Honie at the time of the crime and during his custodial interrogation.  (PCR ROA 3495)

Dr. Smith more recently has had the opportunity to evaluate Mr. Honie, and now offers a more thorough assessment of Mr. Honie's background, mental health issues, including his long-term drug and alcohol abuse, and the effect all of these factors had on Mr. Honie at the time of the crime.  (Affidavit of Robert L. Smith, Ph.D.[59], 04/24/15)

---

[59] *See* First Rule 7 Motion, Exhibit V.

195

Dr. Smith diagnosed Mr. Honie with a Depressive Disorder, Borderline Personality Disorder, and diagnoses related to drug and alcohol abuse, which "are consistent with the diagnoses provided during Mr. Honie's trial." *Id.* at 35.  Dr. Smith notes that Mr. Honie experienced childhood trauma based on his father's rejection of him as his son, the neglect by his parents, loss related to other adult figures he had formed attachments with, in the absence of his parents, the alcohol abuse and frequent arguments by his parents, and sexual abuse. *Id.* at 35-36.  Dr. Smith also notes Mr. Honie's own history of significant alcohol and drug abuse as an adolescent, the loss of several friends, and his parents' vehicle accident as being significant factors in Mr. Honie's life. *Id.* at 35-36.  Dr. Smith found that all of these factors affected Mr. Honie profoundly and led to the development of his Depressive Disorder and Borderline Personality Disorder. *Id.* at 36.

Dr. Smith notes that children who grow up in a dysfunctional family environment are at increased risk for the development of depression and substance abuse. *Id.*  Dr. Smith states that children who develop psychiatric symptoms as a result of a traumatic family life, often self-medicate their symptoms with alcohol and drugs, which was the case with Mr. Honie. *Id.*  Dr. Smith found that while Mr. Honie attempted to stop using alcohol and drugs, it was complicated by the fact that his family and friends were all abusing alcohol and drugs. *Id.* at 41.

Dr. Smith explains how Mr. Honie's psychological disorders and extreme intoxication on the day of the crime impacted his actions at the time of the crime. *Id.*  Dr. Smith notes that given the report of the drugs and alcohol Mr. Honie consumed on the day

196

of the crime, he "was acutely intoxicated by the effects of alcohol and the drugs that he consumed during the time leading up to the instant offense." *Id.* at 43. Dr. Smith states:

> All of these substances impaired the functioning of Mr. Honie's central nervous system at the time of the instant offense and the PCP, methamphetamine and marijuana were active during the time of his arrest and interview by the police. Each of these substances caused Mr. Honie to experience mood swings, poor impulse control, difficulty with attention and concentration, disrupted processing of information and sensory input, poor judgment, difficulty with decision-making, aggressive behavior and distorted perception and memory. In combination, their effects were magnified and the level of impairment was increased.

*Id.* at 43-44. Dr. Smith then explains that the interaction between Mr. Honie's substance abuse and his untreated psychiatric disorders interacted and had a "synergistic effect." Each disorder exacerbated the negative effects of the other. *Id.* at 44. "Mr. Honie's depression; abuse of alcohol, marijuana, cocaine and methamphetamine; and his Borderline Personality Disorder interacted, causing him to be desperate, impulsive, emotionally labile and erratic at the time of the instant offense and continued to impair his cognition and behavior when he was interviewed by the police." *Id.*

### *Gregory Meyer, Ph.D.*
### *Neuropsychologist*

Dr. Meyer performed a neuropsychological examination on Mr. Honie, which included reviewing materials related to Mr. Honie's background, educational, medical, family and substance abuse history. (Report of Gregory J. Meyer Ph. D.[60], 05/05/15)  Dr. Meyer found that "Mr. Honie has an extensive and well-documented substance abuse

---

[60] *See* First Rule 7 Motion, Exhibit W.

history, beginning with substantial prenatal alcohol exposure and including extensive personal use of alcohol and various street drugs beginning in childhood and continuing to the point of his current incarceration." *Id.* at 1. He also found that Mr. Honie "has a history that is significant for multiple head injuries, including significant loss of consciousness from injuries and intoxication." *Id.*

Dr. Meyer explains that he performed a formal evaluation of Mr. Honie "with a battery of standardized, individually administered cognitive and neuropsychological tests over the course of two days in May 2014." *Id.* at 2. Dr. Meyer's testing revealed that "Mr. Honie has a clear pattern of neuropsychological deficits in executive functioning that leave him compromised in his ability to flexibly shift his attention and goal-directed behavior from one target or problem solving strategy to another." *Id.* Dr. Meyer also notes, that Mr. Honie is unable to "to shift flexibly from using one guiding principle to another" which "is also associated with perseverative behavior that interfered with successful performance." *Id.* Dr. Meyer explains:

> Executive functions are mediated by the frontal lobes of the brain, with the ability to switch goal directed behaviors predominantly controlled by the dorsolateral prefrontal cortex.
> . . .
>
> Considerable research has been conducted on the causes and consequences of impairment in prefrontal functioning. First, significant prenatal alcohol exposure contributes to executive functioning deficits, with some evidence showing these deficits are particularly evident on the kinds of switching tasks where Mr. Honie had impairments. These findings are present not just for children who exhibit the physical characteristics of fetal alcohol syndrome, but for children without these characteristics who were regularly exposed to alcohol prenatally. Second, substantial development of the

frontal cortex and its pathways to other areas of the brain, and thus substantial development of executive functioning, occurs during adolescence. Third, sustained alcohol use and marijuana use both contribute to executive functioning deficits and their use during adolescence impairs the typical maturation of the frontal lobes. Fourth, the acute effects of alcohol and marijuana are to produce executive function deficits, with some evidence indicating this is particularly the case for set shifting functions. Fifth, both executive function deficits and alcohol use are related to increased aggression and decreased adaptive behavior. Sixth, even though cognitive functioning generally increases following abstinence from alcohol, there can be sustained deficits in executive functioning following abstinence, particularly for heavy users who began abusing substances early.

*Id.* at 2-3.

Dr. Meyer found that even after sixteen years of abstinence, Mr. Honie "has lingering and substantial deficits in the executive function of set-shifting and mental flexibility." *Id.* at 3. Dr. Meyer found that "[t]hese deficits may be due to prenatal alcohol exposure, the closed head injuries he experienced, his extensive substance abuse across the ten year period from about age 12 or 13 to the start of his current incarceration at age 22, or the combination of these three factors, as all of these factors contribute to the kind of deficits in neuropsychological processing that Mr. Honie has." *Id.* Dr. Meyer notes that "these kinds of deficits would have been much more obvious and evident if Mr. Honie had been thoroughly evaluated at the time of the instant crime[;] [h]owever, he was not." *Id.* Dr. Meyer found that in spite of this, "knowledgeable family members reliably report that Mr. Honie was exhibiting the manifestations of his executive functioning deficits at the time of the crime." *Id.*

Dr. Meyer also explains how the frontal lobe dysfunction in Mr. Honie affected

him at the time of the crime:

> With respect to the crime, the difficulties Mr. Honie shows in shifting
> conceptual sets, and the perseverative motor responses that emerged on
> some of the testing when trying to shift his behavior, provide a
> neuropsychological background that can help understand or explain some
> of the behavior he exhibited the night of the murder. Once he initiates
> particular kinds of actions, he has limitations that make it difficult to
> flexibly shift to an alternative action or problem solving goal. He becomes
> stuck-in-set and cannot readily change course. These cognitive limitations
> are present for him now, after 16 years of sobriety. These
> neuropsychological deficits in processing would have been much more
> significant at the time of the crime, given his prenatal exposure to alcohol,
> his history of head injuries, his 10 year history of extensive abuse of
> alcohol and other drugs, and the combined influence of the acute toxic
> effects of substantial alcohol and marijuana, as was found in his system
> after the crime. Thus, some of the grisliness of the crime is tied to the fact
> that Mr. Honie had a compromised brain that leads to executive function
> deficits and that was further compromised that night by the acute effects of
> substances that also impair executive functions.

*Id.* at 3-4.

### 6.   Mr. McCaughey failed to explain to the sentencing court how Mr. Honie's traumatic background and alcohol and substance abuse affected his behavior at the time of the crime.

This new expert evidence presented by federal habeas counsel demonstrates the

impact Mr. Honie's traumatic background had on his life and explains the correlation

between Mr. Honie's mental health issues, including his severe and long-term addiction

to drugs and alcohol, and his behavior at the time of the crime.  This was an extremely

important aspect of Mr. Honie's mitigation case that was never presented to the

sentencing judge.  Moreover, there were numerous important red flags that trial counsel

failed to investigate, including his failure to hire neuropsychologist to perform a workup of Mr. Honie's mental functioning.  This was warranted given Mr. Honie's history of head injuries and long-term and excessive alcohol and drug abuse that began early in his childhood.  Moreover, the family history of addiction, alone, would have warranted a more thorough work up of Mr. Honie's mental health issues and cognitive functioning. This was a crucial aspect of the investigation that was never performed by trial counsel. Without linking what happened to Mr. Honie in his life to how it affected him at the time of the crime, the sentencing judge did not have a frame of reference for its relevance to punishment.  Mr. Honie has now established this important correlation that helps to explain his actions at the time of the crime.

## CLAIM SIX

I.  **THE TRIAL COURT'S FINDINGS OF FACT AND DETERMINATIONS OF LAW REGARDING THE AGGRAVATING AND MITIGATING CIRCUMSTANCES DID NOT COMPLY WITH DUE PROCESS OR THE NEED FOR AN INDIVIDUALIZED SENTENCING PROCEDURE WHICH GIVES FULL EFFECT TO ALL OF THE EVIDENCE PRESENTED AT TRIAL**

Mr. Honie was sentenced by the court, rather than by a jury.  The trial court's findings of fact and conclusions of law in support of its imposition of the death sentence (TR ROA 543-552) were not reliable, resulting in an arbitrary sentencing proceeding. This was raised as argument III in Mr. Honie's direct appeal brief.  (Opening Brief of Appellant, 04/11/00, at 91-138)  The Utah Supreme Court's determination of this issue

was an unreasonable application of clearly-established federal law, 28 U.S.C. §

2254(d)(1), and an unreasonable determination of the facts, § 2254(d)(2).

The United States Supreme Court has emphasized the need for individualized

sentencing that gives full effect to all of the evidence which is presented to the court.  *See*

*Penry v. Lynaugh*, 492 U.S. 302, 319 (1989).  "Only then can we be sure that the

sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has

made a reliable determination that death is the appropriate sentence."  *Id.*  (quoting

*Woodson v. North Carolina*, 428 U.S. 280, 304-05 (1976)).

In *State v. Wood*, the Utah Supreme Court, relying on United States Supreme

Court precedent, created its standard for ensuring that capital sentences meet the

requirements of the Eighth and Fourteenth Amendments.  In that case, the state court

"reject[ed] the proposition that the death penalty may be imposed when there is

substantial doubt whether it should be."  648 P.2d 71, 80 (Utah 1982).  It noted that a

special rigor in analysis was required to ensure that a capital sentence was just.  "That the

defendant acted in a reprehensible and even vicious manner cannot justify the state's

departure from strict adherence to basic principles of justice."  *Id*.  The court concluded

that "the death penalty may be imposed only when consistent with 'the fundamental

respect for humanity underlying the Eighth Amendment.'"  *Id.* at 80-81 (quoting

*Woodson*, 428 U.S. at 304).

In order to meet the requirements of the constitutional prohibition against arbitrary

and capricious imposition of the death penalty, the Utah court recognized that "[t]he

substantive standards must be 'objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death.'" *Id.* at 81 (quoting *Woodson,* 428 U.S. at 303). The court also recognized that "[t]o assure that the substantive standards . . . are fairly, even-handedly, and properly applied, the basic procedural requirements of the Due Process Clause of the Fourteenth Amendment must be observed." *Id.* (citing *Gardner v. Florida*, 430 U.S. 349 (1977)). In order to meet those requirements, the Utah Supreme Court determined that "the stated objectives cannot be consistently achieved in a capital case unless the decision to impose the death penalty is made on the basis of the reasonable doubt standard." *Id.* at 83. To find otherwise "would create in some cases . . . a substantial possibility of 'arbitrary . . . . treatment' and permit 'penalties which are [not] proportionate,' a result  . . . that would raise issues of a possible constitutional magnitude." *Id.* (quoting U.C.A. § 76-1-104(3)-(4), the principles of statutory construction in the criminal code).

The directive from the Utah Supreme Court is that "the sentencing body compare the totality of the mitigating against the totality of the aggravating factors . . . in terms of their respective substantiality and persuasiveness." *Id*. at 83.

> The sentencing body, in making the judgment that aggravating factors 'outweigh,' or are more compelling than, the mitigating factors, must have no reasonable doubt as to that conclusion, and as to the additional conclusion that the death penalty is justified and appropriate after considering all the circumstances. This means that upon consideration of all of the circumstances relating to this defendant and this crime the sentencing authority must be convinced beyond a reasonable doubt that the death penalty should be imposed.

*Id.* at 83-84.

In a later case, the Utah court clarified the process, writing that "[t]he sentencing authority must apply the beyond-a-reasonable-doubt standard twice in the sentencing process in the two-step procedure established in *Wood,* 648 P.2d at 79-85.  *State v. Holland*, 777 P.2d 1019, 1025 (Utah 1989).  The court explained that

> *Wood* established a two-step formula for deciding whether imprisonment or death should be the sentence. The first step is to determine whether the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. The second step is to determine whether the death penalty is appropriate under all the circumstances of the case and in light of the circumstances of the defendant's background and life as a whole.

*Id*. at 1027.

In this case, the Utah Supreme Court unreasonably applied clearly established federal law by failing to review Mr. Honie's sentence under the individualized standard which would give full effect to all of the evidence presented at trial.  *See Penry*, 492 U.S. at 319.  Instead, the Utah court took the stance that if there was one aggravating factor that was properly found, it would not review the other aggravating or mitigating factors for error in application, but would defer to the lower court's determination of the sentence.  *Honie*, 57 P.3d at 994.  In other words, it conducted no individualized review at all of the non-statutory aggravating and mitigating factors, but simply reiterated the trial court's findings.

A.      **Non-statutory aggravating factors**

1.      **Mr. Honie's character, background, history, mental and physical condition.  U.C.A. § 76-3-207(2)(a)(ii).**

The trial court found Mr. Honie's criminal history, composed solely of misdemeanors, as a factor in aggravation.  (TR ROA 547-48)  The court reached this conclusion by singling out an instance where Mr. Honie, while drunk, had previously assaulted Carol Pikyavit.  The court's entire discussion of this factor is only a few sentences in which it recounted this assault, declared it significant, and stated that on this sole basis, Mr. Honie's character, background, history, mental and physical condition were factors in aggravation for sentencing.

The trial court, however, did not fully consider all of the aspects of this factor, which requires consideration of not just the prior bad acts that the court finds significant. By the terms of this subsection, the sentencing body must consider also all aspects of his character, background, history, and mental and physical condition.  The trial court could not have given full effect to all of the evidence before it, for an individualized sentence without doing this.  *See Penry*, 492 U.S. at 319.  Also, the trial court could not have adequately weighed its significance in balance with all of the other factors to make a determination of the appropriateness of the death penalty without considering each aspect of this factor.  *See Wood*, 648 P.2d at 83-84.  Instead, the trial court reduced Mr. Honie's life and character to a single incident and relied on it as an aggravating factor to impose

death.  The court's finding was not a reliable determination of the facts it was required to consider.

### 2.   Victim impact and the impact of the crime on the victim's family and community.  U.C.A. § 76-3-207(2)(a)(iii).

At the time of Mr. Honie's sentencing, federal law allowed for consideration of victim impact evidence as a "method of informing the sentencing authority about the specific harm caused by the crime in question."  *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).  Its use, however, is limited to evidence of "specific harm," such as that provided by a victim's family testifying about the victim's character and their individual loss.  *Id.* at 825-26.

During Mr. Honie's penalty phase, the State put on eight witnesses, five of whom gave victim impact testimony.  While two of the witnesses were family members who spoke of the specific harm of the loss of Ms. Benn, (TR ROA 605 at 42-43, 45; 46-47, 49-50), most of the testimony was from non-family members, and all of the witnesses spoke of a general loss to the Paiute tribe, rather than in terms of specific loss to individuals.

The State purposefully used the testimony to draw a distinction between Ms. Benn, as a person of value, and others of less value.  It did so in racist terms, derogatory to Native Americans.  In closing, the prosecutor argued that

> [Mr. Honie] did not murder a drunken Indian in the park. . . . He did not murder a woman who, ah, had spent her live [sic] drinking alcohol and puking and walking the streets and shoplifting at Wall-Mart [sic].  He murdered someone that these people look up to.  He murdered a superstar

in the P[a]iute community . . . Claudia Benn was a great person in our community and a great person in the Piute community."

(TR ROA 606 at 54).

Historically, the United States Supreme Court prohibited victim impact evidence because it there was "a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth v. Maryland*, 482 U.S. 496, 502 (1987). This is because the efficacy of victim impact evidence is in the ability of a witness to articulate grief. *Id.* at 505-07. The result would be death sentences which were based on a witness's communication skills rather than the characteristics of the defendant—a constitutional requirement of individualized sentencing. *See id.* at 504 (quoting *Woodson*, 428 U.S. at 304*); see also Penry*, 492 U.S. at 319.

This happened at Mr. Honie's sentencing. The trial court specifically disavowed the prosecutor's racist "drunken Indian" comments in this section of its sentencing document. (TR ROA 546-47) While that was appropriate, the trial court's findings of fact under the victim impact factor only repeated the general impact aspects of the testimony, ignoring the specific harm to the family. (TR ROA 545-46) Therefore, although the trial court claimed to not be placing the value of one person over another, its selective use of the victim impact evidence which was presented—emphasizing that which should have been inadmissible—shows that is, in fact, exactly what it did. The court placed a value on Ms. Benn that was not related to her specific relationships but was about her relative value to her tribe.

207

This error rendered Mr. Honie's sentence unconstitutional because the emphasis on improper victim impact evidence precluded an individualized sentence.  *See Booth*, 482 U.S. at 504; *see also Penry*, 492 U.S. at 319.  It also skewed the balance between factors, undermining certainty that Mr. Honie's death sentence is "justified and appropriate after considering all the circumstances."  *Wood*, 648 P.2d at 84.

### 3.  Use of a deadly weapon, considered under the factors in aggravation residual clause.  U.C.A. § 76-3-207(2)(a)(iv).

The trial court found the use of a knife during the offense constituted a factor in aggravation.  (TR ROA 546)  This is not a specific factor provided in the capital sentencing statute, but, rather, was considered under the catch-all provision of "any other facts in aggravation or mitigation."  Consideration of the weapon used in the offense does not distinguish one case from another, as every capital homicide will involve a murder and a means by which the victim was killed.  *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *see also Arave v. Creech*, 507 U.S. 463, 474 (1993) ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm").  This violates the constitutional requirement that sentencing be individualized.  *See Penry*, 492 U.S. at 319. It cannot, therefore, weigh in favor of a death sentence, beyond a reasonable doubt.

**B.     Mitigating factors**

**1.     Mr. Honie had no significant history of prior criminal activity. U.C.A. § 76-3-207(3)(a).**

As discussed above, Mr. Honie's criminal history was not significant.  It consisted solely of misdemeanors.  The court recognized this fact, writing that "the defendant's criminal history is not significant in number."  (TR ROA 547)  The court did, however, reiterate that the prior assault of Ms. Pikyavit was a significant occurrence.  *Id.*  On that sole basis, the trial court declined to apply this mitigating factor, disregarding the overall nature of Mr. Honie's criminal history, which is largely comprised of non-violent, alcohol related offenses.  In making this determination, the trial court failed to give full effect to all of the evidence presented, in violation of the Eighth Amendment.  On this basis, its finding fails to meet the beyond a reasonable doubt standard.

**2.     Mr. Honie lacked the capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law and was impaired as a result of intoxication, or influence of drugs. U.C.A. § 76-3-207(3)(d).**

The trial court found that Mr. Honie was "'somewhat' intoxicated because no breath test was given and the testimony is mixed: some witnesses testified that he was intoxicated and others stated he was not."  (TR ROA 545)  This is an unreasonable determination of fact.  There were no witnesses that said Mr. Honie was not intoxicated, although there was some variation among the witnesses as to the extent of his intoxication.  The evidence that Mr. Honie was intoxicated was uncontroverted.

While Mr. Honie was able to tell the taxi driver, Mr. Sweeney, approximately where he wanted to go, Mr. Sweeney testified that Mr. Honie was intoxicated and that he could smell alcohol on him.  (TR ROA 607 at 275)  He had also testified at the preliminary hearing that Mr. Honie was "really drunk."  (TR ROA 597 at 35)  Ms. Pikyavit testified that when she spoke to Mr. Honie in the evening before the offense that she could tell he was on his was to being very intoxicated.  (TR ROA 607 at 250)  Responding officers at the scene of the offense described Mr. Honie as smelling of alcohol and making nonsensical statements at the time of his arrest.  (*Id.* at 305-08, 325-26)

The trial court disregarded this evidence.  It emphasized his ability to give the taxi driver directions (while ignoring the taxi driver's testimony that Mr. Honie was drunk) and that Mr. Honie had "determined a way to gain entry to a locked home."  (TR ROA 545)  Smashing through a glass door is hardly evidence of the ability to engage in problem solving or to complete a complex task.  (TR ROA 607 at 349, 354)  The trial court's determination of this factor is not supported by the evidence and is an unreasonable determination of fact.  It cannot be said that Mr. Honie's mental state was not impacted by his intoxication.

### 3.    Mr. Honie's youth at the time of the crime.  U.C.A. § 76-3-207(3)(e).

The trial court correctly recognized that Mr. Honie was young at the time of offense, twenty-two years-old, however, the court then disregarded the scope of this

mitigating factor and emphasized that Mr. Honie had been "involved in substance abuse and counseling programs" which had been unsuccessful.  (TR ROA 544)  This is irrelevant to the determination of whether Mr. Honie was young at the time of the crime.  He was young.  And the court found that he was young.  Therefore, the court should have applied this as a mitigating factor.  The court's failure to accurately apply the law on this point violated Mr. Honie's right to due process and to an individualized and reliable sentencing.

> **4.      Victimization of Mr. Honie by John Boone, considered under the other factors in mitigation residual clause.  U.C.A. § 76-3-207(3)(g).**

The trial court found that it was possible but not probable that Mr. Honie was abused by John Boone, a serial pedophile who preyed on Mr. Honie and his peers over several years as a school teacher on the Hopi Reservation.  (TR ROA 543-44)  The basis for the court's finding was that Mr. Honie was not listed on John Boone's personal log of victimization, Mr. Honie was not among those who made a claim for remuneration as a victim, and because Mr. Honie had not raised it with his mental health counselor.  (*Id.*)

The court's finding is an unreliable determination of fact because it was shown at trial that Mr. Boone's log regarding his victimization of young boys was not comprehensive.  (TR ROA 606 43-44)  Also, it was shown that not every victim sought payment from the settlement fund; in fact, most did not.  (*Id.* at 40-41)  And, most significantly, Mr. Honie had discussed his abuse prior to the offense with Ms. Pikyavit, who testified to such.  (TR ROA 606 at 22)  This fact is the strongest evidence that the

211

abuse occurred, given that Mr. Honie would have no motivation to admit such a thing to Ms. Pikyavit other than because it was true.  Therefore, contrary to the court's finding, it is probable that Mr. Honie was abused by John Boone and this factor should have been weighed in mitigation.

### C.    Conclusion

The trial court consistently disregarded or mischaracterized the evidence presented during the penalty phase, leading to unreasonable determinations of fact that in turn caused erroneous application of the aggravating and mitigating factors.  This violates clearly established federal law which requires the sentencing body to give full effect to all of the evidence presented to it in order to ensure an individualized sentence.  *See Penry*, 492 U.S. at 319.  Only by this process can a reviewing court be certain that the sentence imposed was accurate and not arbitrary.  Mr. Honie did not receive the benefit of these constitutional safeguards.  The Utah Supreme Court extended the trial court's error by accepting, without adequate review, the trial court's findings of fact and conclusions of law.  Both courts disregarded the prohibition in *Wood* that the reprehensible acts of a defendant "cannot justify the state's departure from strict adherence to basic principles of justice."  648 P.2d at 80.  Therefore, the Utah Supreme Court's determination of this claim can be given no deference.

## CLAIM SEVEN

## I.   MR. HONIE'S DEATH SENTENCE WAS THE PRODUCT OF PROSECUTORIAL RACIAL DISCRIMINATION.

Mr. Honie's death sentence violates the Equal Protection clause of the Fourteenth Amendment because the prosecutor exhibited racial prejudice toward Mr. Honie.  As shown in Claim Twelve, the Utah death penalty statutes give the prosecutor unbridled discretion as to whether to charge any person accused of homicide with the death penalty or not.  This claim is exhausted, having been raised as argument I.D in Mr. Honie's direct appeal brief.  (Opening Brief of Appellant, 04/11/00, at 79-81)  The Utah Supreme Court's determination of this issue was an unreasonable determination of the facts, § 2254(d)(2).

Selective enforcement of a law may not be "based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962).  "Though the law itself be fair on its face and impartial in appearance, [] if it is applied and administered by public authority with an evil eye and an unequal hand . . . the denial of equal justice is still within the prohibition of the Constitution." *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886).  In order to establish an Equal Protection claim, a defendant must show the "'existence of purposeful discrimination'" which "'had a discriminatory effect' on him." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (quoting *Whitus* v. *Georgia*, 385 U.S. 545, 550 (1967); *Wayte v. United States*, 470 U.S. 598, 608 (1985).

213

In Mr. Honie's case, the existence of purposeful discrimination is evident on the face of the trial record.  During closing arguments, the prosecutor stated that Mr. Honie "did not murder a drunken Indian in the park. . . . He did not murder a woman who, ah, had spent her live [sic] drinking alcohol and puking and walking the streets and shoplifting at Wall-Mart [sic].  He murdered someone that these people look up to."  (TR ROA 606 at 54)  These comments illuminate the prosecutor's personal discriminatory opinions toward Mr. Honie.

As shown in Claim Five, Mr. Honie was born into a family plagued by alcohol abuse and raised in extreme poverty.  Mr. Honie, with few options available to him, followed in the pattern of alcohol and substance abuse, developing a severe dependency at a very young age, and, as an adult, he existed on the margins of society.  When the prosecutor spoke of "a drunken Indian" who he characterized as a public nuisance, vomiting in public and committing petty crimes, his clear intent was to draw a relative comparison between Mr. Honie—whom he is describing with racist comments—and the victim.  The prosecutor drew a comparison between a person whom he believed deserved to live, and one whom he believed deserved to die, in part, at least, for reasons not related to the offense.

The prosecutor's racial animus had its discriminatory effect on Mr. Honie pre-trial when the prosecutor made the decision to seek the death penalty.  As established in Claim Twelve, the Utah aggravated murder statute is so broad as to encompass nearly every intentional homicide.  *See State v. Young*, 853 P.2d 327, 399 (Utah 1993) (Durham, J.,

214

dissenting).  Because Utah has elected to employ a mechanism whereby the purported narrowing of the class of eligibility for the death penalty occurs during the merits phase, *see Young*, 853 P.2d at 352, the overbroad nature of the aggravated murder statute gives unfettered discretion to the prosecutor on whom to charge in a death penalty case.  And here, the prosecutor's discretion was driven by his racial bias toward Mr. Honie.

The Utah Supreme Court's determination of this issue involved an unreasonable determination of fact.  The court recognized that the prosecutor's comments were "racially-related" and "clearly offensive and distasteful," but contradictorily found that Mr. Honie had failed to show that his race was a factor in his case.  *Honie*, 57 P.3d at 986.  This finding was premised on the court's determination that the charge was supported by the evidence.  *Id.*

In addition to being an illogical conclusion—that there was no discrimination where a prosecutor makes offensive and racially-disparaging comments on the record— the state court seems to have misapprehended the issue.  The issue in this part of the appeal was not whether the court could impose a death sentence based on the evidence, but whether the prosecutor's racial bias drove the decision to charge Mr. Honie with the death penalty at all.  This question was not answered by the court.

The federal law on this point is clear.  Selective enforcement of the law based on racial bias is absolutely prohibited by the Fourteenth Amendment.  *Oyler*, 368 U.S. at 456.  The Utah Supreme Court, by recognizing the presence of racial bias in the prosecutor, should have been compelled to conclude that Mr. Honie was selected for

imposition of the death penalty based on his race, in violation of his right to equal protection of the law.

## CLAIM EIGHT

## I.   TRIAL COUNSEL DID NOT OBJECT TO THE ADMISSION OF HIGHLY PREJUDICIAL PHOTOGRAPHS HAVING LITTLE OR NO PROBATIVE VALUE.

This claim was raised in Mr. Honie's Amended Petition for Post-Conviction Relief.  (PCR ROA 66)  It was dismissed on summary judgment due to Mr. Honie's PCR counsel's failure to oppose it on summary judgment.  *Id.* at 985-989.

The Utah Rules of Evidence prohibit the use of evidence that is unfairly prejudicial or is needlessly cumulative.  Utah R. Evid. 403.  The State relied extensively on several graphic, gruesome photographs that had little or no evidentiary value, which they showed to the jury several times, violating both of the above stated prohibitions.  In each instance, Mr. Honie's trial counsel was ineffective for failing to object to and argue against the admission of these prejudicial photographs, which comprised a substantial portion of the State's exhibits at trial.  *See Strickland v. Washington*, 466 U.S. 668 (1984); *see also Payne v. Tennessee*, 501 U.S. 808, 825 (1991) ("In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.")

"Cases in [the Supreme] Court have long proceeded on the premise that the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial."

216

*Spencer v. Texas*, 385 U.S. 554, 563-64 (1967).  The Court will grant relief where a state court's ruling(s) "denied [the petitioner] a trial in accord with traditional and fundamental standards of due process."  *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see also Payne*, 501 U.S. at 825.  During Mr. Honie's trial, this evidence should not have been admitted and was so prejudicial that it resulted in an unfair trial and violated the due process rights afforded to him by the United States Constitution.  It is not a foregone conclusion that the trial court would have admitted the evidence over trial counsel's objection.  With regard to the some of the more gruesome details of the offense which were admitted through the use of Mr. Honie's statements[61], the trial court stated that "this case is unusually graphic and grotesque" but held that because defense counsel opened the door to the statements, they were allowable.  (TR ROA 607 at 367)

Twenty of the fifty exhibits the State introduced during the merits phase were photographs whose evidentiary value was very low, if they had any at all, in light of the other evidence presented.  Their prejudicial impact, however, was high.  These photographs are shocking and served to inflame the jury against Mr. Honie.  If a jury is permitted to consider evidence that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment has been violated.  *See Darden v. Wainwright*, 477 U.S. 168, 179-83 (1986).  In this case, Mr.

---

[61] The use of Mr. Honie's custodial statements are discussed more thoroughly in Claim Two.

217

Honie's right to a fair trial was violated by the introduction of these numerous

photographs, which his counsel did nothing to inhibit.

> **A.    Repeated use of several photographs of the deceased victim was
> redundant of the testimony of the medical examiner and law
> enforcement officers at the scene.**

The State announced its intention at the outset that it would revel in the gruesome

nature of the crime and that it would expose the jury to the most graphic evidence at its

disposal.  The prosecutor opened by saying, "Horrific, bloody, and brutal.  Those are the

facts of this case.  I tell you that now so you will be prepared over the next couple of days

to hear testimony and to look at photographs and to weigh evidence that is horrific and

bloody and brutal."  (TR ROA 607 at 225-226)  And at every turn, when the State would

exhibit another photograph, or, increasingly, exhibit the same photographs again and

again, the defense sat silent.  The State was able to get away with presenting whatever

prejudicial and inflammatory evidence that it pleased because trial counsel allowed it to

do so.

Over the course of the short two days that the jury heard the merits phase, the

State exhibited twelve different photographs of the deceased victim, either at the scene or

on the autopsy table, including a photograph of her skull with the skin peeled back (an act

performed by the medical examiner).  The State did not show each photograph just once.

Instead, the State showed the jury photographs of the deceased twenty-seven separate

times over the course of less than two days of the presentation of its case.  (TR ROA 607

at 247, 260, 301-303, 314, 332-335, 377, 404; TR ROA 608 at 432, 436, 447-448, 451,

218

456)  Even if these photographs were not unduly prejudicial—which they were, given

their inflammatory nature, and their redundancy to the testimony of law enforcement and

the medical examiner—this was certainly overkill, the only purpose of which was to

shock the jury into deliberations driven by passion—fear, anger, disgust—rather than on

the rational weighing of properly admissible evidence.

These photographs were unnecessary to present the evidence to the jury, given the

other testimony that was presented.  Numerous law enforcement officers testified as to

what they observed at the scene.  (TR ROA 607 at 301-303, 314, 332-335, 377)  There

was no additional probative value in showing the jury gruesome photograph of the scene,

and especially no need to do so repeatedly.

More significantly, the medical examiner's testimony was the best source of

information regarding the victim's body and cause of death.  This witness prepared six

diagrams which she used to aid her testimony in describing the nature and extent of

injuries to the victim.  (TR ROA 608 at 438-440, 445, 448-449)  These diagrams, in

addition to her testimony, provide the clearest, most probative, least cumulative, and least

prejudicial evidence regarding the facts of the offense.  The photographs added nothing

of value.

And the State's technique was cruel.  They forced each of the Ms. Benn's

daughters to separately identify their mother's corpse.  (TR ROA 607 at 247, 260)  This

was not necessary given that photographs of the victim's corpse were also identified by

various officers at the scene, *id.* at 302-303, 314, 332-335, 377, by the crime scene

photographer, *id.* at 404, by the forensic dentist witness (TR ROA 608 at 432), and by the medical examiner, *id.* at 436, 447-48, 451, 456.

The State's purpose in using this technique was clear from the record.  The State warned the jury at the outset of the nature of the evidence with which it would be bombarded.  And, in closing the State reiterated that "I told you at the beginning of this trial that the evidence would be horrific and bloody and brutal.  And I submit to you that the evidence that you have heard and the evidence that you have seen is all of that."  *Id.* at 471.  The State was even explicit that it wanted the jury to be inundated with the gore, saying "[a]nd when you take the exhibits with you back to deliberate, you'll see more."  *Id.*  In response, the defense sat idle.

### B.    The photographs of Mr. Honie had no evidentiary value at all.

There is no colorable argument for any probative value in the photographs of Mr. Honie's nude body that were shown to the jury.  (TR ROA 607 at 322, 343, 344)  Mr. Honie's identity was not in dispute, nor was his presence at the crime scene, or his having caused the death of Ms. Benn.  There was not a single fact in dispute for the jury to resolve that required these pictures to be shown to the jury.  And, again, in response to the jury's repeated exposure to these prejudicial images, the defense did nothing.

The jury was shown five different photographs of Mr. Honie, in varying states of undress, in which he appeared to have a substantial amount of blood on his body.  *Id.* at 322, 343, 344.  These photographs included his shirtless torso smeared with blood, his

head, his gashed hand covered in blood, and two graphic photographs of his naked genitalia with blood on them.

Given that much of the blood on Mr. Honie's body was his own—from the deep cut on his hand which went untreated for several hours after his arrest—the only purpose of showing these photographs to the jury was to cause disgust, and to degrade and humiliated Mr. Honie in the jury's eyes.  His trial counsel allowed this to happen, rather than take any step to protect him against the unfair machinations of the State.

### C.   Photographs of children at the scene were excessively cumulative and prejudicial.

The State also showed the jury photographs of the children present at the time of the offense—one picture of T.H. with blood on her face, and one picture of D.R. and T.R., where D.R. has blood on her skin and clothes, and is nude from the waist down. The repeated use of these exhibits was the most egregious instance of the State's prejudicial battering of the jury with inflammatory images.

Even assuming, for the sake of argument, that it was necessary for a witness to identify a photograph of the children at the scene—which Mr. Honie is not conceding, given the ability of several of the witnesses to testify to their presence without showing the photographs—these photographs were shown more often than any of the others.  The image of T.H. is shown to the jury to be identified by her mother, Carol Pikyavit (TR ROA 607 at 246-247), by her aunt, Benita Rogers, *id.* at 260, by two separate law

enforcement officers, *id.* at 297, 374, by a family services personnel member, *id.* at 381, and by the crime scene photographer, *id.* at 404.

The photograph of D.R. and T.R. was shown even more.  It was shown to the jury during the testimony of all of the same witnesses as the photograph of T.H., *id.* at 247, 260, 294-95, 374, 404, and was also shown during the testimony of the doctor who examined D.R., *id.* at 391, for a total of six times.  The last one is particularly excessive given that D.R. was not seen by the doctor in the condition that the photograph depicts her in.

There is no relevant purpose for the State to show the images of these children eleven times.  It was not necessary to establish that they were present at the scene, or in the condition they were found.  The only function was to horrify the jury, which trial counsel allowed to happen, again and again, throughout the short merits phase of Mr. Honie's trial.

### D.    Conclusion

The State's purpose in using these photographs was overt.  They intended to batter the jury with "[h]orrific, bloody, and brutal" images.  (TR ROA 607 at 225-226)  The State wanted the jury to "look at photographs  . . . that is horrific and bloody and brutal." *Id.* at 226.  The State wanted these images and "more" to predominate in deliberations. (TR ROA 608 at 471)

Trial counsel abdicated his Sixth Amendment duty to Mr. Honie by allowing the State to repeatedly bombard the jury with gruesome photographs, again and again.  *See*

222

*Strickland*, 466 U.S. at 680 ("reasonably effective assistance must be based on professional decisions and informed legal choices"); *see also Dretke v. Haley*, 541 U.S. 386, 390, 394 (2004) (failure to make an objection at trial may be a "viable" and "significant" ineffective assistance claim).   Trial counsel's failure to act cannot be considered reasonable because there is no conceivable strategic value that could be assigned to the failure to inhibit a jury's repeated exposure to irrelevant evidence which will only inflame and prejudice them against the defendant.  *See Strickland* 466 U.S. at 688.

Mr. Honie was prejudiced by his trial counsel's unprofessional failings.  The jury was shown gory photographs of the deceased victim twenty-seven separate times in less than two days.  The jury was shown graphic images of Mr. Honie's nude body and genitalia—which had no evidentiary value and only served to degrade him in the jury's eyes.  The jury was shown five times a photograph of T.H. with blood on her, and a photograph of D.R., nude and bloody, six times, in the course of a single day.  These images would have made an indelible mark on the minds of the jury, one of blood and horror that the State hoped to imprint.  (TR ROA 607 at 225-226; TR ROA 608 at 471) This imprint would arouse the jury's anger and disgust.  It would blind them to any other evidence presented, and guarantee the guilty verdict which they quickly returned.  In light of the circumstances created by the State, which went unchecked by trial counsel, there can be no confidence in the outcome of Mr. Honie's merits phase.  *See Strickland* 466 U.S. at 694.

## CLAIM NINE

**I.    TRIAL COUNSEL FAILED TO OBJECT TO THE STATE'S USE OF PREJUDICIAL VICTIM IMPACT EVIDENCE WHICH WAS INCORPORATED INTO THE FINDINGS OF FACT SUPPORTING MR. HONIE'S DEATH SENTENCE**

The State presented victim impact evidence which should have been objected to as being inadmissible in Utah, and for being too broad under clearly established federal law. 28 U.S.C. 2254(d)(1). The failure of Mr. Honie's trial counsel to raise these objections allowed the evidence to come in, and the trial court relied on it in its findings of fact supporting the imposition of a death sentence.

This claim was raised in Mr. Honie's Amended Petition for Post-Conviction Relief. (PCR ROA 65-66) It was raised separately in two parts, as "[t]rial counsel did not object to the presentation of highly prejudicial victim impact testimony," *id.* at 65, and as "[t]rial counsel did not object when the prosecutor made his 'drunken Indian' argument," *id.* at 66. The opposition to the State's summary judgment motion in PCR, however, makes it clear that these issues were raised in tandem with the "drunken Indian" comment evincing the State's intent to draw comparisons between the victim and other individuals.[62] (PCR ROA 786-793) Regardless, the state court disposed of the two issues separately. It erroneously dismissed the part of the claim regarding the prosecutor's "drunken Indian" argument based on the court's misperception that Mr. Honie's PCR counsel failed to oppose summary judgment on the claim, *id.* 985-89,

---

[62] This language and its impact on Mr. Honie's case is discussed further in Claim Seven.

despite it clearly being encompassed within the victim impact argument in the opposition cited above.  This was an unreasonable determination of fact.  28 U.S.C § 2254(d)(2).  The state court disposed of the other part of the victim impact claim by finding that Mr. Honie suffered no prejudice by the admission of the victim impact evidence because the trial court specifically disavowed reliance on the "drunken Indian" comment.  (PCR ROA 995-998)  This was also an unreasonable determination of fact because, as explained below, the trial court's findings of fact on the victim impact evidence included the inadmissible aspects of the State's victim impact evidence.

Historically, the United States Supreme Court prohibited victim impact evidence—evidence of "the personal characteristics of the victims and the emotional impact of the crimes on the family"—because the Court found it to be "irrelevant to a capital sentencing decision" and that there was "a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Booth v. Maryland*, 482 U.S. 496, 502 (1987).  The holding was based, in part, on the variability of witnesses to be able to articulate their grief and loss, and the difficulty of rebutting such evidence.  *Id.* at 505-07.  This variability had the tendency to result in death sentences that were determined relative to the ability of the witnesses to communicate rather than on the characteristics of the defendant—a constitutional requirement of individualized sentencing.  *See id.* at 504 (quoting *Woodson*, 428 U.S. at 304)*; see also Penry*, 492 U.S. at 319.

225

The Court reconsidered its decision a few years later and determined that "[v]ictim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question."  *Payne v. Tennessee*, 501 U.S. 808, 825 (1991).  Its use, however, is limited by due process, and, depending on its use, it has the potential to be unfairly prejudicial.  *Id.*  In *Payne*, evidence of the "specific harm" was provided by the victim's family who testified about the victim's character and their individual loss, which the Court deemed appropriate.  *Id.* at 825-26.

The Utah state courts' treatment of this issue has not been consistent.  After *Payne* authorized certain victim impact evidence under federal law, the Utah Supreme Court held that, under Utah state law, victim impact evidence had "no probative force in the sentencing context."  *State v. Carter*, 888 P.2d 629, 652 (Utah 1994).  It reached this conclusion on the same basis as the *Booth* court, because "[s]uch evidence does not make it more or less likely that a defendant deserves the death penalty."  *Id.*

In reaching its conclusion, the Utah court relied on language indicating a constitutional analysis of sentencing considerations, saying that "'the primary goal in [a capital] sentencing phase is to acquire a thorough acquaintance with the character and history of the person before the court.'"  *Id.* (quoting *State v. Taylor*, 818 P.2d 1030, 1033 (Utah 1991)).  This is how the United States Supreme Court discusses the Eighth Amendment requirement of individualized sentencing.  *See Woodson*, 428 U.S. at 304*; see also Penry*, 492 U.S. at 319.  Also, the determination that "[s]uch evidence does not make it more or less likely that a defendant deserves the death penalty[,]" *Carter*, 888

226

P.2d at 652, echoes federal case law language about the danger of arbitrariness in capital sentencing. *See Gregg*, 428 U.S. at 189; *see also Booth*, 482 U.S. at 502. Given that the United States Supreme Court had already determined, in *Payne*, that victim impact evidence did not violate the federal constitution, the only remaining inference is that the Utah court was making a state constitutional determination.

Despite this, the Utah court abandoned the holding in *Carter* the next time the question arose, which was in Mr. Honie's direct appeal. The state court disposed of Mr. Honie's challenge to the use of victim impact evidence in a tersely worded footnote, "Defendant claims the victim's identity and other victim impact evidence should be disallowed from consideration at sentencing as a matter of constitutional law. With respect to federal constitutional law, to the contrary, is *Payne v. Tennessee*." *Honie*, 57 P.3d at 994 n.7 (citing *Payne*, 501 U.S. at 827). The state court failed to acknowledge its treatment of victim impact evidence post-*Payne* as a question of state law in *Carter*, sweeping that decision under the proverbial rug.

At the time of Mr. Honie's sentencing, the Utah capital sentencing statute had been amended to allow evidence on "the victim and the impact of the crime on the victim's family and community without comparison to other persons or victims." U.C.A. § 76-3-207(2)(a)(iii). Mr. Honie does not concede that the United States Supreme Court's holding in *Payne* is correct or that the Utah statute meets its criteria. He acknowledges that it does reflect the current state of the law. He also maintains, however, that the Utah Supreme Court was bound by its prior precedent to find the victim

227

impact evidence was improperly admitted in his case.  The Utah Supreme Court's determination of a state constitutional issue cannot be undone merely by a legislative amendment.

At the time of Mr. Honie's sentencing, the most recent case law on the subject declared this kind of evidence inadmissible.  *See Carter*, 888 P.2d at 652-53.  The amended statute allowing victim impact evidence appeared not to satisfy the state constitutional requirements of the *Carter* holding.   Given this, Mr. Honie's trial counsel should have objected to five of the eight witnesses that the State put on in its initial penalty phase presentation.[63]  Each of these witnesses' purpose was to testify as to the victim's identity and impact of the loss on her family and the Paiute Tribe.  Even by the *Payne* standard, the evidence presented at Mr. Honie's trial was unduly prejudicial.  It went beyond the "specific harm" to the victim's family.  The State, in its closing argument, used this evidence to draw inappropriate comparisons between the victim and other individuals (including the use of racist stereotypes to imply a relative value of the life of the victim as qualitatively greater than individuals like Mr. Honie).

Even if victim impact evidence were admissible—which Mr. Honie is not conceding—many of the witnesses' testimony went beyond the "specific harm" Mr. Honie had caused to a much broader spectrum of alleged impact than contemplated by *Payne*.  *See* 501 U.S. at 825-26 (victim's family may testify about the victim's character and their individual loss); *see also State v. Kell*, 61 P.3d 1019, 1036 (Utah 2002) (victim

---

[63] The other three State witnesses testified about Mr. Honie's criminal history.

impact evidence must be "moderate in tone" and may be "descriptive of the family's loss and mourning").

The witnesses spoke of Ms. Benn's impact on the Paiute Tribe.  One family member spoke of Ms. Benn coming "back to the tribe" and "helping the tribe out with their counseling, her own people."  (TR ROA 605 at 44)  Another family member spoke of her "encouraging a lot of people to continue their education, her family members and everybody.  *Id.* at 48.  These witnesses were not discussing specific harm to themselves or their family, but a broad impact without specifics.

Other witnesses were not limited to family members.  A former employer testified about Ms. Benn's past work experiences (at an organization she had long since left), which did not have relevance at all, even under the new victim impact statute.  *Id.* at 52-56.  She, like the prior family witnesses, also recounted her perception of Ms. Benn's unspecific relationship to her tribe.  *Id.* at 56, 60-61.   A representative of the Paiute tribe also spoke non-specifically about Ms. Benn's interaction with members of the tribe.  *Id.* at 72-73.  These witnesses went beyond what is allowable either under *Payne*, or under the state law as applied after the fact in *Kell*.  Trial counsel did not cross-examine any of these witnesses.  As noted, this type of evidence is not amenable to being rebutted.  *See Booth*, 482 U.S. at 502.

It is clear from the face of the record that the State intended this evidence to be used to compare the relative value of the victim to other individuals, specifically, to

individuals the prosecutor characterized as being of less value as human beings—those situated similarly to Mr. Honie.  In his closing argument the prosecutor said:

> [Mr. Honie] did not murder a drunken Indian in the park. . . . He did not murder a woman who, ah, had spent her live [sic] drinking alcohol and puking and walking the streets and shoplifting at Wall-Mart [sic].  He murdered someone that these people look up to.  He murdered a superstar in the P[a]ute community . . . Claudia Benn was a great person in our community and a great person in the P[a]ute community.

(TR ROA 606 at 54)  In addition to making a racist denigration of Mr. Honie, it is clear that the State was also drawing an invidious distinction between class and character— those, like the victim, whose worth is inherently greater than others who may achieve less.

Mr. Honie's counsel was unreasonable for failing to object to the admission of evidence, which was inadmissible under *Carter*, and exceeded the limits of *Payne*.  *See Strickland*, 466 U.S. at 680 (reasonableness is determined based on the information known at the time of the decision); *see also Dretke v. Haley*, 541 U.S. 386, 394 (2004) (failure to make an objection at trial may be a "viable" and "significant" ineffective assistance claim).   There can be no strategic purpose for allowing inadmissible and prejudicial evidence to be used against one's client.  *See Strickland*, 466 U.S. at 688.

Mr. Honie was prejudiced by his trial counsel's failure because there was a good basis for arguing that the evidence should not be admitted.  And, more importantly, Mr. Honie was prejudiced because the sentencing court relied on the inadmissible aspects of the State's victim impact case in sentencing him to death.

The trial court specifically disavowed the prosecutor's racism.  (TR ROA 547-546)  While it is laudable that the court rejected the racist language, it did take up the other impermissible comparison between the value of one person over another.  The court tried to state that it did not do this, but the language of its sentencing document belies the rationale.  (TR ROA 546-545)  The court did not cite to the family member's testimony and their specific harm but spoke almost exclusively about the larger, non-specific impact—that is, the court relied almost solely on what should have been inadmissible evidence in making its victim impact determination.  The trial court cited Ms. Benn's education, her career, and quoted a tribal representative who only spoke generally of Ms. Benn, while glossing over the specific evidence provided by individual family members.  *Id.* at 546-545.  On this basis, Mr. Honie was sentenced to death in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution.

## CLAIM TEN

I. **MR. HONIE'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO STIPULATE TO THE ADMISSION OF MR. HONIE'S CRIMINAL HISTORY OR TO OBJECT TO THE PREJUDICAL AND CUMULATIVE EVDIENCE OF THAT HISTORY**

Mr. Honie's trial counsel was ineffective in handling the issue of his criminal history during the penalty phase of his trial.  Mr. Honie raised this claim in his Amended Petition for Post-Conviction Relief.  (PCR ROA 63)  The state court dismissed the claim on summary judgment, erroneously finding that it had been raised on direct appeal.  (PCR ROA 981-984)  On direct appeal, Mr. Honie had raised the issue of the trial court's error

in weighing his criminal history as a factor in sentencing (Opening Brief of Appellant, 04/11/00, at 104-106), but had not raised the ineffective assistance of counsel component prior to his post-conviction proceedings. Therefore, the state court's dismissal of this claim as having been previously raised was an unreasonable determination of fact which deserves no deference. 28 U.S.C. § 2254(d)(2).

The State put on eight witness during its initial penalty phase presentation—five gave victim impact evidence and are discussed in Claim Nine. The other three were put on by the State to provide evidence of Mr. Honie's criminal history. The first witness, Pauline Mason, authenticated Mr. Honie's criminal record. (TR ROA 605 at 9) The next two witnesses, Monte Gibson and Carol Pikyavit, both testified regarding the same incident, from September 1995, when Mr. Honie assaulted Ms. Pikyavit (then known as Carol Polsvar), providing graphic detail. *Id.* at 13-16, 19-30.

Mr. Honie had pled guilty to the misdemeanor assault charge and served jail time. *Id.* at 17. It would have been included as part of his criminal record, which had already been admitted through Ms. Mason. *Id.* at 9. Therefore, the testimony of Mr. Gibson was unnecessarily cumulative of the evidence which came in through Ms. Mason. And the testimony of Ms. Pikyavit was unnecessarily cumulative of the evidence provided through both Ms. Mason and Mr. Gibson.

Mr. Honie's trial counsel should have stipulated to the admission of Mr. Honie's criminal history. The record from the Hopi Tribal Court was clearly admissible evidence, properly considered during sentencing, and there was no need to put its authentication to

232

an adversarial test (which Mr. Honie's counsel did not do anyway).  Stipulating to the admission of the criminal history could have averted the State's first three witnesses and the damaging testimony of Mr. Gibson and Ms. Pikyavit.

Alternatively, Mr. Honie's trial counsel should have objected to the testimony of Mr. Gibson and Ms. Pikyavit as violating the Utah evidentiary rule prohibiting needlessly cumulative and prejudicial evidence.  *See* Utah R. Evid. 403.  The court had already been provided with evidence of Mr. Honie's conviction for assaulting Ms. Pikyavit, it did not need a detailed recital of the facts, much less two.  Also, the details of the assault were not any more probative of Mr. Honie's background or character than what the court had already received, which included his guilty plea and conviction for the offense.  The failure to protect one's client from cumulative and prejudicial evidence cannot have a strategic value and is, therefore, unreasonable.  *See Strickland*, 466 U.S. at 688.

Mr. Honie was prejudiced by his trial counsel's deficient performance because the trial court relied heavily on the details of the assault on Ms. Pikyavit in its determination of sentence.  It was the only fact discussed by the court in its consideration of Mr. Honie's character, background and history as an aggravating factor.[64]  (TR ROA at 548-547)  The court also relied on it as the reason that Mr. Honie's lack of a significant criminal history was not applied as a mitigating factor.  *Id.* at 546-545.  Had the court been spared the details, either by stipulation or by objection to cumulative and prejudicial evidence, it would have changed how the court determined both the presence of these

---

[64] Discussed further in Claim Six.

aggravating and mitigating factors, and how the totality of the factors weighed in favor of or against a death sentence.  *See Wood*, 648 P.2d 71, 83-84.  On this basis, there can be no confidence in the accuracy of the outcome of Mr. Honie's sentencing.  *See Strickland*, 466 U.S. at 694.

**CLAIM ELEVEN**

## I.    THE INEFFECTIVE ASSISTANCE OF MR. HONIE'S APPELLATE COUNSEL

Mr. Honie's trial counsel was ineffective for failing to raise and preserve claims for appeal,[65] resulting in the claims being determined by the lowest standard of review. His counsel was also ineffective for failing to adequately brief issues for appeal, resulting in them not being considered by the Utah Supreme Court at all.  This claim was raised in Mr. Honie's Amended Post-Conviction Petition.  (PCR ROA 67)  It was dismissed by the PCR court in summary judgment.  (PCR ROA 1008-1011)

The effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."); *see id.* at 395 ("Because the right to counsel is so fundamental to a fair trial, the Constitution cannot tolerate trials in which counsel, though present in name, is unable to assist the defendant to obtain a fair decision

---

[65] Mr. Honie was represented by the same counsel at trial and on direct appeal.  (Opening Brief of Appellant, 04/11/00)

on the merits.").  As such, "nominal representation" during an appeal "does not suffice to render the proceedings constitutionally adequate[.]"  *Id.* at 396.

Ineffective assistance of appellate counsel claims are governed by the standard of review set forth in *Strickland*, 466 U.S. at 686-87.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Accordingly, a petitioner must show that appellate counsel's representation "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 687-88, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694.  In addition, the ABA Guidelines are instructive in evaluating the reasonableness of counsel's conduct.  *See Rompilla v. Beard*, 545 U.S. 374, 387 (2005).

Regarding appellate performance, the 1989 ABA Guidelines indicate that "[a]ppellate counsel should seek, when perfecting the appeal, to present *all arguably meritorious issues*." 1989 ABA Guidelines 11.9.2(D) (Duties of Appellate Counsel) (emphasis added).  Moreover, "[a]ppellate counsel should be familiar with all state and federal appellate and postconviction options available to the client, and should consider how any tactical decision might affect later options."  1989 ABA Guidelines 11.9.2(A) (Duties of Appellate Counsel)  Therefore, when appellate counsel fails to preserve meritorious issues that could have resulted in a reversal of conviction or sentence, counsel has necessarily caused prejudice to the defendant. *See, e.g.*, *Strickland*, 466 U.S. at 694 (stating that prejudice occurs when, absent counsel's deficiencies, there is a reasonable probability that the result of the proceeding would have been different).

### A.    The ineffective assistance of trial and appellate counsel resulted in the state court applying the lowest standard of review to Mr. Honie's direct appeal issues.

The Utah Supreme Court found that the only issue that trial counsel preserved for appeal was whether "Utah's statutory scheme unconstitutionally fails to channel sentencing discretion by failing to narrow the class of persons who are eligible for the death penalty, [which] defendant did not raise before the trial court and properly preserve the constitutional and other issues he raises now on appeal." *Honie*, 57 P.3d at 983 n.2. Consequently, the other issues would only be afforded the court's most deferential and least-rigorous standard of review. "'On direct appeal in capital cases . . . this Court will review an error, even though no proper objection was made at trial and even though the error was not raised on appeal, if the error was manifest and prejudicial.'" *Id.* (quoting *Wood*, 648 P.2d at 77). Therefore of the four main points raised in the appeal brief, all but one subpart of one point was subject to the lowest standard of review.

One of the most important points raised on appeal was a detailed challenge to the trial court's application of the standard established in *Wood* for determining the sentence in a capital case [66]. *See* 648 P.2d at 83-84. It occupied over half of the pages used for argument in the opening. (Opening Brief of Appellant, 04/11/00, at 91-138)

> *Wood* established a two-step formula for deciding whether imprisonment or death should be the sentence. The first step is to determine whether the aggravating circumstances outweigh the mitigating circumstances beyond a

---

[66] The underlying claim regarding the state court's unreasonable determinations of fact and violations of clearly established federal law regarding Mr. Honie's sentencing proceeding is raised in Claim Six.

reasonable doubt. The second step is to determine whether the death penalty is appropriate under all the circumstances of the case and in light of the circumstances of the defendant's background and life as a whole.

*Holland*, 777 P.2d 1019, 1027 (Utah 1989).

This is a rigorous, detailed, and fact-intensive process, which the Utah Supreme Court has acknowledge is a difficult undertaking. "The sheer emotional impact of all the evidence of an unjustified killing tends to overwhelm evidence of mitigating factors in the mind of the sentencing authority." *Id.* at 1028. Because of this, the sentencing body must be cautious in its determining of facts and weighing of all the aggravating and mitigating factors. If there is an error, it is absolutely essential that trial counsel preserve a challenge to the error to allow the reviewing court to fully engage in the facts and issues involved.

Given the space afforded the issue in the appeal brief, Mr. Honie's counsel clearly understood its importance. Yet, his counsel failed to preserve the issue for appeal. Therefore, the Utah Supreme Court reviewed it under the manifest and prejudicial error standard—the standard most deferential to the court below and least favorable to the appellant. There is no conceivable strategic purpose in failing to act in order to secure one's client the most favorable circumstances possible for raising an appeal issue. *See Strickland*, 466 U.S. at 688.

Mr. Honie was prejudiced by having this issue reviewed by the state supreme court without a level of review adequate to determine the myriad errors in the trial court's determination of facts and weighing of factors that it relied on for sentencing Mr. Honie

to death.  As shown in Claim Six, many of the facts determined by the trial court do not satisfy the standard established in *Wood*.  Nor do the aggravating factors outweigh the mitigating factors beyond a reasonable doubt.  Therefore, it cannot be said that Mr. Honie's death sentence is appropriate or justified.  Given that the trial court's findings were not subjected to an adequate level of review, due to the unreasonable performance of Mr. Honie's counsel, there can be no confidence in the result of Mr. Honie's appeal of this issue.

> ### B.      Improper briefing by appellate counsel resulted in issues not being determined on appeal at all.

In the appeal brief, Mr. Honie also raised a challenge based on racial discrimination by the prosecutor in having charge Mr. Honie with a death penalty case.[67] (Opening Brief of Appellant, 04/11/00, at 79-81)  As with the *Wood* issue, the Utah Supreme Court found that "this issue was not before the trial court and properly preserved" and so the court would only "review for manifest and prejudicial error." *Honie*, 57 P.3d at 986.  Mr. Honie's counsel was ineffective, as above, for failing to preserve the issue and causing it to be subject to the lowest standard of review.  Mr. Honie was prejudiced by having his issue determined by this reduced standard, given that the state court refused to fully engage the issue, dismissing it with a few sentences and with no meaningful analysis.  *Id.* at 986.

---

[67] The underlying claim regarding prosecutorial discrimination is raised in Claim Seven.

238

After filing the opening brief, appellate counsel filed a supplement to the brief, expanding on the original challenge to prosecutorial discrimination in which he advanced law and argument in support of a claim that the discrimination should be found to be structural error warranting new proceedings.  (Supplement to Opening Brief, 08/14/00)  The court found the briefing in this document to be inadequate, writing that "a reviewing court is not simply a depository in which the appealing party may dump the burden of argument and research."  *Honie*, 57 P.3d at 995 (citing State v. Lafferty, 20 P.3d 342 (Utah 2000)).  Accordingly, it declined to take up the issues presented.

Mr. Honie's counsel's performance clearly fell below the standard of reasonableness, given the state court's response to its briefing.  Mr. Honie was prejudiced by this unprofessional failing because it resulted in the state court refusing to consider at all a potentially meritorious issue contained within the supplement to the brief.

In the supplement to the brief, Mr. Honie cited to *United States v. Doe*, 903 F.2d 16, 24-25 (D.C. Cir. 1990), a case which briefly discussed federal case law about the use of racially inflammatory remarks during government summation.  (Supplement to Opening Brief, 05/15/00, at 14 n.9).  Although it was not laid out in the supplement, this portion of *Doe*, cited by Mr. Honie, included cites to cases which lay out the clearly established United States Supreme Court precedent regarding the impact of prosecutorial discrimination in charging cases.  Had Mr. Honie's counsel adequately briefed the issue, it would have included the law from these cases and argument based on it.

239

In *McCleskey v. Kemp*, the United States Supreme Court explained that "[b]ecause of the risk that the factor of race may enter the criminal justice process, we have engaged in 'unceasing efforts' to eradicate racial prejudice from our criminal justice system." 481 U.S. 279, 309 (1987) (quoting *Batson* v. *Kentucky*, 476 U.S. 79, 85 (1986)).  These unceasing efforts have included the Court "repeatedly stat[ing] that prosecutorial discretion cannot be exercised on the basis of race." *Id.* at n.30 (citing *Wayte* v. *United States*, 470 U.S. 598, 608 (1985); *United States* v. *Batchelder*, 442 U.S. 114 (1979); and *Oyler* v. *Boles*, 368 U.S. 448 (1962)).  In the cases cited to in *McCleskey*, the Court holds that "although prosecutorial discretion is broad, it is not '"unfettered.'  Selectivity in the enforcement of criminal laws is . . . subject to constitutional constraints.'" *Wayte*, 470 U.S. at 608 (quoting *Batchelder*, 442 U.S. at 125).  And, selective enforcement of a law may not be "based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962).

These cases are particularly instructive for Mr. Honie's case because they are expressly about prosecutorial discretion in charging cases.  *Wayte* dealt with a prosecutor's discretion on whether to charge a person with a crime or not.  470 U.S. at 600.  *Batchelder*, dealt with a prosecutor's discretion on how to charge a crime.  442 U.S. at 124-25.  Finally, *Oyler* dealt with a sentencing enhancement which was applied "to only a minority of those subject to its provisions, in violation  . . . [of the] Equal Protection Clause[] of the Fourteenth Amendment." 368 U.S. at 499.

This authority is squarely on point regarding the issue raised by Mr. Honie in his appeal and first supplement to his brief.  In his opening brief, Mr. Honie argued that, in his case, "the prosecutor [] had the choice between two very similar statutes and opted to prosecute Honie for capital murder and seek the death penalty" and the record shows that the prosecutor "engaged in racial stereotyping and discrimination on the record in prosecuting this capital case[.]"  (Opening Brief of Appellant, 04/11/00, at 80)  In his supplement to the brief, Mr. Honie expanded on that to argument to include that when local prosecutor's had "virtually unreviewable powers to charge a case as capital or non-capital" and, when that choice is motivated by racial bias, "the error must be viewed as a structural one which is not subject to traditional harmless error analysis."  (Supplement to Opening Brief, 08/14/00, at 4-5)

Mr. Honie had a substantial and meritorious issue in his opening brief and supplement to the brief.  But for his counsel's errors in failing to preserve the issue for appeal, to lay out the federal legal precedents, and to marshal them in support if the arguments, the Utah Supreme Court would have fully engaged this issue.  Given that Mr. Honie had the benefit of clearly established federal law on his side, there can be no confidence in the accuracy of the outcome of his appeal on this issue.

## CLAIM TWELVE

**I.    THE UTAH AGGRAVATED MURDER STATUTE FAILS TO NARROW THE CLASS OF ELIGIBILITY FOR THE DEATH PENALTY, RESULTING IN SENTENCES THAT ARE ARBITRARY AND ARE IN VIOLATION OF DUE PROCESS AND EQUAL PROTECTION**

This was raised as argument I.A. in Mr. Honie's direct appeal brief.  (Opening Brief of Appellant, 04/11/00, at 60-68)  If this court finds that the claim is not exhausted, failure to do so is the result of the ineffective assistance of Mr. Honie's direct appeal counsel.  The effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  *Evitts*, 469 U.S. at 396 (1985).  Ineffective assistance of appellate counsel claims are governed by the standard of review set forth in *Strickland* 466 U.S. 668 (1984).  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).

In his direct appeal, Mr. Honie stated the issue as "the failure of subsection (1)(d) to channel the capital sentencers' discretion."  (Opening Brief of Appellant, 04/11/00, at 60)  The Utah Supreme Court dismissed the argument with the following statement,

> In *State v. Young* we held that so long as the initial narrowing of death-eligible defendants occurs at the guilt phase in Utah's statutory scheme, any expanded consideration of factors at sentencing is constitutional.  [Citations omitted.]  With respect to the statutory scheme applicable to defendant, the narrowing of death-eligible defendants occurs at the guilt phase, *see* Utah Code Ann. §§ 76-5-202, 76-3-206, and 76-5-203, and therefore we reject defendant's argument.

*State v. Honie*, 57 P.3d 977, 986 (Utah 2002).  In *Young*, the Utah Supreme Court held that "the narrowing function required by the Eighth Amendment may occur at either the guilt or the penalty stage of a capital trial" and that "Utah's scheme is similar to that

upheld in *Lowenfield* [*v. Phelps*, 484 U.S. 231 (1988)]" because "it narrows the class of offenders subject to the death penalty during the guilt phase of the trial."  853 P.2d 327, 352 (Utah 1993).  This is the entirety of the analysis.  The Utah Supreme Court's determination of this issue was an unreasonable application of clearly-established federal law, 28 U.S.C. § 2254(d)(1), and an unreasonable determination of the facts, § 2254(d)(2).

While the Utah Supreme Court is correct that the United States Supreme Court has held that narrowing may occur during the merits phase of a capital trial, what the Utah court is not addressing is the essential part of the holding which requires a capital sentencing scheme to "'genuinely narrow the class of persons eligible for the death penalty'" in order to "'reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'"  *Lowenfield*, 484 U.S. at 244 (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).  The Court elaborated that "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion."  *Id*.  Utah's aggravated murder statute fails to serve that function.

The lengthy list of aggravating factors in U.C.A. § 76-5-202 allows almost any homicide to result in a death penalty, thereby failing to narrow the class.  As written, Utah's statute is one of the broadest aggravated murder statues in the nation.  At the time of Mr. Honie's trial, there were seventeen different aggravators.  One of those aggravators allowed for the death penalty to be imposed if death occurred during one of

twenty different crimes.  Currently, there are twenty aggravating circumstances in the main statute, not counting the various subcategories detailing prior convictions which may now constitute aggravators (twenty-three different felonies).  § 76-5-202(1)(a)-(t). There is, in addition, a separate subsection, 76-5-202(2) relating to six different crimes against children, under which the attendant homicide need not be knowing and intentional but requires only a reckless indifference to human life.  The number and scope of aggravators are so broad as to encompass virtually every criminal homicide committed in the state.

Neither the version in use at the time of Mr. Honie's trial nor the current version has been reviewed by a federal court to determine its constitutionality.  In 1986, the Tenth Circuit Court of Appeals reviewed the 1973 version of the statute, which only had eight possible aggravators.  *See Andrews v. Shulsen*, 802 F.2d 1256, 1261 (10th Cir. 1986).  The Tenth Circuit found the sentencing scheme to be constitutional; however, it also noted that the 1986 version of the statute contained seventeen aggravators, and stated that "[w]e express no opinion on its constitutionality, but confine our attention to the 1973 statutes."  *Id.* at 1261 n.1.  As noted above, the current version of the statute contains two-and-a-half times the number of aggravators as the original 1973 statute, plus additional categories encompassing another twenty-nine ways in which a murder may be considered aggravated.  Utah does not narrow the class of eligibility, but ever expands it.

And despite the fact that the federal appellate court specifically disavowed any consideration of the then-current expanded aggravated murder statute, the Utah Supreme

Court has continued to rely on the finding in *Andrews* to justify its failure to examine the statute.  In 1999, the state court reviewed a case brought under the later, expanded version of the statute but held that "the statute's constitutionality under the federal constitution has been upheld by the Tenth Circuit."  *State v. Lovell*, 984 P.2d 382, 390 (Utah 1999) (citing *Andrews*, 802 F.2d at 1261-62).  This is plainly false, and the court should know it, given the specific limitation of the holding in *Andrews*.  The Utah Supreme Court's findings and conclusions on this claim can be given no deference.

And the state court, while citing to United States Supreme Court precedent, is able to identify the controlling law, but has failed to reasonably apply it.  In case after case, the state court dismisses the challenge that the Utah statute has failed to narrow the class of eligibility without ever actually applying an analysis to the question.  The court's typical practice is to declare the issue decided with a string cite to its prior cases.  In another decision, issued the same year as Mr. Honie's direct appeal, an appellant raised the same issue of the Utah aggravated murder statute's failure to narrow the class of eligibility.  In response, the court provided no analysis, but simply stood on the notion that the court had previously considered the constitutionality of the state's death penalty statutes.  *See State v. Kell*, 61 P.3d 1019, 1036-37 (Utah 2002) ("We have addressed this issue on numerous occasions, concluding that Utah's death penalty statutes are constitutional.") (citing *State v. Lafferty*, 20 P.3d 342 (Utah 2001); *State v. Lovell*, 984 P.2d 382 (Utah 1999); *State v. Young*, 853 P.2d 327 (Utah 1993); *State v. Holland*, 777 P.2d 1019 (Utah 1989); *State v. Tillman*, 750 P.2d 546, (Utah 1987); and *State v. Wood*,

648 P.2d 71 (Utah 1982)).  These cases, however, do not address the issue of the statute's

failure to narrow.  Generally, they perform the same function as *Kell*, stating that the

constitutionality of the Utah statute is beyond question and citing to several previous

Utah Supreme Court cases.  Review of all of the cases cited to by the Utah Supreme

Court in the cases cited to in *Kell* reveals, however, that the issue of an overly-broad

statute has never been actually substantively addressed by the state court.[68]  The Utah

Supreme Court cannot be said to have made a reasonable application of clearly

established federal law on an issue where it has never taken up the question at all.

     This fact was recognized by one member of the Utah Supreme Court.  In *Young*,

Justice Durham wrote a dissent acknowledging that

> [t]he lead opinion dismisses the issue without analysis, asserting that the
> court has previously considered such challenges. That assertion is incorrect.
> An examination of each of our death penalty cases since 1983, when Utah's
> capital murder statute, Utah Code Ann. § 76-5-202(1), was significantly
> amended, discloses that we have never addressed the question defendant
> now raises. I conclude that the current Utah scheme of statutory
> aggravating circumstances fails to meet federal constitutional requirements
> and is invalid on its face.

*Young*, 853 P.2d at 397.  Justice Durham based her conclusion on the fact that Utah's

aggravated murder statute was one of the most extensive in the nation—she surveyed all

of the aggravated murder statutes then operating in the nation, compiled a comprehensive

list of aggravators that they each contained, totaling twenty-two categories, and found

---

[68] These cases include *State v. Bishop*, 753 P.2d 439 (Utah 1988); *Andrews v. Morris*, 677
P.2d 81 (Utah 1983), *Andrews v. Morris*, 607 P.2d 816 (Utah 1980); *Pierre v. Morris*,
607 P.2d 812 (Utah 1980); *State v. Andrews*, 574 P.2d 709 (Utah 1977); *State v.
Codianna*, 573 P.2d 343 (Utah 1977); and *State v. Pierre*, 572 P.2d 1338 (Utah 1977).

that Utah's statute contained seventeen of those.  *Id.* at 399.  In addition to containing more aggravators than any other state, Justice Durham concluded that it excluded "almost no intentional killings at all."  *Id.*  On this basis, she concluded that "Utah's statutory definition of capital homicide excludes so few categories and so few actual murders that it has in effect returned the state to where it was before *Furman* was decided; there is no meaningful narrowing of the class of death-eligible murders pursuant to objective, rational standards."  *Id.*  Justice Durham identified where the Utah court has made an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2), and how this has led to an unreasonable application of clearly-established federal law, § 2254(d)(1).

And still, the state court has steadfastly refused to review the breadth of the grossly expansive aggravated murder statute and its creation of the arbitrary and capricious imposition of the death penalty.  Most recently, the Utah Supreme Court stated that "since *Young*, we have reviewed claims that Utah's death penalty scheme insufficiently narrows the class of death-eligible offenses  . . . [and] we have never found it to be unconstitutional."  *State v. Maestas*, 299 P.3d 892, 987 (Utah 2012).  The cases cited to, however, include *Lovell*, *Kell*, and *Honie*, discussed above, which do not, in fact, address the issue, but, rather, merely reiterate the string cites the court typically relies on, but which provide no answer to the question presented.

The Eighth Amendment requires death penalty sentencing schemes to "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of

247

murder." *Zant*, 462 U.S. at 877.  In addition to narrowing, the statutes must provide "a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." *Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980) (internal citations omitted).  "[T]here is a required threshold below which the death penalty cannot be imposed . . . [and] the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular case meet the threshold." *Blystone v. Pennsylvania*, 494 U.S. 299, 308 (1990) (quoting *McCleskey v. Kemp*, 481 U.S. 279 (1987)).

This is where the Utah death penalty statute fails.  Having been expanded to encompass a broad array of circumstances, it does not provide the "meaningful basis" required to satisfy the standards of clearly established federal law.  The Utah Supreme Court refuses to make a proper determination of the insufficiency of the Utah death penalty scheme under the proper federal constitutional standards.  *Godfrey*, 446 U.S. at 427-28.  The breadth and variety of aggravators allowed under the statue result in an inability to distinguish between "the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Id.*  Therefore, there are no "rational criteria that narrow the decisionmaker's judgment." *Blystone*, 494 U.S. at 308.

Traditionally, when the merits phase is used as the narrowing mechanism, the requirement to prove an aggravator to establish eligibility for the death penalty has been determined to be enough of a check on the decisionmaker—the jury.  When, however, a state has an aggravated murder statute which encompasses virtually every homicide that

248

is committed within the state, the jury's role as decisionmaker is usurped. The question of whether the particular defendant should be singled out for the most severe punishment available is no longer a real choice. The decision to charge a particular defendant with a capital crime was made by the prosecutor, who, unilaterally, and without guidance or oversight, chose to single out the particular defendant from among the larger pool of death-eligible defendants. Without specific standards to guide their discretion, the process of deciding who is to be sentenced to death has been shielded from judicial review. *See Woodson* 428 U.S. at 303 (1976).

This creates an undue risk that the death penalty will be imposed where a lesser sentence may be appropriate. It allows arbitrary and capricious charging decisions, creates a substantial risk of variation between similar cases, and leads to the wanton and freakish imposition of the death sentence. *See Furman*, 408 U.S. at 310 (opinion of Justice Stewart). "[D]iscretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189.

The over-breadth of the Utah death penalty statutes brings virtually every homicide within the umbrella of aggravated murder and fails to narrow the class of defendants who may be subject to the ultimate penalty. This results in a system which violates the Eighth Amendment's protections against cruel and unusual punishment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendments.

249

## CLAIM THIRTEEN

**I.    MR. HONIE'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN HIS CASE.**

Mr. Honie's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Honie's merits and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of his guilt and his sentence, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978); *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973).

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003) (quoting *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002)).  In making this determination, the prejudicial impact of each allegation of error must be analyzed within the overall context.  No single allegation of error is severable from any other.  "[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the errors, it is impossible to conclude that substantial rights were not affected." *United States v. Wood*, 207 F.3d 1222, 1237-38 (10th Cir. 2000)

(quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).  This includes errors related to evidentiary rulings made under state law "which result in a denial of fundamental fairness."  *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983).

Mr. Honie incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition and the exhibits thereto.  In addition, Mr. Honie re-urges all objections, arguments, and claims of error made at trial, in direct appeal proceedings, and during post-conviction proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process.  Each of these errors deprived Mr. Honie of important constitutional rights, including but not limited to his right to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this Petition individually justifies reversal, when considered cumulatively these errors denied Mr. Honie his constitutional rights.  These constitutional violations warrant the granting of this petition without any determination of whether these violations substantially affected or influenced the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993).  Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless.  In

any event, these violations of Mr. Honie's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

## CLAIM FOURTEEN

## I.      THE DEATH PENALTY IS UNCONSTITUTIONAL BECAUSE IT IS CRUEL AND UNSUAL PUNISHMENT

Mr. Honie concedes that the United States Supreme Court has held that "the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." *Gregg* 428 U.S. at 187. The Court reached this conclusion because it believed that the death penalty could serve the "two principal social purposes" of "retribution and deterrence of capital crimes by prospective offenders." *Id.* at 183.  However, in the years since *Gregg*, a steady tide of empirical evidence has eroded these two justifications for the death penalty. *See, e.g.*, John J. Donohue & Justin Wolfers, *The Ethics and Emprics of Capital Punishment: Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794 (2005) (reviewing statistical studies concerning death penalty and finding "not just 'reasonable doubt' about whether there is any deterrent effect of the death penalty, but profound uncertainty").

Mr. Honie submits that the death penalty serves neither the goal of retribution nor the goal of deterrence, and it should therefore be abolished in deference to the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356

U.S. 86, 101 (1958).  Accordingly, Mr. Honie's death sentence is categorically cruel and unusual punishment in violation of the Eighth Amendment, and he is entitled to relief.

## V.     PRAYER FOR RELIEF

WHEREFORE Petitioner, Taberon Dave Honie, requests this Court to:

1. Order Respondent to provide the Court and parties with a complete record of all state and federal proceedings in Mr. Honie's case;

2. Take judicial notice of the certified record in Mr. Honie's prior proceedings as specified above in the Petition.

3. Order Respondents to file an Answer or other responsive pleading to this petition, showing cause why Mr. Honie is not entitled to the relief he seeks;

4. Order that Mr. Honie be granted leave to conduct discovery pursuant to Rule 6 of the Rules Governing § 2254 Cases and permit him to utilize the processes of discovery set forth in Federal Rules of Civil Procedure, Rules 26-37, to the extent necessary to fully develop and identify the facts supporting his petition and any defenses raised by Respondent's Answer;

5. Order that upon completion of discovery, Mr. Honie be granted leave to amend the instant petition to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery;

6. Conduct an evidentiary hearing during which proof may be offered concerning the allegations of this petition and/or to rebut any affirmative defenses raised by Respondent;

6. Allow Mr. Honie the opportunity to seek leave to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases to include any additional evidence, relevant to either the issues presented herein or to rebut any defense raised by Respondent, that Mr. Honie might obtain through further investigation and discovery;

7. After full consideration of the issues raised in this petition, issue a writ of habeas corpus to have Mr. Honie brought before the Court to the end that he may be immediately discharged from his unconstitutional confinement and restraint;

8. In the alternative, issue a writ of habeas corpus to have Mr. Honie brought before the Court to the end that he may be relieved from his unconstitutional convictions and sentences, including his sentence of death; and

254

9.  Grant such other relief as may be appropriate and to dispose of the matter as law and justice require.

Respectfully submitted this 18th day of May, 2015.

Jon M. Sands
Federal Public Defender
Therese Michelle Day
David Christensen
Office of the Federal Public Defender
for the District of Arizona


/s/ Therese M. Day
Therese Michelle Day
Assistant Federal Public Defender
Counsel for Petitioner

255

## VI.   VERIFICATION OF PETITION

I, Therese M. Day, declare under penalty of perjury that the following information

is true and correct to the best of my knowledge:

1.   I am the attorney appointed as lead counsel for Petitioner in this matter.  I am admitted to practice in the State of Georgia, and am admitted *pro hac vice* to appear before this Court.  I am an attorney with the Office of the Federal Public Defender for the District of Arizona.

2.   Petitioner is confined and restrained at Utah State Prison in Draper, Utah.

3.   I prepared this Petition for Writ of Habeas Corpus, together with co-counsel David Christensen.

3.   This Petition was prepared with Petitioner's knowledge and authorization.  I have read the foregoing Petition to verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  I make this verification because Petitioner is incarcerated in a county different from the one in which my office is located, and because the truth and accuracy of the facts contained herein are more within my knowledge than that of Petitioner's.

Executed this 18th day of May, 2015, in Phoenix, Arizona.

/s/ Therese M. Day
Therese Michelle Day
Assistant Federal Public Defender

256

## VII.   CERTIFICATE OF ELECTRONIC FILING AND SERVICE

I hereby certify that on this 18th day of May, 2015, I electronically transmitted the

foregoing Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 to the Clerk's

Office Using the CM/ECF System for filing and transmittal of a Notice of Electronic

Filing to the following CM/ECF registrants:

> Thomas B. Brunker
> Assistant Attorney General
> 160 East 300 South, Sixth Floor
> P.O. Box. 140854
> Salt Lake City, Utah 84114-0854

> Sharel Reber
> Assistant Attorney General
> Heber Wells Bldg.
> 160 East 300 South, 6th Floor
> P.O. Box 140854
> Salt Lake City, Utah 84114-0854

> /s/ Chelsea Hanson
> Legal Assistant

257